IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| BEATRICE WILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  3:05-CV-1019-W |
| | ) | |
| SEARS, ROEBUCK & CO., | ) | |
| | ) | |
| Defendant. | ) | |

SEARS, ROEBUCK AND CO.'S BRIEF IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant designated as Sears, Roebuck & Co., ("Sears" or "defendant") submits the following as its Brief in Support of its Motion for Summary Judgment:

## I.    STATEMENT OF THE CASE

Beatrice Willis ("plaintiff' or "Willis"), an African-American female, was employed at Sears as a sales associate in its appliance department in Auburn, Alabama.  At the end of October, 2004, Sears discovered that Willis had given Sears' $65.00 service coupon to several customers who were not eligible to receive it.  This was a clear violation of Sears' unauthorized discount policy.  Consequently, Sears terminated Willis' employment on November 1, 2004.

On April 28, 2005, Willis filed an EEOC charge alleging solely that Sears discriminated against her based on her race when it terminated her employment.  The EEOC found no cause to believe that discrimination had occurred and dismissed the charge.  On October 24, 2005, Willis filed this lawsuit.  She alleges a single claim of race discrimination under Title VII of the Civil Rights Act of 1964 based exclusively on her termination and seeks back pay, reinstatement, and "other relief as deemed appropriate."  (Compl. ¶¶ 6, 12).  Sears filed its Answer to Willis'

Complaint on December 5, 2005, denying that it discriminated against Willis and setting forth several affirmative defenses. On or about July 6, 2006, Willis amended her complaint to include a claim for punitive damages. Sears filed an Answer to the plaintiff's Amended Complaint denying that the plaintiff is entitled to punitive damages or any relief whatsoever. The plaintiff is not seeking any compensatory damages or relief for mental anguish or emotional distress. (Comp. ¶ 12; Amended Compl.; Pltf. depo. p. 194:8-22). For the reasons set forth below, the plaintiff's claim is due to be dismissed.

## II.     UNDISPUTED STATEMENT OF FACTS

### A.     Sears and Its Employment Policies.

Sears operates a retail establishment located in Auburn, Alabama, where it sells fashion merchandise, hardware, paint, automotive supplies, home appliances, home fashions, home electronics, and office equipment. (Gandy Decl. ¶ 3; Mason Decl. ¶ 3). Sears employs sales associates to work in these various departments. (Gandy Decl. ¶ 4; Mason Decl. ¶ 4). Sears maintains an Equal Employment Opportunity Policy that prohibits discrimination based on an employee's race, sex, national origin, religion, disability or other protected characteristics with regard to hiring, termination, discipline, promotions, and other employment actions. (Pltf. depo. p. 228:8-16, Ex. 3). This policy is published in Sears' Associate Handbook and is distributed to all of its employees. (Pltf. depo. pp. 228:8-16, Ex. 3).

Sears also has a policy that strictly prohibits employees from giving customers unauthorized discounts. (Pltf. depo. pp. 69:1-70:10, Ex. 3; Gandy Decl.¶ 5; Mason Decl. ¶ 6; Reese Decl. ¶ 4; Darby Decl. ¶ 5; Dodson Decl. ¶ 5; Landers Decl. ¶ 4). This includes applying a coupon to a transaction when the customer is _not_ _eligible_ to receive the discount stated on the coupon. (Pltf. depo. p. 70:6-10, Ex. 3; Reese Decl. ¶ 4; Gandy Decl. ¶ 5; Mason Decl. ¶ 6;

Darby Decl. ¶ 5; Dodson Decl. ¶ 5; Landers Decl. ¶ 4).  Sears' Associate Handbook specifically states that giving unauthorized discounts to a customers is unacceptable and constitutes unethical behavior and that associates who violate this policy may be terminated.  (Pltf. depo. pp. 69:1-70:10, Ex. 3; Gandy Decl. ¶ 5; Mason Decl. ¶ 6; Reese Decl. ¶ 4; Darby Decl. ¶ 5; Landers Decl. ¶ 4; Dodson Decl. ¶ 5).  All sales associates receive and are trained on the policies in this handbook.  (Pltf. depo. p. 67:12-23; Gandy Decl. ¶ 5; Mason Decl. ¶ 6; Reese Decl. ¶¶ 4, 5; Lawrie Decl. ¶ 5; Darby Decl. ¶ 5; Dodson Decl. ¶ 5; Landers Decl. ¶ 5).

Sears also has a company records policy that prohibits its employees from obtaining and using information from Sears for any non-business related reason concerning its customers, associates, and suppliers.  (Pltf. depo. p. 70:11-20, Ex. 3).  Violation of this policy is cause for termination.  (Plft. depo. pp. 70:11-71:1; Mason Decl. ¶ 26).  This policy is likewise published in Sears' Associate Handbook.  (Pltf. depo. p. 70:11-20, Ex. 3; Mason Decl. ¶ 26).

### B.   Willis' Employment With Sears.

Willis began working for Sears in September of 1994 as a sales associate at Sears' Auburn store.  (Pltf. depo. p. 44:3-5; Mason Decl. ¶ 7, Ex. B).  She was initially hired to work part-time selling vacuums.  (Pltf. depo. p. 46:19-23; Mason Decl. ¶ 7; Reese Decl. ¶ 28).  In 1997, the plaintiff began working full-time.  (Pltf. depo. p. 46:15-18).  In 2000, Willis was promoted to a full-time position in the appliance department.  (Pltf. depo. pp. 49:7-22; Mason Decl. ¶ 7).  Her duties consisted of selling major home appliances (including washers, dryers, refrigerators, ovens, and dishwashers), assisting customers, running the register, monitoring Sears' promotions and discounts of merchandise, keeping the sales area clean, stocking, and unpacking appliances and the accessories that went with these appliances.  (Pltf. depo. pp. 52:10-

53:11;  Mason Decl. ¶ 9; Reese Decl. ¶ 32; Darby Decl. ¶ 10; Dodson Decl. ¶ 4 Landers Decl. ¶ 3).

At all times during her employment, the plaintiff worked on straight commission. (Pltf. depo. pp. 47:6-18, 63:20-64:4). Plaintiff worked as a sales associate in the appliance department in Auburn from 2000 until her termination on November 14, 2004. (Pltf. depo. pp. 61:3-6; Gandy Decl. ¶ 7; Mason Decl. ¶ 8). At the time of her termination, Kenny Reese (white) was the Store General Manager ("SGM"), Terry Gandy (white) was the Loss Prevention Manager, John Lawrie (white) was the Hardlines Manager (which includes the appliance, electronics, lawn and garden, fitness, vacuums, and hardware departments) and Byron Mason (African-American) was the Softlines Manager (which includes apparel, home fashions, luggage and the shoe departments). (Pltf. depo. pp. 120:12-121:10; Reese Decl. ¶ 3; Gandy Decl. ¶ 6; Mason Decl. ¶ 13; Lawrie Decl. ¶ 3). In November 2004, the appliance sales associates included Beatrice Willis (African-American), Denise Smith (African-American), Jackie Dodson (African-American), Carolyn Landers (white), and Merle Miller (white). (Pltf. depo. pp. 59:1-60:14, Gandy Decl. ¶ 7; Reese Decl. ¶ 14; Dodson Decl. ¶2, 16; Landers Decl. ¶ 17).

During her employment with Sears, Willis received a copy of Sears' Associate Handbook, which contains a copy of Sears' unauthorized discount policy. (Pltf. depo. p. 67:12-23, Ex. 3). Willis was well aware that giving customers discounts using coupons for which the customer did not qualify was a violation of this policy and was cause for termination. (Pltf. depo. pp. 69:1-70:10, Ex. 3).

## C.    Sears' Service Coupon.

Sears has a $65.00 coupon that it provides to its customers who have received a service call from a Sears technician but have declined to have their appliance repaired by the technician

because they would rather replace the item than pay for the repair. (Pltf. depo. pp. 75:1-76:22, Ex. 4; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie Decl. ¶ 8). These coupons are different than most other Sears coupons because they are only available to *specific customers*. (Pltf. depo. p. 76:3-10; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie ¶ 8). These service coupons are distributed to customers by Sears' service technicians. (Pltf. depo. pp. 75:16-76:10; Gandy Decl. ¶ 10; Reese Decl. ¶ 7). Sears offers the $65.00 discount to these customers as an incentive for them to purchase their replacement item at Sears rather than one of Sears' competitors. (Pltf. depo. pp. 75:12-76:2, Ex. 4; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie Decl. ¶ 8). *Only customers who receive a service call and decline a repair* are eligible to receive Sears' service coupon. (Pltf. depo. p. 76:7-22, Ex. 4; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie Decl. ¶ 8; Darby Decl. ¶ 8; Landers Decl. ¶ 7; Dodson Decl. ¶¶ 8,10). *No other customers* are permitted to receive this discount. (Pltf. depo. p. 76:14-22, Ex. 4; Gandy Decl. ¶ 10; Reese Decl. ¶ 7; Lawrie Decl. ¶ 8; Darby Decl. ¶ 8; Landers Decl. ¶ 7; Dodson Decl. ¶ 8). Sears' service coupon clearly instructs the sales associates to award the discount to customers who have received a service call and have declined a repair; it also specifically instructs the sales associates to *collect and destroy* the coupon once it is used. (Pltf. depo. pp. 76:14-77:9, Ex. 4; Gandy Decl. ¶ 11, Ex. B; Reese Decl. ¶ 8; Lawrie Decl. ¶ 9; Darby Decl. ¶ 8; Landers Decl. ¶ 7).

### D.    Plaintiff's Misuse of Sears' Service Coupon.

In October 2004, Willis gave several customers a discount using Sears' $65.00 service coupon even though these customers were *not eligible* to receive this discount. (Pltf. depo. pp. 81:4-82:6, 89:9-114:21, Ex. 5, 204:8-14; Gandy Decl. ¶ 14; Reese Decl. ¶ 10). Specifically, Willis took a service coupon from the register that had already been used for one customer and gave it to several customers whom she knew had not received a service call and declined a

service repair. (Pltf. depo. pp. 81:4-82:6, 89:9-114:21, Ex. 5, 204:8-14; Gandy Decl. ¶ 15). Willis awarded the discounts to these individuals despite the fact that Sears has a clear policy (which she had received) prohibiting her actions and even though the terms of the discount were clearly stated on the coupon. (Pltf. depo. pp. 82:3-6, 204:8-14, Exs. 3 and 4; Gandy Decl. ¶ 15. Willis knew that Sears' coupons included terms defining who was eligible to receive the discount and to what items the coupon could be applied. (Pltf. depo. p. 64:15-65:5). None of Sears' managers ever instructed her to use the service coupon or any other coupon to close a sale if the customer was not eligible for the discount. (Pltf. depo. p. 84:14-20; Reese Decl. ¶ 9; Lawrie Decl. ¶ 10; Gandy Decl. ¶ 35; Mason Decl. ¶ 21).

E.    **Sears' Investigation and Plaintiff's Termination for Misusing the Service Coupon.**

On or about October 28, 2004, Joel Smith, an independent contractor who handled Sears' deliveries for the appliance department, informed Terry Gandy (Sears' Loss Prevention Manager) and John Lawrie (Sears' Hardlines Manager) that he thought Willis was providing unauthorized free delivery to Sears' customers. (Pltf. depo. pp. 123:18-124:13; Gandy Decl. ¶ 12; Lawrie Decl. ¶ 11). This was a violation of Sears' unauthorized discount policy. (Pltf. depo. p. 124:14-17; Gandy Decl. ¶ 12). Gandy immediately began investigating this allegation. (Gandy Decl. ¶ 12; Pltf. depo. p. 188:4-22). During his preliminary investigation, Gandy noticed that Willis had given numerous customers an unusually high number of $65.00 discounts. (Gandy Decl. ¶ 14). Gandy suspected that these discounts were related to Joel Smith's allegations regarding the delivery fees because Sears charged $65.00 for out of area delivery. (Pltf. depo. p. 120:7-11; Gandy Decl. ¶ 14; Lawrie Decl. ¶ 12). Consequently, Gandy pulled the

journal tapes associated with these transactions to determine if this was in fact the case.[1] (Gandy Decl. ¶ 14). However, when Gandy reviewed the journal tapes associated with Willis' transactions, he discovered that these discounts were actually awarded to customers using Sears' service coupon. (Gandy Decl. ¶ 12). Specifically, the journal tapes and associate summaries showed that Willis had used the service coupon approximately 16 times within the last 30 days. (Gandy Decl. ¶ 15; Pltf. depo. pp. 89:9-114:21, Ex. 5). This was highly suspicious, especially for such a small store; a store the size of the Auburn store usually has only a total of 4 to 8 service coupon markdowns in the entire department per month. (Gandy Decl. ¶ 15; Reese Decl. ¶ 10). Thus, Gandy contacted the service department and confirmed that approximately 15 of these customers had not received a service call and therefore were not eligible for this discount. (Gandy Decl. ¶ 15; Pltf. depo. p. 188:4-22). Gandy discussed these findings with Kenny Reese, the SGM. (Gandy Decl. ¶ 16; Reese Decl. ¶ 15). Gandy also contacted Sears' corporate human resources consultants located at Sears' corporate office in Illinois. (Gandy Decl. ¶ 16; Reese Decl. ¶ 15; Pltf. depo. pp. 144:2-5, 243:8-16). The HR consultant advised Gandy to interview Willis to see if she could explain these unauthorized discounts. (Gandy Decl. ¶ 16).

On November 1, 2004, Gandy and Nina Fitzwater, who was the HR Lead at the Auburn store at the time, questioned Willis about why she had awarded the service coupon to customers who were not entitled to it. (Pltf. depo. pp. 125:23-127:12; Gandy Decl. ¶ 17). Willis admitted to Gandy and Fitzwater that she had given the service coupon to customers who were not eligible to receive it. (Pltf. depo p. 126:5-17; Gandy Decl. ¶ 17). The plaintiff's only explanation was

---

[1]     The journal tapes resemble receipts and provide details for each transaction, including the customer's name, the sales person's associate number, and the bar code number pertaining to any coupons that the associate used. (Gandy Decl. ¶ 14; Pltf. depo. p. 91:2-22, Ex. 5). Examining the bar code numbers on the journal tapes is the only way Sears can determine exactly which coupon the sales associates used to give the discounts. (Gandy Decl. ¶ 14; Pltf. depo. pp. 65:6-67:11, 118:1-119:2).

that other sales associates may have used her sales number to complete some of these transactions and that other sales associates in her department were also misusing the service coupon.[2] (Pltf. depo. pp. 126:5-127:12). At no time did Willis identify any one by name. (Pltf. depo. pp. 126:5- 127:12, 211:9-22). Willis was given the opportunity to write a statement regarding her misuse of the coupon. (Pltf. depo. pp. 127:13-128:12; Gandy Decl. ¶ 17). The plaintiff would only write that she had been advised that the service coupon was only to be given to customers who had declined to have their appliance repaired.[3] (Pltf. depo. pp. 127:13-128:12, Ex. 6; Gandy Decl. ¶ 17). The plaintiff told Gandy and Fitzwater that "this was BS and she could get a job selling anywhere." (Pltf. depo. p. 133:17-23; Gandy Decl. ¶ 17).

Based on Gandy's investigation and Willis' admission that she had misused the service coupon, Sears' corporate HR consultant, Reese, and Gandy made the decision to terminate Smith for awarding Sears' service coupon to customers who were not eligible for it. (Gandy Decl. ¶ 18; Reese Decl. ¶ 12; Pltf. depo. pp. 131:22-132:3, 143:9-144:5). Gandy and Reese met with Willis that same day. (Pltf. depo. pp. 131:14-132:3; Gandy Decl. ¶ 19). Reese informed the plaintiff that Sears was terminating her employment because she had given several customers unauthorized discounts using Sears' service coupon. (Pltf. depo. p. 131:14-132:3; Gandy Decl. ¶ 19; Reese Decl. ¶ 12).

---

[2]     Sears denies that Willis ever stated during this meeting, or at any other time, that other sales associates may have completed some of these transactions under her sales number. However, Sears has identified this testimony as undisputed for summary judgment purposes only as summary judgment requires the facts to be viewed in a light most favorable to the non-moving party.

[3]     Interestingly, the plaintiff did not include in her statement that other sales associates may have rung some of these sales under her associate number. (Pltf. depo. p. 127:13-128:12, Ex. 6).

Gandy also investigated the remaining associates in the appliance department to determine whether any other sales associates had misused the service coupon. (Gandy Decl. ¶¶ 20-21; Pltf. depo. pp. 119:11-17, 188:4-190:9). Gandy reviewed the same documents for the same time period as he did for Willis. (Gandy Decl. ¶ 21; Pltf. depo. p. 188:4-22). Gandy's investigation revealed that associate <u>Smith</u> (black) had completed approximately <u>nine</u> transactions using the service coupon during this time frame, associate <u>Dodson</u> (black) had completed <u>four</u> sales transactions using the $65.00 service coupon, associate <u>Landers</u> (white) had completed <u>one</u> transaction using the $65.00 service coupon, and associate <u>Miller</u> (white) had completed <u>none</u>. (Pltf. depo. pp. 188:4-190:9; Gandy Decl. ¶¶ 22, 25, Exs. F, G, and H; Reese Decl. ¶ 19). Gandy subsequently contacted Sears' service department to verify whether Smith's, Dodson's, and Landers' customers, who had been awarded the service coupon discount, had in fact received a service call and therefore properly received the discount. (Gandy Decl. ¶¶ 22, 26, 27; Pltf. depo. pp. 188:4-190:9). The service department informed Gandy that only <u>two out of Smith's nine</u> customers <u>had received</u> a service call and were therefore eligible for the discount; that <u>three out of four of Dodson's</u> customers <u>had received</u> a service call; and that <u>Landers' one customer</u> to whom she had given the discount <u>had received</u> a service call. (Pltf. depo. pp. 188:4-190:9; Gandy Decl. ¶ 22, 26, and 27).

Based on this, Gandy and Fitzwater questioned both Smith and Dodson about their transactions. (Gandy Decl. ¶ 22, 28; Dodson Decl. ¶ 14). Smith <u>admitted</u> that she had given the coupon to customers who were <u>not eligible</u> for it and was unable to adequately explain her misconduct. (Gandy Decl. ¶ 22). Consequently, Sears terminated Smith's employment on November 14, 2004. (Gandy Decl. ¶ 24; Reese Decl. ¶ 18). Dodson, who is also African-American, did not generally admit or deny giving unauthorized discounts using the service

coupon but explained to Gandy and Fitzwater that her <u>one</u> <u>customer</u> who was reported <u>not</u> to have had a <u>service</u> <u>call</u> had obtained the coupon from her daughter who had received a service call. (Gandy Decl. ¶ 28, Ex. I; Dodson Decl. ¶14). The customer told Dodson that she was purchasing the appliance as a gift for her daughter; Dodson believed this to be a proper use of the service coupon. (Gandy Decl. ¶ 28, Ex. I; Dodson Decl. ¶ 14). Based on Dodson's explanation, Gandy and Reese concluded that Dodson had <u>not</u> misused the service coupon and should not be disciplined. (Gandy Decl. ¶ 29; Reese Decl. ¶ 22; Dodson Decl. ¶ 15; Pltf. depo. pp. 188:4-190:9).

Gandy and Reese likewise determined that neither Landers nor Miller should be disciplined because Gandy's investigation revealed that <u>neither</u> of these individuals had awarded the service coupon to customers who were not eligible to receive it. (Gandy Decl. ¶ 26; Reese Decl. ¶ 20; Pltf. depo. pp. 188:4-190:9).

Additionally, Gandy investigated all of the sales associates in the electronics department. (Pltf. depo. p. 119:11-23; Gandy Decl. ¶ 30). Both black and white associates were working in this department, and both black and white associates were investigated. (Gandy Decl. ¶ 30; Pltf. depo. pp. 188:4-190:9). Gandy's investigation revealed that <u>no</u> associates in the electronics department had completed any transactions using Sears' $65.00 service coupon. (Pltf. depo. pp. 119:11-23, 188:4-190:9; Gandy Decl. ¶ 30).

**F.    Willis' Allegation of Race Discrimination.**

Willis filed her EEOC charge on April 28, 2005, alleging a single claim of race discrimination based on her <u>termination</u>. (Pltf. depo. pp. 138:6-139:9, Ex. 7). On October 24, 2005, Willis filed a lawsuit claiming that Sears discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964. (Pltf. depo. p. 190, Ex. 11). Plaintiff's

Complaint and EEOC charge are limited <u>exclusively</u> to her <u>termination</u>. (Pltf. depo. pp. 138:6-139:9, Ex. 7, 190:10-191:12, Ex. 11).

The only reasons Willis believes that Sears terminated her because of her race are because: (1) she is outspoken; (2) Reese would not interact with her or other black employees; (3) Reese, on one occasion, called Willis away from the sales floor and asked her to call Lowe's to see what its delivery charge was; (4) Reese asked only about Landers' sales; (5) Reese hired Landers who is white when only blacks were working in the department before and scheduled Landers to work the hours that Willis wanted to work; and (6) on one occasion, Reese rang up sales for Landers when the department was shorthanded when Landers was the only associate working. (Pltf. depo. pp. 140:13-143:6, 233:1-235:13). Willis concedes, however, that she <u>does not know</u> if Reese <u>always</u> spoke to the <u>white associates</u>, if he rang up any sales for black associates, or if he asked about black associates' sales. (Pltf. depo. pp. 237:1-239:18, 240:19-242:1). Willis also admits that she was a full-time employee with more availability than Landers who was a part-time employee. (Pltf. depo. p. 239:12-18).

Reese did not treat Sears' black employees less favorably than Sears' white employees. (Mason Decl. ¶ 28, 35; Reese Decl. ¶ 29; Landers Decl. ¶ 16; Till Decl. ¶ 16; Darby Decl. ¶ 16; Dodson Decl. ¶ 31; Pltf. depo. pp. 237:1-239:18, 240:19-242:1). Reese did not always talk to the white associates either. (Reese Decl. ¶ 31; Landers Decl. ¶ 17; Till Decl. ¶ 17; Darby Decl. ¶ 18; Pltf. depo. pp. 237:1-239:18). Moreover, there is evidence that Reese regularly interacted with black employees. (Mason Decl. ¶ 30; Dodson Decl. ¶ 31). In fact, Reese had lunch with Byron Mason, who was Sears' Softlines Manager, several times per week when Reese worked at the Auburn store. (Reese Decl. ¶ 30; Mason Decl. ¶ 34; Darby Decl. ¶ 17; Lawrie Decl. ¶ 30, Pltf. depo. pp. 239:19-240:2). Mason is black. (Reese Decl. ¶ 30; Mason Decl. ¶ 34; Pltf. depo. pp.

239:19-240:2). Reese called other associates, including other straight commission white associates, away from the sales floor. (Reese Decl. ¶ 33; Landers Decl. ¶ 19; Darby Decl. ¶ 20; Dodson Decl. ¶ 25; Pltf. depo. p. 237:18-238:2). Additionally, white associates, including Landers, did not always receive the schedule they requested. (Lawrie Decl. ¶ 34; Landers Decl. ¶¶ 16, 24; Darby Decl. ¶ 24). Moreover, it was Lawrie's responsibility to make the schedule for the appliance department, not Reese's. (Lawrie Decl. ¶ 34; Reese Decl. ¶ 36.

Reese also promoted several black employees in his capacity as SGM, including Tammy Calhoun from Merchandising Associate to Merchandising Lead, Stacy Dumas from Softlines Lead to Automotive Manager, and Denise Smith from a part-time sales position in the vacuum department to a full-time position in the appliance department. (Reese Decl. ¶ 29; Lawrie Decl. ¶ 24; Mason Decl. ¶ 32, 33; Smith. depo. pp. 70:8-22, 81:7-82:7; Pltf depo. 240:4-18). Additionally, Willis herself testified that she believed Dodson, a black associate in appliances, had misused the service coupon but that Reese and Gandy did not terminate her. (Pltf. depo. pp. 242:8-243:2).

Reese and Gandy terminated several white persons for similar integrity issues like those involved in Willis' misconduct, including Michael Cunningham for attempting to give customers free delivery, and Christopher Pritchett and Brent Haney for re-ringing tickets to make their sales appear higher than they actually were. (Reese Decl. ¶ 40; Gandy ¶ 45; Mason Decl. ¶ 39; Lawrie Decl. ¶ 38; Pltf. depo. p. 242:2-7).

Shannon Bryant, a former Sears employee, also testified that she allegedly overheard Terry Gandy tell John Lawrie (who was the Hardlines Manager) that "we are finally getting rid

of the two black trouble makers in appliances."[4]    (Bryant depo. p. 70:7-11).  Bryant merely

assumes that Gandy was referring to Willis and Denise Smith.  (Bryant depo. p. 72:7-73:21).

Bryant testified that she resigned at the end of October, 2004, and that she overheard this remark

in September of 2004 prior to her resignation.  (Bryant depo. pp. 47:11-21, 71:6-9).  This was

well before Gandy learned or even suspected that Willis and Smith had misused the service

coupon.  (Bryant depo. p. 47:11-21, 72:2-3; Gandy Decl. ¶ 31, 33).  Bryant testified that she

thinks this comment had to do with the fact that Willis had called the corporate HR department

to complain about her schedule and that Smith was questioning management about how much

time she was supposed to work.  (Bryant depo. pp. 71:1-73:21).

It is undisputed that no one in management, including Terry Gandy, Kenny Reese, or

John Lawrie, ever told Willis that she was being terminated because of her race.  (Pltf. depo. p.

144:6-17; Reese Decl. ¶ 42; Gandy Decl. ¶ 51; Lawrie Decl. ¶ 40).  Likewise, Willis never heard

anyone in management ever say anything derogatory about African-Americans.  (Pltf. depo. p.

145:2-15; Reese Decl. ¶ 41; Gandy Decl. ¶ 50; Lawrie Decl. ¶ 39).  Willis understood that Sears

terminated her employment because she had used Sears' $65.00 service coupon to give

customers unauthorized discounts.  (Pltf. depo. pp. 131:14-132:3).  Plaintiff does not allege that

anyone was hired to replace her, and since plaintiff's termination, Sears has hired African-

Americans to work as sales associates in the appliance department.  (Mason Decl. ¶ 36; Lawrie

Decl. ¶ 31).

### G.    Plaintiff's Alleged Comparators.

Willis alleges that employees Stephanie Darby (white), Carolyn Landers (white), and

Merel Miller (white) misused the service coupon but were not terminated.  (Pltf. depo. pp. 155:6-

---

[4]    Both Gandy and Lawrie deny that Gandy ever made such a remark.  (Gandy Decl. ¶ 52; Lawrie Decl. ¶ 16).

23, 191:15-193:22).  Willis admits, however, that she does not have any facts to support her conclusion. (Pltf. depo. pp. 151:7-154:23, 156:3-18, 162:7-168:21, Ex. 9, 169:13-173:21, 175:4-11, 176:15-18, 177:9-15, 178:2-186:9, Ex. 10, 188:4-190:9, 211:9-22, 218:1-219:8).  First, Willis does not have any evidence that when these associates allegedly used the service coupon, or any other coupon, that the customers were not eligible for it.  (Pltf. depo. pp. 151:7-154:23, 156:3-10, 162:7-168:21, Ex. 9, 178:2-186:9, Ex. 10, 218:1-19:8).  Furthermore, the plaintiff does not have any evidence that management suspected that any other sales associates had misused the service coupon.  (Pltf. depo. pp. 156:3-18, 162:7-168:21, Ex. 9, 169:13-173:21, 177:9-15, 176:15-18, 178:2-186:9, Ex. 10, 211:9-22, 218:1-219:8).  The plaintiff specifically concedes that she does not even know who else was investigated for abuse of the service coupon or what Gandy's investigation showed. (Pltf. depo. p. 119:11-20, 188:4-190:9).

Willis contends that Darby gave Sears' service coupon to customers who were not entitled to it and that Darby was not terminated.  (Pltf. depo. p. 155:6-23).  Willis alleges that while she saw Darby use the service coupon, she does not know if the customer had received a service call and was eligible for the discount.  (Pltf. depo. p. 156:9-18).  Additionally, Willis stated that she does not know if anyone else was present or was aware that Darby was "misusing" the service coupon (Pltf. depo. pp. 156:19-157:1).  Willis also relies on the associate summaries that Smith, another sales associate who was also terminated for misusing the coupon, took from Sears (at Willis' request) in violation of Sears' company records policy.  (Pltf. depo. pp. 162:7-168:21, Ex. 9, 218:11-219:1).  These associate summaries fail to show that Darby awarded the service coupon to customers who were not eligible to receive them, or even that the transaction involved the service coupon at all.  (Pltf. depo. p. 162:7-168:2, Ex. 9).  It is undisputed that these documents do not identify which coupon was used in these transactions but

only the total dollar amount of the discount that was given to the customer. (Pltf. depo. p. 120:1-4, 163-165, 167, 181).[5] More importantly, Willis, clearly admits that she does not know if any of these customers listed in these associate summaries had a service call and were therefore eligible for these discounts or if management was aware if these transactions. (Pltf. depo. pp. 162:7-168:21, Ex. 9).

In addition to the service coupon, Willis also claims that Darby gave Gandy a discount using two $30 coupons. (Pltf. depo. p. 151). These transactions did not involve the service coupon, which are only available to certain customers, and Willis readily concedes that she does not know what the terms of these coupons were or if Darby used them inappropriately. (Pltf. depo. p. 152, 153).

There is likewise no evidence that anyone in management was aware of or believed that Darby had allegedly misused the service coupon. (Pltf. depo. pp. 162:7-168:21, 176:15-18, Ex. 9, 188:4-190:9, 211:9-15, 218:1-219:8; Gandy Decl. ¶¶ 25, 26; Reese Decl. ¶¶ 19, 20). Although Willis claims she saw Darby "misuse" the service coupon, she never reported it to management. (Pltf. depo. pp. 125-27, 211:9-15). Moreover, Gandy's investigation undisputedly established that Darby had not completed any transactions using the service coupon during the investigated time period. (Gandy Decl. ¶¶ 25, 26, Ex. G; Pltf. depo. pp. 188:4-190:9). In fact, Darby was not even working as a sales associate when Gandy investigated the misuse of the service coupon. (Gandy Decl. ¶ 20; Darby Decl. ¶ 30; Pltf. depo. p. 176:15-18).

Willis also concludes without any factual basis that Carolyn Landers misused Sears' service coupon. (Pltf. depo. p. 155:6-23). Willis again relies on associate summaries related to

---

[5]     The plaintiff herself states that the receipts/journal tapes are the only means of identifying what coupon was used and that she does not have these documents. (Plft. depo. p. 165-167).

Landers' transactions to support her allegation. (Pltf. depo. pp. 178:2-186:9, Ex. 10, 218:1-219:8). The plaintiff offers <u>no</u> <u>evidence</u> that these customers were <u>not</u> <u>eligible</u> for the discount. (Pltf. depo. pp. 178:2-186:9, Ex. 10, 218:1-219:8). Willis herself states that she does not know if any of Landers' customers, including the ones listed on the associates summaries, actually had a service call. (Pltf. depo. pp. 178:2-186:9, Ex. 10, 219:2-8).

Moreover, there is no evidence that management was aware that Landers had allegedly misused the service coupon. (Pltf. depo. pp. 170:2-23, 172:3-10, 173:5-8, 219:2-8). Willis claims that on one occasion she saw Landers improperly use the service coupon. (Pltf. depo. pp. 169:21-170:4). Willis, however, specifically testified that management "did not come over there" and that no one in management was aware of this transaction. (Pltf. depo. p. 173:5-8). Additionally, Willis repeatedly testified in her deposition that she did not know if management had any knowledge as to whether Landers misused the service coupon in any transactions, including the transactions listed in Landers' associate summaries. (Pltf. depo. p. 178:2-186:9, 219:2-8). Willis admits that neither she nor anyone else to her knowledge ever told Gandy that Landers had allegedly misused the coupon. (Pltf. depo. p. 175:4-11). Furthermore, Gandy's investigation revealed that Landers had <u>not</u> misused the service coupon. (Gandy Decl. ¶¶ 21, 25, 26; Reese Decl. ¶ 20; Pltf. depo. pp. 177:9-13, 188:4-190:9). Additionally, it is undisputed that the one customer to whom Landers awarded this discount <u>did have a service call</u>. (Gandy Decl. ¶ 26; Pltf. depo. p. 177:9-13, 188:4-190:9).

## III.    SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith" when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the

defendant establishes that it is entitled to a judgment as a matter of law, the burden shifts to the plaintiff to show that summary judgment is not appropriate. Fed. R. Civ. P. 56(e). The plaintiff may not rest upon the mere allegations in his complaint, but rather, must set forth "specific facts" showing a "genuine issue" for trial. Id. To create a "genuine issue" for Rule 56 purposes, a plaintiff must produce "'significant probative evidence'" showing an actual dispute as to a material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (quoting First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290 (1968)). "Significant probative evidence" is evidence upon which "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252 (emphasis added).

In employment discrimination cases such as this one, the plaintiff, to avoid summary judgment, "must present specific nonconclusory facts that would support a jury verdict against the particular defendant on the issue of discriminatory intent." Ratliff v. DeKalb County, Georgia, 62 F. 3d 338, 341 (11th Cir. 1995). The plaintiff "cannot rely on attenuated possibilities that a jury would infer a discriminatory motive." Pace v. Southern Ry. Sys., 701 F. 2d 1283, 1291 (11th Cir.), cert. denied, 464 U.S. 1018 (1983). Instead, she "must come forward with sufficient evidence to establish a *prima facie* case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact." Id. See, e.g., Maniccia v. Brown, 171 F. 3d 1364 (11th Cir. 1999); Standard v. A.B.E.L. Serv., Inc., 161 F. 3d 1318 (11th Cir. 1998); Raney v. Vinson Guard Serv., Inc., 120 F. 3d 1192 (11th Cir. 1997); Holifield v. Reno, 115 F. 3d 1555 (11th Cir. 1997).

The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The law is well settled that "'conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.'" Young v. General Foods Corp., 840 F. 2d 825, 830 (11th Cir. 1988), cert. denied, 488 U.S. 1004 (1989)(quoting Grigsby v. Reynolds Metals Co., 821 F. 2d 590, 597 (11th Cir. 1987)). See generally Clay v. Equifax, Inc., 762 F. 2d 952, 959 (11th Cir. 1985) (a "broad, conclusory allegation . . . without more is not sufficient to withstand a motion for summary judgment").

Here, the plaintiff's claim cannot withstand summary judgment. She has completely failed to offer "significant probative evidence" showing an actual dispute of material fact as to Sears' reason for terminating her employment. Consequently, summary judgment is warranted.

## IV.    ARGUMENT

### A.    Willis Cannot Establish that Sears Actually and Intentionally Discriminated Against her Because of her Race.

In a disparate treatment case such as this one, the plaintiff must prove "intentional discrimination" to prevail. Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 256; see also Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 153 (2000) (the "ultimate question" in every disparate treatment case "is whether the plaintiff was the victim of intentional discrimination.") The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical" in disparate treatment cases. Teamsters v. United States, 431 U.S. 324, 335-36 n.15 (1977). See also United States Postal Service v. Aikens, 460 U.S. 711, 715 (1983); Clark v. Huntsville City Bd. of Educ., 717 F. 2d 525, 528-29 (11th Cir. 1983). The Supreme Court has also held that "discriminatory intent" in a discrimination case "means actual motive; it is not a

legal presumption to be drawn from a factual showing of something less than actual motive." Pullman-Standard v. Swint, 456 U.S. 273, 289-90 (1982).

To prove a case of intentional discrimination, "[p]laintiffs can present direct evidence, statistical evidence or circumstantial evidence (i.e., the McDonnell Douglas framework)." Verbraeken v. Westinghouse Elec. Corp., 881 F. 2d 1041, 1045 (11th Cir. 1989). The analytical framework and burden of production vary depending on the proof method chosen. Standard v. A.B.E.L. Services, Inc., 161 F. 3d 1318, 1330 (11th Cir. 1998). As shown below the plaintiff cannot succeed under any one of these methods.[6] Therefore, summary judgment is appropriate.

### B.    Willis Cannot Prove Intentional Discrimination Through Direct Evidence.

The Eleventh Circuit has repeatedly recognized that "[o]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Richardson v. Dougherty County, 2006 WL 1526064 (11th Cir. 2006) (emphasis added) (quoting Akouri v. Fla. Dep't of Transp., 408 F. 3d 1338, 1347 (11th Cir. 2005)). Thus, a statement constitutes direct evidence only when there is no other reasonable interpretation for the statement than one of discriminatory intent. See Richardson , 2006 WL 1526064 (11th Cir. 2006). Furthermore, it is well settled that the alleged direct evidence must be linked in the actual employment decision. Bass v. Bd. of County Commissioners, 256 F. 3d 1095, 1105 (11th Cir. 2001) ("[R]emarks unrelated to the decision-making process itself are not direct evidence of discrimination."); See Standard v. A.B.E.L. Services, Inc., 161 F. 3d 1318, 1329 (11th Cir. 1998) (concluding that there was no nexus between the comment that "older people have more go wrong" and the employment decision to prove discriminatory intent based on direct evidence); Riley v. Birmingham Board of Education,

---

[6]    Plaintiff does not allege any statistical evidence in this case.

2005 WL 2981869 (11th Cir. 2005) (holding that the decision-maker's comment that "we have to take care of our own . . . people are going to look at us by our skin color," was not direct evidence of discrimination because it was not made during the decision-making process).

The plaintiff asserts that Shannon Bryant, a former Sears employee who did not even work in the appliance department and who was not involved in the investigation or termination of Willis, allegedly overheard Gandy remark to Lawrie that "we are finally getting rid of the two black trouble makers in appliances." (Bryant depo. p. 70:7-11). Even if Gandy made this remark, which he denies, Bryant merely assumes that Gandy was referring to Willis and Smith. (Bryant depo. p. 70:7). She, however, has no evidence to support her conclusion. (Bryant depo. p. 72:7-73:21). Additionally, Bryant testified that Gandy allegedly made this comment in *September 2004*. (Bryant depo. p. 71:6-9). This was well *before* Gandy had even <u>begun</u> <u>his</u> <u>investigation</u> into the misuse of the service coupon or even <u>suspected</u> that anyone in the appliance department was giving customers unauthorized discounts using Sears' service coupon. (Pltf. depo. p. 121:12-17, 125:6-4; Gandy Decl. ¶¶ 12-16; Bryant depo. pp. 47:11-21). Thus, the plaintiff cannot possibly contend that this vague  comment was related to the decision-making process. See Jones v. BE&K Engineering, 2005 WL 1995425 *2 (11th Cir. 2005)("In order to constitute direct evidence, the evidence must directly relate in time and subject to the adverse employment actions at issue.").

Moreover, this alleged statement requires an inference and presumption that Sears terminated the plaintiff *because* of her race. See Richardson v. Dougherty County, 2006 WL 1526064 (11th Cir. 2006) (holding that statements allegedly made by the defendant including that it was not going to accommodate his religion, that he needed to find another religion or another job, and that "You want every Saturday off. We're sick of this. I wish you would find

another job," did not prove discriminatory motive and therefore did not constitute direct evidence); Tippie v. Spacelabs Medical Inc., 2006 WL 1130809 (11th Cir. 2006) (finding that the decision-makers use of the phrase "not-native" in making the disputed hiring decision required an inference of discrimination based on the plaintiff's national origin rather than her language abilities). Bryant testified that she believed that Gandy made this remark because Willis had called the HR hotline to complain about her schedule and because Smith was also questioning management about her schedule. (Bryant depo. p. 72:7-73:21). Thus, according to Bryant herself, this alleged comment was made in response to Willis' and Smith's complaints about their work hours and not because of their race. Therefore, this vague remark, which obviously has no connection to the termination decision, cannot possibly establish discriminatory intent. This is especially true in view of the fact that Gandy and Reese decided to retain a black associate (Jackie Dodson) who had a questionable transaction involving the same service coupon, that Reese promoted several African-Americans, and that Gandy and Reese both participated in the decision to terminate several white employees for similar integrity issues. (Pltf. depo. p. 186:10-187:15, 242:2-243:3; Bryant depo. p. 74:12-21; Gandy Decl. ¶¶ 27-29, 45; Reese Decl. ¶¶ 20-22, 30, 40). Consequently, the plaintiff cannot establish a claim of intentional discrimination based on direct evidence.

C.  **Willis Cannot Prevail on Her Race Discrimination Based on Circumstantial Evidence.**

Willis likewise cannot establish that she was terminated because of her race based on circumstantial evidence.[7] Willis' claim fails under this method of proof for two reasons. First,

---

[7] Under the circumstantial evidence method of proof the Supreme Court held that a plaintiff must carry the initial burden of establishing a *prima facie* case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the defendant only has the burden of articulating or producing evidence, but not persuading, that the actions complained of were taken

Willis cannot establish a prima facie case of discrimination because she cannot identify any white employees who are similarly-situated to her who were treated more favorably. Namely, there is no evidence that any individual that Willis identifies misused the service coupon to give unauthorized discounts to customers or that Sears believed that any white employees misused the service coupon. Second, she cannot show that Sears' legitimate, non-discriminatory reason for her discharge--her blatant and admitted misuse of Sears' service coupon--was a pretext for intentional race discrimination. Sears is therefore entitled to summary judgment.

    1.    <u>Plaintiff cannot establish a prima facie case of race discrimination</u>.

To establish a prima facie case of racial discrimination based on disparate treatment using circumstantial evidence, a plaintiff must show that "(1) [she] belongs to a racial minority; (2) [she] was subjected to an adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [she] was qualified to do the job." <u>Holifield v. Reno</u>, 115 F. 3d 1555, 1561-62 (11th Cir. 1997); See <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F. 3d 1313, 1316 (11th Cir. 2003). Here, Smith cannot establish the third element of her prima facie case.

_____

for a "legitimate, nondiscriminatory reason." <u>Reeves</u>, 530 U.S. at 142; <u>Burdine</u>, 450 U.S. at 253. Once the defendant articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising out of the *prima facie* case "simply drops out of the picture." <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 510-11 (1993); see also <u>Burdine</u>, 450 U.S. at 255 n. 10 ("drops from the case"). This is true because once the defendant articulates a legitimate nondiscriminatory reason for its actions, the "nondiscriminatory reasons just as readily explain the difference in treatment." <u>Nix v. WLCY Radio</u>, 738 F. 2d 1181, 1186 (11th Cir. 1984).
    If the defendant succeeds in rebutting plaintiff's prima facie case, the plaintiff still must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Burdine</u>, 450 U.S. at 253; <u>see also Reeves</u>, 530 U.S. at 143. To do so, the plaintiff must present "concrete evidence in the form of <u>specific facts</u> which show that the defendant's <u>proffered reason</u> is mere <u>pretext</u>. Mere conclusory allegations and assertions will not suffice." <u>Earley v. Champion Int'l Corp.</u>, 907 F. 2d 1077, 1081 (11th Cir. 1990) (emphasis added).

The Eleventh Circuit has stated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Jones v. Bessemer Carraway Medical Center, 137 F. 3d 1306, 1311 (11th Cir.), opinion modified by 151 F. 3d 1321 (1998) (quoting Holifield v. Reno, 115 F. 3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Id. (internal quotations and citations omitted). *We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.*

Maniccia v. Brown, 171 F. 3d 1364, 1368-69 (11th Cir. 1999) (emphasis added). "[T]o meet the comparability requirement a plaintiff is required to show that [she] is similarly situated in all relevant respects to the non-minority employee." Silvera v. Orange Cty. School Bd., 244 F. 3d 1253, 1259 (11th Cir. 2001) (internal citations omitted). Where there are clear differences in either the *quantity* or *quality* of the acts of misconduct committed by the plaintiff and her alleged comparators, it cannot be said that they are "nearly identical." Silvera, 244 F. 3d at 1259. "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." Abel v. Dubberly, 210 F. 3d 1334, 1339 (11th Cir. 2000); see Jones v. Bessemer Carraway Med. Ctr., 137 F. 3d 1306, 1311 (11th Cir. 1998) ("[i]f plaintiff fails to identify similarly situated, non-minority employees who were treated more favorably, her case must fail because the burden is on her to establish her prima facie case.").

Here, Willis has failed to present any evidence that any white sales associates engaged in the same "quantity and quality" of misconduct but were not terminated. In fact, the plaintiff cannot establish that any white sales associates misused Sears' service coupon or any other coupon.[8] (Pltf. depo. pp. 162:7-168:21, Ex. 9, 178:2-186:9, Ex. 10, 188:4-190:9, 211:9-15,

---

[8] In Smith v. International Paper Co., 160 F. Supp. 2d 1335, 1340 (M.D. Ala. 2001), the plaintiff was terminated for falsifying his payroll records indicating that he had

218:1-219:8).  Willis unconvincingly alleges that Stephanie Darby, Carolyn Landers, and Merle
Miller all gave the service coupon to customers who were not eligible for it.  (Pltf. depo. pp.
155:6-23, 191:15-193:22).  The plaintiff, however, was unable to provide any specific facts
regarding these transactions, including whether the customer had a service call and whether
management was even aware of these alleged transactions.  (Pltf. depo. pp. 152:2-14, 153:8-17,
156:9-157:1, 162:7-168:21, Ex. 9, 169:21-171:1, 172:3-10, 173:5-8, 177:9-186:9, Ex. 10, 188:4-
190:9, 211:9-15, 218:1-219:8).[9]

Willis alleges that on one occasion she saw Darby use a service coupon.  (Pltf. depo. p.
156:9-18).  Willis testified, however, that she does not know if this particular customer had a
service call.  (Pltf. depo. p. 156:9-18).  She also admitted that she did not know if anyone else
saw Darby use the coupon.  (Pltf. depo. pp. 156:19-157:1).  Thus, at best, the plaintiff's evidence
merely shows that Darby used the coupon and not that she misused it.

The plaintiff also ineffectively relies on Darby's associate summaries that she had Denise
Smith take from Sears in violation of Sears' company records policy and that Willis produced
during the course of discovery in an effort to show that Darby also misused the service coupon.

---

attended certain training classes when he had not.  160 F. Supp. 2d at 1338.  The court held that
the plaintiff was not similarly situated to the white employees he identified as potential
comparators because the evidence showed that these individuals had not engaged in the alleged
misconduct.  160 F. Supp. 2d at 1343-45; See also Daniel v. Spectrum Stores, Inc., 381 F. Supp.
2d 1368, 1377 (M.D. Ga. 2005) (finding that the plaintiff was not similarly situated to the alleged
comparator for purposes of his sex discrimination claim because the evidence showed that the
plaintiff had missed a scheduled shift and the comparator had only objected to it); Rayborn v.
Auburn University, 350 F. Supp. 2d 954, 962 (M.D. Ala. 2004) (awarding summary judgment in
favor of the employer because the alleged comparator had merely acted without authorization by
sending his shift workers to provide security to the stadium; he had not, like the plaintiff,
blatantly ignored a direct order from his supervisor).

[9]      Earley, 907 F. 2d at 1081 (the plaintiff must present "concrete evidence in the
form of specific facts" to withstand summary judgment); See Jacobs v. Henderson, 2001 WL
34866606 *14 (M.D. Ala. 2001) ("information and belief assertions" are "too skimpy" to
establish that an alleged comparator is similarly situated to the plaintiff).

(Pltf. depo. pp. 162:7-168:21, Ex. 9, 218:11-219:1). First, these associates summaries do not even identify what coupons were used in the transaction. (Pltf. depo. pp. 120:1-4, 165:3-15; Gandy Decl. ¶ 13, 14. It is undisputed that only the journal tapes identify what coupons were used. (Pltf. depo. pp. 166:1-167:17; Gandy Decl. ¶ 14). Moreover, even if it was clear from these summaries that Darby actually used the service coupon, the plaintiff admitted in her deposition that for each of these transactions on the associate summaries, that she does not know whether any of these customers had received a service call and therefore were eligible for the discount. (Pltf. depo. pp. 162:7-168:21, Ex. 9, 218:11-219:1). Thus, the plaintiff's documentary evidence fails to establish that Darby engaged in misconduct "nearly identical" to the plaintiff's.

The plaintiff's alleged evidence with regard to Landers is just as weak. Again, Willis relies on the associate summaries related to Landers' transactions that she produced during discovery in an effort to establish that Landers misused the service coupon. (Pltf. depo. pp. 178:2-186:9, Ex. 10, 218:1-10, 219:2-8). Again, the plaintiff is grasping at straws. As was the case with Darby, the plaintiff admitted that she does not even know by looking at these documents what coupons were awarded to these customers, let alone if the customers were eligible for these discounts. (Pltf. depo. pp. 178:2-186:9, Ex. 10, 218:1-10). Therefore, the plaintiff cannot show that Landers is similarly situated to the plaintiff.

Although it is not entirely clear, the plaintiff also seems to allege that Merle Miller misused the service coupon. (Pltf. depo. pp. 191:15-193:22). Willis appears to assume that Miller may have misused the coupon because he allegedly used other associates' sales numbers to ring up his transactions while he was in training. (Pltf. depo. p. 193:10-22). The plaintiff, however, has no specific facts to support this broad conclusion. (Pltf. depo. p. 193:16-22). In fact, the plaintiff, admitted that she does not have any personal knowledge or other information

that Miller awarded the service coupon to customers who were not entitled to it. (Pltf. depo. p. 193:16-22). Consequently, the plaintiff cannot successfully contend that Miller violated Sears' unauthorized discount policy and is therefore comparable to her.

Additionally, it is well established that the employer must be aware of the alleged similar violations of the named comparators to be similarly situated. See Jones v. Gerwen, 874 F. 2d 1534, 1541-1542 (11th Cir. 1989) (holding that because the plaintiff had failed to produce any evidence that the decision-makers knew of the comparators unauthorized use of the Unit truck, he could not establish that these comparators were similarly situated); Key v. Advanced Stores, Co., 2005 WL 1026062 (M.D. Fla. 2005) ("Absent a showing that [the decision-makers] were aware of, or consciously overlooked [the comparators] allegedly similar violation, this court cannot find that [the comparator] and [the plaintiff] were similarly situated."); Moreland v. Miami-Dade County, 255 F. Supp. 2d 1304, 1314 (M.D. Fla. 2002) ("[I]t is impossible to identify any non-African American employee . . . that [the decision-maker treated] more favorably for violating a [workplace] rule [because] [the plaintiff's] evidence fails to show that [the decision-maker] knew that these purported comparators committed misconduct similar to [the plaintiff's].").

Here, Willis has absolutely no evidence that Gandy, Reese, or the human resources representative in Sears' corporate office in Illinois who participated in the decision to terminate Willis were aware of or "consciously overlooked" any white associate's misuse of the service coupon. (Gandy Decl. ¶¶ 20, 21, 22, 25, 26, 28-31, 14, 26; Reese Decl. ¶¶ 16, 19-20, 23, 25; Pltf. depo. pp. 162:7-168:21, Ex. 9, 170:2-23, 172:3-10, 173:5-8, 176:13-177:1, 178:2-186:9, Ex. 10, 188:4-190:9, 218:1-219:8).

It is undisputed that Willis' termination arose out of a single investigation in late October /early November 2004 specifically relating to misuse of Sears' $65.00 service coupon. (Gandy Decl. ¶¶ 12-18; Reese Decl. ¶¶ 10-12; Pltf. depo. pp. 131:14-132:3). It is further undisputed that the only means of determining who misused the service coupon was to review each sales associate's transactions and the journal tapes corresponding to these transactions[10] and then contact the service department to see if these customers had recently had a service call. (Gandy Decl. ¶ 13-15; Pltf. depo. pp. 118:1-119:2, 120:1-4).

Sears undisputedly reviewed the transactions of <u>all</u> the sales associates who worked in the appliances and electronics departments in November 2004. (Gandy Decl. ¶¶ 20, 21, 30; Pltf depo. pp. 119:11-13, 188:4-190:9). Darby was not even working as a sales associate in <u>any</u> department during this time. (Darby Decl. ¶ 2; Gandy Decl. ¶ 20; Pltf. depo. pp. 176:19-177:1). Thus, Sears had no reason to know, let alone the opportunity to "consciously overlook," Darby's alleged misuse of the service coupon. (Pltf. depo. pp. 176:19-177:1; Darby Decl. ¶ 28). Moreover, Willis stated that she <u>never</u> reported to management that Darby had allegedly misused the service coupon. (Pltf. depo. p. 211:9-22). Willis also conceded that she does not know if management had any knowledge as to whether Darby misused the service coupon in the transactions she identifies in Darby's associate summaries. (Pltf. depo. pp. 162:7-168:21, Ex. 9, 218:11-19:1).

Likewise, there is no evidence that Sears had any knowledge that Landers had misused the service coupon. Sears' investigation undisputedly showed that Landers only had <u>one</u> transaction involving the service coupon and that this customer <u>had received</u> a service call and

---

[10]    The journal tapes identify which sales associate completed the transaction, and specifically what coupons were used in each transaction. (Gandy Decl. ¶ 14; Pltf. depo. pp. 167, Ex. 9). Sears was only able to review the sales transactions for the previous 30 days due to the memory limitations of Sears' register system. (Gandy Decl. ¶ 14; Pltf. depo. p. 118:13-16).

had declined a repair.  (Gandy Decl. ¶ 26, Ex. G; Reese Decl. ¶ 20; Pltf. depo. pp. 119:11-20, 188:4-190:9).  Moreover, Willis testified that on the one occasion, Willis allegedly saw Landers use a service coupon from the register drawer, that management "did not come over there" and that management did not see this transaction.  (Pltf. depo. pp. 170:22-23, 171:21-172:10). Additionally, Willis testified that she _never_ reported this incident or otherwise informed management that Landers had given the service coupon to a customer who was not eligible for it. (Pltf. depo. pp. 175:4-11, 211:9-15).   Willis further conceded that she does not know if management had any knowledge as to whether Landers misused the service coupon in any other transactions.  (Pltf. depo. pp. 178:2-186:9, Ex. 10, 219:2-8).  Thus, according to Willis' own admission, she has no evidence that Sears knew about or "consciously overlooked" Landers' misuse of the service coupon.  In fact, Gandy's investigation undisputedly revealed that Landers had _not_ _misused_ the service coupon.  (Pltf. depo. pp. 119:11-20, 188:4-190:9; Gandy Decl. ¶ 26, Ex. G).   The customer Landers gave the $65.00 coupon to had received a service call and therefore _was_ _eligible_ to receive this discount.  (Pltf. depo. pp. 188:4-190:9; Gandy Decl. ¶ 26).

Similarly there is no evidence that Gandy, or anyone else, was aware that Miller had completed _any_ transactions involving the service coupon, whether under his number or anyone else's.  The plaintiff _never_ identified Miller as someone who had misused the service coupon. (Pltf. depo. p. 126:5-127:12, Ex. 6; Gandy Decl. ¶ 17, Ex. D).  Moreover, Gandy's investigation did not link Miller to any of the impermissible transactions.  (Pltf. depo. pp. 188:4-190:9; Gandy Decl. ¶ 21, 25). Because Willis cannot show that Miller or any other employee engaged in conduct nearly identical to hers or that management was aware of it, summary judgment is due to be granted.

2.   Willis cannot establish that her termination was merely a pretext for
intentional race discrimination.

Even assuming that Willis could establish a prima facie case of race discrimination,

which she cannot, the court should still grant Sears' motion for summary judgment.  Sears has

articulated a legitimate, nondiscriminatory reason for terminating the plaintiff.  See Combs v.

Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (stating that the employer must

articulate, but not persuade the trier of fact, that the allegedly adverse employment decision was

made for "legitimate, nondiscriminatory reasons.").  Specifically, Sears terminated the plaintiff

because she used Sears' service coupon to give multiple customers unauthorized discounts.

(Gandy Decl. ¶ 18; Reese Decl. ¶ 12).   Her admitted misconduct clearly violated Sears'

unambiguous unauthorized discount policy.  (Gandy Decl. ¶¶ 17, 18; Reese Decl. ¶ 12; Pltf.

depo. pp. 81:2-82:6, 86-112:12, Ex. 5, 114:8-22, 204:8-14).   Once the defendant articulates a

"legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising

out of the prima face case "drops from the case." Id.  Thus, to prevail, the plaintiff must establish

that the employer's articulated reason was a pretext for discrimination.  Turlington v. Atlanta Gas

Light Co., 135 F. 3d 1428, 1432 (11th Cir. 1998).  See Hicks, 509 U.S. at 507 (quoting Burdine,

450 U.S. at 253) ("'The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff.'").  It is the

plaintiff that has the burden of persuading the court that "the defendant acted with a

discriminatory purpose."  Clark v. Huntsville Bd. of Educ., 717 F. 2d 525, 529 n.5 (11th Cir.

1983).

To establish pretext a plaintiff must establish BOTH that the articulated reason is false

and that race is the true reason for the termination.  See Hicks, 509 U.S. at 515 (1993).  Here,

Willis cannot do either.  First, there is absolutely no evidence that Sears' reason for terminating

her is <u>false</u>. Willis <u>admitted</u> in her interview with management during Gandy's investigation, <u>and again</u> in her deposition, that she was giving Sears' service coupon to customers who were not eligible for it. (Pltf. depo. pp. 81:2-82:6, 86:112:12, Ex. 5, 125:23-127:12, 114:8-22; Gandy Decl. ¶ 17). Her actions clearly violated Sears' unauthorized discount policy. (Pltf. depo. pp. 67:16-70:10, Ex. 3; Gandy Decl. ¶¶ 17-19). Furthermore, the plaintiff understood at the time she was terminated that her misuse of the service coupon was <u>the reason</u> for her termination. (Pltf. depo. pp. 131:22-132:3). Consequently, there simply can be no argument that Sears' reason for terminating her is false.

Additionally, Willis cannot show that her race was the <u>real reason</u> for her discharge. Willis testified that the only reasons she believes that Sears discriminated against her on the basis of her race are because (1) she is outspoken; (2) Reese hired Landers, who is white, to work in the appliance department when there were only blacks in that department before; (3) on one occasion, Reese called Willis away from the sales floor to call Lowe's to check on its price for delivery; (4) Reese scheduled Landers, a part-time associate, to work the hours the plaintiff wanted to work; (5) Reese, would not interact with the black associates or ask about the black associates' sales, and (6) that on one occasion, Reese allegedly rang up sales for Landers when the department was shorthanded and Landers was the only associate working.[11]  (Pltf depo. pp. 140:13-143:6, 233:1-235:13).

---

[11]    In the plaintiff's EEOC charge, her complaint, and in her deposition, the plaintiff limits her race discrimination claim to her termination. (Pltf. depo. p. 138, 190, Exs. 7 & 11). However, even if the plaintiff was attempting to assert a separate claim that Sears treated her differently than white associates with respect to the terms and conditions of her employment, these allegations neither collectively nor individually constitute adverse employment action(s) <u>See Davis v. Town of Lake Park</u>, 245 F. 3d 1232, 1238-39 (11th Cir. 2001) (to establish an adverse employment action, a plaintiff must show a "serious and material change" in the terms, conditions, and privileges of employment; Title VII is not a general civility code nor a statute making actionable the ordinary tribulations of the workplace).

Willis' allegations in this case are even less remarkable than those unsuccessfully asserted by the plaintiff in <u>Delong v. Best Buy Co.</u>, 206 WL 562195 (N.D. Ga. 2006). In <u>Delong</u>, the plaintiff alleged as evidence of pretext that her supervisor did not visit her store, that he treated her in a demeaning manner, that he refused to communicate with her for long periods of time, and that he appointed assistant managers without her approval. 2006 WL 562195 *12 (N.D. Ga. 2006). The plaintiff also admitted that she had <u>no</u> <u>personal</u> <u>knowledge</u> of how Best Buy treated <u>other</u> <u>male</u> <u>managers</u> in her district. <u>Id.</u> at *13. Based on this admission and the lack of evidence that Best Buy treated male managers more favorably, the court held that the plaintiff could not establish that her termination was a pretext for gender discrimination. <u>Id.</u> at *13.[12]

Like the plaintiff in <u>Delong</u>, Willis concedes that she has <u>no</u> <u>personal</u> <u>knowledge</u> of how Reese acted towards white associates. (Pltf. depo. pp. 237:1-239:18, 240:19-241:1). Specifically, she agrees that she <u>does</u> <u>not</u> <u>know</u> whether Reese spoke to white associates, whether he called white sales associates away from the sales floor, whether he rang up sales for any black associates, or whether he asked anyone about any black associates' sales. (Pltf. depo. pp. 237:1-239:18, 240:19-242:1). This leaves only Willis' unsupported conclusions to establish discriminatory intent.

---

[12]    <u>See</u> <u>Shah v. General Electric Co.</u>, 816 F. 2d 264, 271 (6th Cir. 1987) (finding that the following behavior of the plaintiff's supervisor was <u>not</u> <u>sufficient</u> to establish pretext for race discrimination: failing to respond to plaintiff's memos; refusing to shake the plaintiff's hand; isolating the plaintiff from the rest of the division; telling the plaintiff not to give their shared secretary his work; and not spelling the plaintiff's name correctly; the plaintiff also admitted he <u>did</u> <u>not</u> <u>know</u> if his supervisor treated anyone else differently); <u>Hughes v. Chesapeake and Potomac Telephone Co.</u>, 583 F. Supp. 66, 73 (D.C. 1983) (concluding that the following evidence was <u>not</u> <u>sufficient</u> to establish pretext: the plaintiff's feelings that the white employees "talked and joked" with white supervisors; white supervisors listening to the suggestions of the white employees but not the plaintiff's; non-verbal acts of the white supervisors that made the plaintiff feel inferior; and a white employee getting up from her position to do other job-related tasks).

Also similar to <u>Delong</u>, the record is devoid of <u>any</u> <u>evidence</u> that Reese treated black associates any less favorably than whites associates.   In fact, the undisputed evidence demonstrates that Reese treated black employees <u>no</u> <u>differently</u> than he treated white employees: Reese did not always talk to white employees either; Reese asked white employees to perform work-related tasks away from the sales floor; Reese asked about <u>all</u> associates' sales; and he closed sales for some black associates, including the plaintiff herself.   (Reese Decl. ¶¶ 27-34; Landers Decl. ¶ 18; Darby Decl.¶ 19; Dodson Decl. ¶ 23, 25, 31; Mason Decl. ¶ 28-31, 34, 35; Pltf. depo. pp. 237:1-239:18, 240:19-242:1).     Additionally, the record evidence clearly establishes white associates did not always receive the schedule they wanted and that Reese was not responsible for making the schedule for the appliance department. (Lawrie Decl. ¶¶ 34, 35; Landers Decl. 22; Darby Decl. ¶¶ 23, 24, Reese Decl. ¶ 36).   Based on this and Willis' complete failure to present any concrete evidence of differential treatment, summary judgment is warranted.

Willis' allegation that her race is the true reason for her termination is   even less convincing in light of the overwhelming evidence that both Reese and Gandy engaged in conduct wholly inconsistent with racial animus towards African-Americans.   First, it is undisputed that during this same investigation that led to the plaintiff's termination, Reese and Gandy elected to retain an African-American sales associate (Jackie Dodson) who had given the service coupon to a customer who had not had a service call.   (Reese Decl. ¶¶ 19-22; Gandy Decl. ¶¶ 27-29; Dodson Decl. ¶¶ 14, 15; Pltf. depo. pp. 242:8-243:3).     Dodson was questioned about this transaction and explained to Reese and Gandy that the customer's daughter was the one who had the service call and that the daughter had given the coupon to her mother to use to purchase a replacement item for her.   (Gandy Decl. ¶ 28, Ex. I; Dodson Decl. ¶¶ 14-16).   Gandy and Reese

chose to believe Dodson's explanation and therefore made the decision to retain her. (Gandy Decl. ¶ 23; Reese Decl. ¶ 22; Dodson Decl. ¶¶ 14, 15; Pltf. depo. pp. 187:6-188:3, 191:22-192:16, 242:8-243:3). Clearly, Gandy's and Reese's decision to retain an African-American who had a suspicious transaction is <u>not</u> at all consistent with the discriminatory motive necessary to establish pretext.

Second, Reese undeniably <u>promoted</u> <u>several</u> <u>African-Americans</u> while in his capacity as SGM at the Auburn store. Specifically, he promoted the Denise Smith (black) from a part-time sales associate in the vacuum department to full-time sales associate in the appliance department. (Reese Decl. ¶¶ 28-29; Mason Decl. ¶ 32; Smith. depo. pp. 70:8-22, 81:7-82:7). Reese also promoted Tammy Calhoun from Merchandising Associate to Merchandising Lead and Stacy Dumas from Softlines Lead to Automotive. (Reese Decl. ¶ 29; Lawrie Decl. ¶ 21; Mason Decl. ¶ 33; Pltf. depo. p. 239:19-240:3). Moreover, Reese went to lunch with Byron Mason, who is African-American, several times per week when Reese worked at the Auburn store. (Pltf. depo. p. 239:19-22; Reese Decl. ¶ 30; Mason Decl. ¶¶ 34, 35).

In addition to the above, both Gandy and Reese participated in the decision to terminate several white employees for similar integrity issues. For example, Gandy and Reese participated in the decision to terminate Michael Cunningham for offering customers free delivery and Brent Haney and Christopher Pritchett for re-printing transactions to make their sales appear higher than they actually were. (Gandy Decl. ¶ 45, Ex. J; Reese Decl. ¶ 40; Mason Decl. ¶ 39; Pltf. depo. 242:2-7). Like Willis, these incidents involved integrity issues. And like Willis, Gandy and Reese recommended terminating their employment.

These facts clearly negate Willis' already weak and unsubstantiated evidence of pretext. Consequently, Willis cannot establish that her race was the real reason for her termination, and summary judgment is appropriate in this case.

**D.      The Plaintiff's Claim for Relief is Limited by the Mixed Motive Defense.**

Even assuming for purposes of summary judgment only that Willis could succeed on her claim for intentional race discrimination, the plaintiff is not entitled to any monetary damages. Under Title VII, if the employer can show that it would have taken the same employment action despite any alleged impermissible motivating factor, the plaintiff is not entitled to back pay or reinstatement. Desert Palace, Inc. v. Costa, 539 U.S. 90, 94-95 (2003). Rather, a plaintiff's remedies are limited to declaratory relief, other injunctive relief, and attorney's fees and cost. 42 U.S.C. § 2000e-5(g)(2)(B). Here, the plaintiff is seeking reinstatement, back pay, and punitive damages. It is undisputed, however, that Sears would have terminated the plaintiff regardless of her race. (Reese Decl. ¶ 12; Gandy Decl. ¶¶ 10. 47). The record evidence clearly demonstrates that the plaintiff used Sears' service coupon to close numerous sales when the customer was not eligible to receive that discount. (Pltf. depo. pp. 81:4-82:6, 89:9-114:21, Ex. 5, 204:8-14; Gandy Decl. ¶¶ 12-18, Ex. C; Reese Decl. ¶ 10). It is also undisputed that Sears takes integrity issues seriously and has consistently terminated associates who have engaged in such behavior regardless of their race. (Gandy Decl. ¶ 47; Reese Decl. ¶ 38; Mason Decl. ¶ 39; Pltf. depo. pp. 69:7-71:1 Ex. 3). Consequently, the plaintiff's relief is limited.

**V.      CONCLUSION**

For the foregoing reasons, Sears submits that its motion for summary judgment on all of the plaintiff's claims should be granted, or in the alternative, that plaintiff's damages should be limited as requested.

Respectfully submitted,


/s/ Mieke A. Hemstreet
Mac B. Greaves (GRE007)
Mieke A. Hemstreet (HEM007)
Attorney for Defendant
SEARS, ROEBUCK AND CO.


OF COUNSEL:

BURR & FORMAN LLP
3100 Wachovia Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following by directing same to his office address through first-class, United States mail, postage prepaid, on this the 16th day of October, 2006:

T. Robin McIntyre
2101 Executive Park Drive
Opelika, AL 36801


/s/ Mieke A. Hemstreet
OF COUNSEL