LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                     EASTERN DIVISION

4

5     CASE NUMBER:   03-CV-05-1019-W

6

7     BEATRICE L. WILLIS,

8               Plaintiff,

9

10    vs.

11

12    SEARS, ROEBUCK & CO.,

13               Defendant.

14

15

16               DEPOSITION TESTIMONY OF:

17               BEATRICE L. WILLIS

18

19

20          S T I P U L A T I O N S

21          IT IS STIPULATED AND AGREED by and

22    between the parties through their

23    respective counsel that the deposition of

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

"Exhibit 1"

Page 2

1    BEATRICE L. WILLIS may be taken before

2    Bridget McClain, a Court Reporter and

3    Notary Public for the State at Large, at

4    the offices of Burr & Forman, 201 Monroe

5    Street, 1950 RSA Tower, Montgomery,

6    Alabama, on the 3rd of August, 2006,

7    commencing at approximately 10:32 a.m.

8         IT IS FURTHER STIPULATED AND AGREED

9    that the signature to and the reading of

10   the deposition by the witness is waived,

11   the deposition to have the same force and

12   effect as if full compliance had been had

13   with all laws and rules of Court relating

14   to the taking of the depositions.

15        IT IS FURTHER STIPULATED AND AGREED

16   that it shall not be necessary for any

17   objections to be made by counsel to any

18   questions except as to form or leading

19   questions and that counsel for the parties

20   may make objections and assign grounds at

21   the time of trial or at the time said

22   deposition is offered in evidence, or prior

23   thereto.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 3

1    In accordance with Rule 5(d) of the

2    Alabama Rules of Civil Procedure, as

3    amended, effective May 15, 1998, I, Bridget

4    McClain, am hereby delivering to Mieke Ann

5    Hemstreet, Esq., the original transcript of

6    the oral testimony taken the 3rd day of

7    August, 2006, along with exhibits.

8    Please be advised that this is the

9    same and not retained by the Court

10   Reporter, nor filed with the Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 4

1                          I N D E X

2

3      EXAMINATION BY:                          PAGE NO.

4      Ms. Hemstreet                             8-231

5                                               235-246

6      Mr. McIntyre                             231-235

7

8

9

10                       E X H I B I T S

11

12     FOR THE PLAINTIFF:

13     None offered.

14

15

16     FOR THE DEFENDANT:

17     Number 1 - determination                   41

18     Number 2 - application                     44

19     Number 3 - handbook                        67

20     Number 4 - coupon                          75

21     Number 5 - receipts                        86

22     Number 6 - statement                      128

23     Number 7 - EEOC charge                    138

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 5

1   Number 8  - dismissal      139

2   Number 9  - receipts       162

3   Number 10 - receipts       178

4   Number 11 - complaint      190

5   Number 12 - statement      206

6   Number 13 - responses      217

7   Number 14 - statement      221

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 6

1                    A P P E A R A N C E S

2

3      PRESENT FOR THE PLAINTIFF:

4      ROBIN T. MCINTYRE

5      Attorney at Law

6      201 Executive Park Drive

7      Opelika, AL  36801

8

9

10

11     PRESENT FOR THE DEFENDANT:

12     MIEKE ANN HEMSTREET

13     Burr & Forman

14     420 20th Street North

15     Suite 3100

16     Birmingham, AL  35203

17

18

19

20

21

22

23

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 7

1      I, Bridget McClain, a Court Reporter

2  and Notary Public, State of Alabama at

3  Large, acting as Commissioner, certify that

4  on this date, pursuant to the Alabama Rules

5  of Civil Procedure, and the foregoing

6  stipulation of counsel, there came before

7  me at the offices of Burr & Forman, 201

8  Monroe Street, 1950 RSA Tower, Montgomery,

9  Alabama, commencing at approximately 10:32

10 a.m., on the 3rd day of August, 2006,

11 BEATRICE L. WILLIS, witness in the above

12 cause, for oral examination, whereupon the

13 following proceedings were had:

14

15          BEATRICE L. WILLIS

16    being first duly sworn, was examined

17         and testified as follows:

18

19      COURT REPORTER:  Usual

20 stipulations?

21      MR. MCINTYRE:  Yes.

22      MS. HEMSTREET:  That's fine.

23      MR. MCINTYRE:  That's fine.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 8

1    EXAMINATION BY MS. HEMSTREET:

2        Q.    Ms. Willis, will you state your

3    full name for the record, please?

4        A.    Beatrice L. Willis.

5        Q.    Ms. Willis, I'm Mieke Hemstreet

6    and we met a few minutes ago. And I am

7    here to ask you some questions about the

8    lawsuit that you filed against Sears. Do

9    you understand that to be the case today?

10       A.    Yes.

11       Q.    Okay. Have you ever had your

12   deposition taken before?

13       A.    No.

14       Q.    In that case, I would like to go

15   over just a couple of ground rules. Some

16   of them go for me as well as for you. You

17   can take a break whenever you need it, just

18   let me know when and so long as there is

19   not a question on the table. In other

20   words, if I ask you a question, I just ask

21   that you go ahead and answer it before we

22   take a break.

23              Secondly, if you don't understand

Page 9

1    something that I ask you, let me know and

2    I'll rephrase it or do the best of my

3    ability to make sure that you understand

4    it.  And if you do answer the question and

5    don't ask me to clarify, then I'm going to

6    assume that you understood my question.  Is

7    that fair?

8          A.    That's fair.

9          Q.    Okay.  Additionally, your

10   attorney may object from time to time

11   today.  And if that's the case, that's

12   primarily the objections are just to get on

13   the record.  Also, during a deposition

14   sometimes it becomes conversation like.

15   And I ask that we both do our best not to

16   talk over each other.  In other words, I'll

17   let you finish your answer before I go onto

18   my next question, vice versa.  If you can

19   let me finish my question before you

20   answer.  Do you understand, is that fair?

21         A.    That's fair.

22         Q.    Okay.  Have you taken any

23   medication today or anything that would

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 10

1  impair your ability to answer my questions

2  truthfully today?

3       A.   No.

4       Q.   Okay.  Anything else that would

5  prevent you from answering my questions

6  truthfully today?

7       A.   No.

8       Q.   Do you have any medical

9  conditions that I need to be aware of as we

10  go through today?

11       A.   No.

12       Q.   Okay.  Now, did you review any

13  documents in preparation for your

14  deposition today?

15       A.   No.

16       Q.   Now, did you bring any additional

17  documents with you today that you needed to

18  provide me a copy with?  I know Robin has

19  already sent me some information and

20  documents that you have gathered.  Is there

21  anything else that you need to produce to

22  me that you brought with you today?

23       A.   No.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 11

1    Q.    Okay.  How much time did you

2  spend in preparation for the deposition

3  today?

4    A.    About --

5    Q.    Besides getting into the parking

6  deck, I guess.

7    A.    About an hour-and-a-half.

8    Q.    Did you discuss this deposition

9  today with anybody other than your

10  attorney?

11    A.    No.

12    Q.    Okay.  Did you discuss this

13  deposition with Ms. Smith?

14    A.    Well, in the presence of my

15  attorney.

16    Q.    Okay.  It was in the presence of

17  Robin, okay.

18    A.    Of my attorney, yes.

19    Q.    Did you discuss this deposition

20  with Shannon Bryant at all?

21    A.    Well, just in the presence of my

22  attorney.

23    Q.    And Ms. Bryant does not have a

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 12

1    lawsuit against Sears; is that correct?

2         A.    No.

3         Q.    Okay.  Did you talk to anybody

4    else in preparation for your deposition

5    today?

6         A.    No.

7         Q.    Now, Ms. Willis, have you ever

8    been a party to a lawsuit?

9         A.    No.

10        Q.    Neither as the plaintiff or as a

11   defendant?

12        A.    No.

13        Q.    Have you ever filed any EEOC

14   charge besides the one you filed against

15   Sears that's the subject of this lawsuit?

16        A.    No.

17        Q.    Okay.  Have you ever filed for

18   Worker's Compensation benefits?

19        A.    Are you asking me about did I

20   file for my unemployment?

21             MR. MCINTYRE:  No.

22        Q.    Worker's Compensation, if you're

23   injured on the job.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 13

1    A.    No.

2    Q.    Okay.  Now, did you ever go by

3  another name besides Beatrice Willis, it

4  was Lewis before; is that right?

5    A.    Right, those are the only two.

6    Q.    Is that your maiden name?

7    A.    Yes.

8    Q.    Okay.  What is your current

9  address?

10    A.    It's 18 Brannon Avenue and that's

11  Opelika, Alabama.

12    Q.    And how long have you lived

13  there?

14    A.    About four years.

15    Q.    Do you recall where you lived

16  before that?

17    A.    2106 Waverly Parkway, Apartment

18  6-C.

19    Q.    Is that also in Opelika?

20    A.    Uh-huh.

21    Q.    Now, in your current place of

22  residence, is that a house?

23    A.    Yes.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 14

1      Q.    Okay.   Does anybody live there

2   with you?

3      A.    My son.

4      Q.    Your son, okay.   And how old is

5   he?

6      A.    He's twenty.

7      Q.    Okay.   And what is his name?

8      A.    William B. Lewis.

9            MR. MCINTYRE:   I will be right

10   back.

11           MS. HEMSTREET:   Off record for a

12   minute.

13           (Break taken.)

14      Q.    (By Ms. Hemstreet) You said your

15   son lives with you.   Anybody else?

16      A.    That's it.

17      Q.    Are you renting a house or do you

18   have a mortgage on it or are you --

19      A.    I'm buying it.

20      Q.    Okay.   You're buying.   Okay.   Can

21   you tell me your Social Security number?

22      A.    It's 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.

23      Q.    Okay.   And what is your date of

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 15

1   birth?

2          A.    1/1/1963.

3          Q.    New Year's Day, huh?

4          A.    Yeah.

5          Q.    Now, are you currently married?

6          A.    No.

7          Q.    Okay.  Were you married at one

8   time?

9          A.    I was.

10         Q.    Okay.  And who were you married

11  to?

12         A.    Willie Frank Willis.

13         Q.    And when did you get married?

14         A.    September 16th of '94.

15         Q.    Now, you're no longer married; is

16  that correct?

17         A.    No.

18         Q.    Did you get divorced or is that

19  what happened?

20         A.    (Witness nodding head.)

21         Q.    Okay.  And where did you file for

22  divorce?

23         A.    It was in Lee County.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 16

1      Q.    Lee County?

2      A.    Uh-huh.

3      Q.    Any other marriages?

4      A.    No.

5      Q.    Any other children besides

6    William?

7      A.    (Witness shaking head.)

8           COURT REPORTER:  Can you answer

9    out, please?

10          THE WITNESS:  No.

11          COURT REPORTER:  Thank you.

12     Q.    Now, can you tell me the names of

13   the relatives that you have in basically

14   the Montgomery, Opelika area including, you

15   know, parents, brothers, sisters, that kind

16   of thing?

17     A.    I don't have any relatives that

18   live in Opelika.  My husband lived in

19   Opelika.

20     Q.    Your ex-husband?

21     A.    Yeah.

22     Q.    Okay.  So you don't have any

23   relatives in the Montgomery area?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 17

1    A.    Well, I have a sister in

2  Montgomery.

3    Q.    Okay.  What is her name?

4    A.    Latriesha Craton.

5    Q.    Anybody else in the Montgomery

6  area say up to Birmingham?

7    A.    I have a niece.  I have a niece

8  that lives in Montgomery, Sonia Berry.

9    Q.    Who else, anybody else?

10    A.    And Charles Lewis which is my

11  nephew, he lives in Montgomery.

12    Q.    Anybody else say from Montgomery

13  up north to Birmingham, not including

14  Birmingham?

15    A.    Uh-uh, not in Montgomery up to.

16    Q.    Anybody say south of Montgomery

17  towards Dothan?

18    A.    Dothan, my mother, she lives in

19  Tuskegee.

20    Q.    Okay.  What is her name?

21    A.    Rebecca Lewis.

22    Q.    Anybody else?

23    A.    I have a sister, Tracy Lewis.

Page 18

1       Q.    Tracy?

2       A.    Uh-huh.

3       Q.    And where does she live?

4       A.    She lives in Tuskegee.

5       Q.    Anyone else you can think of?

6       A.    Jerry Lewis.

7       Q.    And how is he related to you?

8       A.    He's a brother.

9       Q.    And where does he live, Tuskegee

10   as well?

11      A.    Uh-huh.

12      Q.    Anybody else?

13      A.    Otis Lewis, that's a brother.

14      Q.    Another brother you said?

15      A.    Yes.

16      Q.    You have a big family.

17      A.    Yeah, we do.  And Cynthia Lewis,

18   that's a sister.

19      Q.    Does she live in Tuskegee as

20   well?

21      A.    Right.

22      Q.    Anyone else?

23      A.    That's all I can think of.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 19

1    Q.    Okay.

2    A.    That's the family.

3    Q.    Now, Ms. Willis, have you ever

4  been arrested for any kind of crime?

5    A.    Well, this was back in probably

6  the '80s.

7    Q.    And what was that?

8    A.    Criminal trespassing, me and a

9  young lady had a confrontation.

10    Q.    Who did, I'm sorry?

11    A.    Me and this girl, we just had a

12  confrontation.  I went to her house and we

13  had a few words.

14    Q.    Okay.  Were you actually charged

15  with trespassing, criminal trespassing?

16    A.    Yeah.

17    Q.    Did you serve any time at all?

18    A.    No.

19    Q.    Did you pay a fine?

20    A.    Yeah.

21    Q.    Did you plead guilty?

22    A.    I did.

23    Q.    Is this the only conviction?

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 20

1       A.    That's the only one, yes.

2       Q.    Is this the only arrest --

3       A.    Yeah.

4       Q.    -- that you've had?  And, again,

5   that was in Lee County did you say?

6       A.    That was in Lee County, yes.

7       Q.    Where did you go to high school?

8       A.    Tuskegee Institute High School.

9       Q.    And what year did you graduate?

10      A.    '81.

11      Q.    Did you go to college?

12      A.    No.

13      Q.    Did you take any college courses

14  or anything?

15      A.    (Witness nodding head.)

16      Q.    Did you go to any kind of trade

17  schools or any other kind of schooling?

18      A.    (Witness nodding head.)

19      Q.    No?

20      A.    No.

21      Q.    We'll remind you.

22      A.    Yeah.

23      Q.    Ever served in the military?

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 21

1      A.    No.

2      Q.    Now, after you graduated from

3  high school, did you go right to work?

4      A.    I did.

5      Q.    Okay.  Do you recall where you

6  started working?

7      A.    Right out of high school, that

8  was at -- I got a job at Burger King.

9      Q.    Okay.  And how long were you

10  there?

11      A.    Probably for about two or three

12  years.

13      Q.    And which location was that?

14      A.    That was in Tuskegee.

15      Q.    Were you a crew member there or

16  were you a manager or what was your title?

17      A.    Just a crew member.

18      Q.    And what did you do after that?

19      A.    After that, I worked at the

20  mini-mart.  I was just a salesperson there,

21  cashier.  And I did that for probably about

22  seven or eight years.

23      Q.    Do you remember the name of the

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 22

1    mini-mart or what company it was with?

2         A.    I don't.

3         Q.    Now, why did you leave Burger

4    King?

5         A.    Because I got the job at the

6    mini-mart.

7         Q.    Were you ever disciplined while

8    you worked at Burger King?

9         A.    Uh-uh.

10        Q.    Okay.  What about the mini-mart,

11   were you disciplined while you worked

12   there?

13        A.    No.

14        Q.    Were you a cashier the whole time

15   you were there?

16        A.    Yeah.

17        Q.    Who was your supervisor, do you

18   recall?

19        A.    Selena Williams.

20        Q.    And eventually you left the

21   mini-mart; is that right?

22        A.    Yes.

23        Q.    Okay.  What was your reason for

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 23

1    leaving?

2         A.    I moved to Lee County.

3         Q.    And when was that?

4         A.    When was that -- it was in the

5    '80s, I would say around '85.

6         Q.    And did you get a job once you

7    moved?

8         A.    I did.

9         Q.    Now, where was that?

10        A.    That was JJ Raceway in Auburn.

11        Q.    And what did you do there?

12        A.    I was a cashier there.

13        Q.    And do you remember how long you

14   were there?

15        A.    I was there for about four years.

16        Q.    And who was your supervisor, do

17   you remember?

18        A.    Jesse Strickland.

19        Q.    Did you ever receive a discipline

20   while you worked there, either verbal or

21   written?

22        A.    No.

23        Q.    You were never reprimanded for

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 24

1    anything?

2        A.    No.

3        Q.    And do you remember what your

4    salary was when you worked there?

5        A.    I really don't.

6        Q.    Okay.  Were you paid hourly?

7        A.    Yeah.

8        Q.    And now after you left JJ

9    Raceway, what was your reason for leaving

10   there?

11       A.    I found a better job.

12       Q.    And where was that?

13       A.    That was Auburn Daycare.

14       Q.    And when did you begin that job,

15   do you recall?

16       A.    Approximately -- it had to be in

17   the '90s.

18       Q.    Your interrogatory responses

19   indicate that it was around 1994.  Does

20   that sound about right?

21       A.    Yeah, if that's what it is, I

22   know it had to be in the '90s.

23       Q.    Okay.  And what was your job

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 25

1    title there?

2         A.    I was a school-age teacher.

3         Q.    And what does that include?

4         A.    Picking the kids up from, you

5    know, elementary school.  The different

6    schools you go around, pick them up.  And

7    then you bring them back and you stay in

8    the classroom with them until their parents

9    pick them up.

10        Q.    Okay.  And you were a van driver

11   also?

12        A.    Uh-huh.

13        Q.    And you earned $6 an hour doing

14   that?

15        A.    Yeah, about six, yeah.

16        Q.    And who was your supervisor?

17        A.    Ethel White.

18        Q.    Were you ever disciplined while

19   you worked there?

20        A.    I'm thinking -- I think -- yes.

21        Q.    Okay.  What was that for?

22        A.    It was verbal, me and one of the

23   other school-age teachers, a teacher said

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 26

1    that -- we had said something about a

2    parent or something, I mean --

3        Q.    Do you recall what it was that

4    they said you had said?

5        A.    I don't recall.  I don't know.

6        Q.    Do you remember when that was?

7        A.    No.

8        Q.    So basically what you're telling

9    me is that you were -- were you written up;

10   is that right?

11       A.    No, she just verbally --

12       Q.    Verbally?

13       A.    Yes.

14       Q.    This is Ms. White?

15       A.    That's Ethel White.

16       Q.    And she told you that a parent

17   had complained; is that right?

18       A.    Yes, yes.

19       Q.    About something you had said; is

20   that right?

21       A.    Right.

22       Q.    But you don't recall what it was

23   that you had said?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 27

1      A.    Right.

2      Q.    Any other disciplines there that

3  you can recall?

4      A.    That was it.

5      Q.    Ever disciplined there for

6  violating any kind of company policy?

7      A.    Uh-uh.  Now, I also worked during

8  that time too I worked for Auburn City

9  Schools.  I was a bus aide on the handicap

10  bus.  And I just assisted the driver with,

11  you know, getting the kids, making sure

12  that they were in their seat belts.

13      Q.    Okay.  And when was that?

14      A.    It had to be about '95, let's

15  see.  '94 was when it was -- no --

16      Q.    Your interrogatory responses say

17  1991 through 1996, is that --

18      A.    You know what, but see I worked

19  at the daycare and I worked on the bus.

20      Q.    Okay.

21      A.    Because see, I would have to be

22  there at 6 o'clock in the morning.

23      Q.    At where at 6 o'clock in the

Page 28

1    morning?

2         A.    At the school.

3         Q.    At the daycare?

4         A.    Uh-uh, at the school, Auburn City

5    Schools.

6         Q.    Okay.

7         A.    I went to the daycare at 11

8    o'clock.

9         Q.    Okay.  So which job did you get

10   first, do you remember that?

11        A.    The job at the daycare.

12        Q.    Okay.  And how much were you

13   earning at the Auburn City Schools as the

14   bus aide bus driver, do you remember?

15        A.    I'm not really for sure about the

16   pay.

17        Q.    When you worked -- who was your

18   supervisor when you worked there?

19        A.    Mike Holden.

20        Q.    Were you ever disciplined while

21   you worked there?

22        A.    No.

23        Q.    Never verbally reprimanded or

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 29

1   written up for anything?

2       A.   No.

3       Q.   Never reprimanded for any

4   violation of company policy?

5       A.   No.

6       Q.   Now, why you did you leave Auburn

7   Daycare?

8       A.   Because I got the job at Sears.

9       Q.   So you voluntarily resigned; is

10  that right?

11      A.   Right.

12      Q.   What about Auburn City Schools,

13  what was the reason for terminating that

14  employment?

15      A.   Well, I continued to work at

16  Auburn City Schools and Sears for about

17  three, four years.

18      Q.   So when you got the job at Sears,

19  you left the daycare; is that right?

20      A.   Yes.

21      Q.   But you continued to work at

22  Auburn City Schools as the bus driver?

23      A.   Right.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 30

1    Q.    Bus aide, bus driver?

2    A.    Right.

3    Q.    Okay.  And then why did you end

4    your employment with Auburn City Schools?

5    A.    Because I decided to go full time

6    for Sears.

7    Q.    Now, these places that you had

8    listed for me, your previous jobs, did you

9    ever complain about discrimination while

10   you were at any of these jobs?

11   A.    No.

12   Q.    Did you ever file any EEOC charge

13   against any of these employers?

14   A.    No.

15   Q.    And you never filed any kind of

16   lawsuit against any of these employers?

17   A.    No.

18   Q.    Any other jobs that you can think

19   of that you had before you went to work for

20   Sears?

21   A.    I gave them all to you.

22   Q.    Okay.  Now, you said that around

23   1994, is that right, when you went to work

Page 31

1    for Sears?

2         A.   Right.

3         Q.   I believe it was around September

4    of 1994; is that right?

5         A.   Uh-huh.

6         Q.   Now, you went to work for Sears

7    for some period of time.  And your

8    employment ended there in November of 2004;

9    is that right?

10        A.   Right.

11        Q.   Okay.  We're going to come back

12   to that in a minute.

13        A.   Okay.

14        Q.   I want to talk about your

15   employment after your employment finished

16   with Sears.  Now after that, where did you

17   go to work?

18        A.   Dillard's.

19        Q.   Okay.  At The Village?

20        A.   Colonial Mall.

21        Q.   And when did you begin that, do

22   you know?

23        A.   December 4th of 2004.

Page 32

1    Q.    And what did you do there?

2    A.    I was a sales associate.

3    Q.    In what department?

4    A.    Accessories.

5    Q.    Who was your supervisor?

6    A.    I had to think.  Belinda Miles

7    was but she's gone.  Patsy Jones, I had to

8    think about that.

9    Q.    Belinda Miles was first and then

10   Pat Jones?

11   A.    Patsy.

12   Q.    Patsy Jones?

13   A.    Uh-huh.

14   Q.    And are you still working at

15   Dillard's?

16   A.    Yes.

17   Q.    And how many hours a week do you

18   work there?

19   A.    About twenty hours.

20   Q.    So you're part time?

21   A.    Yes.

22   Q.    Have you always been part time

23   there?

Page 33

1    A.    Well, no, I started out full

2 time.

3    Q.    So you were full time December 4,

4 2004. And then when did you stop working

5 full time?

6    A.    I stopped I think it was October

7 of last year.

8    Q.    So October of 2005?

9    A.    Right.

10    Q.    So you worked full time for

11 almost a year, a little less than a year?

12    A.    Yes.

13    Q.    And what was your reason for

14 going part time -- let me ask you: Did you

15 go part time, there was no break in your

16 employment, you went from full time to part

17 time in October of 2005?

18    A.    Right.

19    Q.    And what was your reason for

20 going part time?

21    A.    Because I got a job with Opelika

22 City Schools driving a school bus.

23    Q.    Now, did you work in accessories

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 34

1    the entire time at Dillard's?

2         A.    Yes.

3         Q.    And what were your duties there

4    at Dillard's?

5         A.    Well, taking care of the

6    customers, putting out merchandise,

7    maintaining the department, cashier,

8    mark-downs, mark-ups.

9         Q.    Now, how did you obtain this job

10   at -- well, let me back up.  What was your

11   rate of pay or what is your rate of pay?

12        A.    At Dillard's?

13        Q.    Yeah.

14        A.    I started out at $9.50 an hour.

15        Q.    And what is it now?

16        A.    $8.55.

17        Q.    Why the reduction?

18        A.    Because if you don't maintain

19   your sales prior goal, then you get a pay

20   cut by 10 percent.

21        Q.    And when did that cut happen?

22        A.    I'm thinking back in January, I

23   think.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 35

1    Q.   So you began there full time,

2  worked full time from December 2004 to

3  October 2005 then you went part time and

4  have been part time ever since then?

5    A.   Yes.

6    Q.   Okay.  And right now you're

7  earning approximately $8.55 per hour?

8    A.   Yes.

9    Q.   Do you work on commission at all?

10   A.   No.

11   Q.   Have you ever worked on

12 commission since you've been there?

13   A.   No.

14   Q.   So just straight hourly rate?

15   A.   Yes.

16   Q.   Now, have you ever been

17 disciplined since you've been working at

18 Dillard's?

19   A.   No.

20   Q.   Never been verbally warned or

21 reprimanded of any sort?

22   A.   No.

23   Q.   How did you get the job at

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 36

1    Dillard's?

2        A.    I just applied for it.

3        Q.    Filled out an application?

4        A.    Right.

5        Q.    Now, between your termination

6    from Sears and your obtaining a job with

7    Dillard's, did you work anywhere?

8        A.    No.

9        Q.    Okay.  Did you look for a job

10   anywhere at that time?

11       A.    I was looking.

12       Q.    Were you offered a job anywhere

13   between your termination and the time that

14   you obtained a job at Dillard's?

15       A.    No.

16       Q.    Okay.  Where did you apply during

17   that time, that month period between your

18   termination and your starting to work at

19   Dillard's?

20       A.    Lowe's, I applied there.  And

21   that's about it.

22       Q.    Do you recall when you filled out

23   an application at Dillard's?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 37

1      A.    I couldn't tell you the exact

2   date.

3      Q.    Were you hired shortly after you

4   filled out an application?

5      A.    I was.

6      Q.    Now, you're still part time at

7   Dillard's, correct?

8      A.    Yes.

9      Q.    And you also work at Opelika City

10  Schools; is that right?

11     A.    Right.

12     Q.    As a bus driver; is that right?

13     A.    Right.

14     Q.    And what are your earnings there?

15     A.    I make $12.64 an hour.

16     Q.    And how many hours a week do you

17  work?

18     A.    Four hours a day, that will be

19  twenty hours a week.

20     Q.    And who is your supervisor?

21     A.    Jeff Foster.

22     Q.    And what do your job duties there

23  include?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 38

1       A.    Just to transport the kids safely

2   from home to school.  And in the afternoon,

3   the same thing from school back home.  Make

4   sure the bus is kept clean, you know.

5       Q.    And you've been doing that since

6   you said around October 2005; is that

7   right?

8       A.    Right.

9       Q.    Okay.  Now, since you've been

10  there, have you ever been disciplined of

11  any sort, verbal or written?

12      A.    No.

13      Q.    Never reprimanded for failing to

14  follow company policy?

15      A.    No.

16      Q.    And you still work there; is that

17  correct?

18      A.    Yes.

19      Q.    Ever complained about

20  discrimination since you've been there?

21      A.    No.

22      Q.    And have you ever filed any EEOC

23  charge against them?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 39

1      A.    No.

2      Q.    And how did you obtain this

3  position?

4      A.    I just applied.  I filled out an

5  application.

6      Q.    Okay.  Through application?

7      A.    Right.

8      Q.    Now, Ms. Willis, based on the

9  employment history that we've gone over, my

10 understanding from what you've told me is

11 that you were unemployed for approximately

12 a month after your termination from Sears;

13 is that correct?

14     A.    Yes.

15     Q.    Have you been unemployed at any

16 point in time since then, since your

17 termination from Sears?

18     A.    No.

19     Q.    So just that one month?

20     A.    Yes.

21     Q.    Now, did you apply for

22 unemployment compensation benefits?

23     A.    I did.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 40

1     Q.    During that one month?

2     A.    I did.

3     Q.    After you were terminated from

4   Sears; is that right?

5     A.    Yes.

6     Q.    And were you awarded

7   unemployment?

8     A.    No.

9     Q.    Did you have a hearing to see if

10  you were entitled to receive unemployment?

11    A.    A phone hearing, yes.

12    Q.    Okay.  And based on that phone

13  hearing, the Alabama Department of

14  Industrial Relations determined that you

15  weren't eligible for unemployment; is that

16  right?

17    A.    Right.

18    Q.    And that reason was because they

19  found that you had, in fact, violated

20  Sears' policy with regard to misusing the

21  service coupon; is that right?

22    A.    That's what they said.

23    Q.    Okay.  They found you had given

Page 41

1  this coupon to customers who weren't

2  eligible for it; is that right?

3      A.    That's what Kenny Reese told me.

4      Q.    But that's what they determined;

5  is that right?

6      A.    Right and that's what Kenny Reese

7  told me.

8      Q.    Did you have a chance at the

9  telephone hearing to offer your side of the

10 story?

11     A.    Yes.  But at that time, Kenny

12 Reese, John Lawry and Terry Gandy, all of

13 them was on the phone.  And, you know, I

14 told them that what they were saying was

15 not the way it was.  That was just their

16 version of it.

17     Q.    Did you receive a copy -- I'm

18 going to mark Defendant's Exhibit 1, it's

19 the determination from the Alabama

20 Department of Industrial Relations, did you

21 receive that?

22     A.    I did.

23 (Defendant's Exhibit No. 1 was

Page 42

1    marked for identification.)

2        Q.    And that, in fact, says that they

3    found you ineligible for Worker's Comp

4    benefits because you had misused the

5    service coupon and given it to customers

6    who weren't eligible for it; is that right?

7        A.    That's what Kenny Reese and them

8    told them.

9        Q.    Is that what that document --

10        A.    That's what Kenny and them told

11    me.

12        Q.    Okay.  That was my question --

13        A.    That's what Kenny Reese had told

14    them.

15        Q.    Okay.  But that's what the

16    document says though, correct?

17        A.    That's what Kenny Reese had told

18    them.

19        Q.    Okay.  But is that what's stated

20    in that document?

21        A.    That's what Kenny Reese told them

22    and that's what they wrote down there.

23        Q.    In that document, Defendant's

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 43

1    Exhibit 1?

2        A.    That's what Kenny Reese told

3    them.

4        Q.    Okay.  Well, I'll tell you what,

5    let's -- now, if you look -- okay.  Now, if

6    you look on the first page there, Ms.

7    Willis, on that last paragraph about midway

8    through the page -- actually, middle way

9    through that paragraph.  Now, this is on

10   Defense Exhibit 1, the findings from the

11   Alabama Department of Industrial Relations.

12   Do you see where it says it was verified

13   with the service manager that thirteen of

14   the fourteen sales transactions that the

15   claimant transacted with the coupon were

16   invalid because the customers had not

17   received the coupon with the service

18   department.  So that's, in fact, what they

19   found, correct, that's what the document

20   says?

21       A.    That's what the document says.

22       Q.    Okay.  That's my question.  Now,

23   I want to go back and -- we skipped over

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 44

1    your employment with Sears.  I want to go

2    back and talk about your employment with

3    Sears.  Now, you told me that you were

4    hired in September of 1994; is that right?

5        A.   Yes.

6        Q.   And you filled out an

7    application; is that right?

8        A.   Yes.

9        Q.   Do you remember filling out that

10   application?

11       A.   It's been so long ago, but I know

12   I filled out one.

13       Q.   Does that look like the

14   application that you filled out, is that a

15   copy of your application?  I'll mark as it

16   Defense Exhibit 2.

17   (Defendant's Exhibit No. 2 was

18    marked for identification.)

19       Q.   Do you mind if I put a sticker on

20   that, just put it on the front page if you

21   don't mind.

22            (Witness complies.)

23       A.   Yeah.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 45

1      Q.    Okay.  So you applied for a

2   full-time job, is that right, as a sales

3   associate?

4      A.    But I didn't work full time.

5      Q.    I understand that.  But is that

6   what you applied for, is that what I'm

7   understanding that to mean at the bottom

8   where it says forty or more hours?

9      A.    That's what's on here.

10     Q.    Okay.

11     A.    But I didn't work full time, I

12  worked part time.

13     Q.    At first, correct?

14     A.    Right.

15     Q.    Now, that was in September of

16  1994 when you filled this out?

17     A.    Right, starting out I just worked

18  part time from 9:00 to 1:00 every day.

19     Q.    Now, is that your signature on

20  the second page of this application?

21     A.    It is.

22     Q.    Now, if you look in that

23  paragraph, that typed paragraph right above

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 46

1    your signature, do you see in the middle of

2    that paragraph where it says in

3    consideration of my employment I agree to

4    conform with the rules and regulations of

5    Sears Company, Sears Roebuck and Company;

6    is that right?

7         A.    Uh-huh.

8         Q.    So you agreed to at that point to

9    conform to their rules and regulations; is

10   that right?

11        A.    I did.

12        Q.    Okay.  Now, you said you began

13   working part time at first?

14        A.    Right.

15        Q.    And when did you start working

16   full time?

17        A.    I think around '97.  I think it

18   was around '97 when I went full time.

19        Q.    Now, when you first started

20   working there in '94, what position did you

21   hold?

22        A.    I worked in the vacuum cleaner

23   department.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 47

1    Q.    And who hired you?

2    A.    Jeffrey Smith.

3    Q.    And who was he?

4    A.    He was the supervisor over brand

5    central.

6    Q.    Who was the SGM at that time when

7    you were hired?

8    A.    Jim Chandler.

9    Q.    And what were your duties in the

10   vacuum cleaner department?

11   A.    To sale, wait on customers, run

12   the register, keep the area clean, stock.

13   Q.    And that was part time you said?

14   A.    Yes.

15   Q.    Did you work on commission?

16   A.    Yeah.

17   Q.    Straight commission?

18   A.    Uh-huh.

19   Q.    Who was your direct supervisor at

20   that time?

21   A.    Jeffrey Smith.

22   Q.    Okay.  Then in 1997, you went

23   full time.  Were you still working in the

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 48

1  vacuum cleaner department at that time?

2  Well, let me rephrase that.  How long did

3  you work in the vacuum cleaner department?

4      A.   I'm not really sure.  I know from

5  -- at that time, they had vacuums and some

6  ranges and dishwashers and all that stuff

7  together.  So, actually, refrigerators and

8  all that was by itself.

9      Q.   Refrigerators and all what were

10 by themselves?

11     A.   Refrigerators and washers and

12 dryers was one -- freezers and all that was

13 one area.

14     Q.   So the bigger appliances were by

15 themselves?

16     A.   Right, larger appliances, yes.

17     Q.   Okay.  So vacuum cleaners were

18 together with the ranges?

19     A.   With the ranges, it was Division

20 20 and 22.  And 22 was the ranges,

21 dishwashers, microhoods and microwaves and

22 stuff.

23     Q.   Okay.  So that's the department

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 49

1  you worked in at first --

2      A.    Right.

3      Q.    -- in '94?

4      A.    Right.

5      Q.    Part time?

6      A.    Right.

7      Q.    And then how long were you

8  working in that department?

9      A.    I worked -- I did that up until

10  when they merged, when they had this major

11  -- I would say in 2000, it was in 2000.

12      Q.    Okay.  So about 2000 you started

13  working in appliances?

14      A.    Yeah, just major appliances.

15  Then they combined the whole area, the

16  whole kitchen area, the stove and

17  refrigerators and all that stuff was

18  combined at that time.

19      Q.    But they moved the vacuum

20  cleaners, correct?

21      A.    Right, they moved vacuums to --

22  that was a part of electronics.

23      Q.    Okay.  And you were full time at

Page 50

1    that point, right?

2        A.    Yes.

3        Q.    Because you went full time in

4    '97?

5        A.    Yeah.

6        Q.    Is that right?

7        A.    It was around '97.

8        Q.    And did you want to go full time?

9        A.    Yeah.

10       Q.    And who was the SGM at that time

11   when you went full time?

12       A.    Louis Collins.

13       Q.    And when you began working in

14   major appliances, who was the SGM in 2000,

15   do you remember?

16       A.    Greg Newton.

17       Q.    And who was your direct

18   supervisor when you worked in major

19   appliances?

20       A.    David Williams.

21       Q.    Now, was there an SGM between

22   Mr. Collins and Mr. Newton?

23       A.    It was actually two, Robert Smith

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 51

1    and Roy Treadwell.

2        Q.    Okay.  How many hours a week did

3    you work when you worked part time from

4    about '94 to '97?

5        A.    I would say about twenty hours.

6        Q.    And then when you began working

7    full time, it was around forty hours a

8    week; is that right?

9        A.    Anywhere from thirty to

10   thirty-five hours.

11       Q.    Thirty to thirty-five hours?

12       A.    Uh-huh.  Sometimes forty, but, I

13   mean, there were hardly forty hours.

14       Q.    And you were still working on

15   commissions; is that right?

16       A.    Yes, ma'am.

17       Q.    Now, who became the SGM after

18   Greg Newton, do you know?

19       A.    Kenny Reese.

20       Q.    Okay.  And he was the SGM at the

21   time of your termination; is that right?

22       A.    Yes, ma'am.

23       Q.    Okay.  Now, you say your direct

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 52

1    supervisor in 2000 when you moved to major

2    appliances was David Williams; is that

3    right?

4        A.    Right.  And David was there up

5    until I think John Lawry came in around

6    June or July.

7        Q.    Of?

8        A.    David quit, yeah -- of 2004,

9    yeah.

10       Q.    Okay.  Now, when you worked in

11   appliances, tell me what your job duties

12   were.

13       A.    Well, basically taking care of

14   the customers, making sure that the

15   department is kept clean, stocking,

16   deluxing.  I had to take all of the stuff

17   out of the appliances.

18       Q.    What do you mean deluxing, can

19   you tell me what that --

20       A.    Taking all the plastic and the

21   styrofoam and all that out of the

22   refrigerators and ranges and all that

23   stuff.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 53

1      Q.    So basically unpacking them and

2   arranging them on the floor?

3      A.    Right, they just call it

4   deluxing.  And putting up stock, arrange

5   courts and all that stuff, smooth top range

6   cleaner, compactor bags and all, putting up

7   stock.

8      Q.    So making sure the area was neat?

9      A.    Exactly.

10      Q.    And appealable to the customer?

11      A.    Exactly.

12      Q.    Did you want to move from vacuums

13   to major appliances?

14      A.    Well, actually, at first I

15   didn't.  But then after talking to

16   Mr. Newton and, you know, he made me see

17   that, you know, I could make more money to

18   move.  And this conversion was going to

19   take place regardless.  So I had a choice,

20   either I go to appliances and do what I had

21   pretty much had been doing or I would have

22   to move to electronics which I didn't know

23   anything about that stuff.  So, I mean,

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 54

1    actually, they was going to make the

2    conversion regardless, so.

3         Q.    Okay.

4         A.    But, I mean, I was willing to go.

5         Q.    Okay.  And the major appliances

6    my understanding is that at Sears -- that's

7    the best chance to make the most

8    commission; is that correct?

9         A.    Yes.

10        Q.    Now, when you began working in

11   appliances, do you recall who worked in

12   that department with you?

13        A.    In my area, I know Michael Smith,

14   he worked there briefly.  I'm thinking --

15   I'm not sure, but I'm thinking -- you're

16   talking about before they made the

17   conversion?

18        Q.    I'm talking about when you first

19   started working in appliances in 2000.

20        A.    Okay.  That's what I was

21   thinking.

22        Q.    Do you remember?

23        A.    I know Michael Smith, Jason

Page 55

1    Golden, we had so many peoples come and go.

2        Q.    Was Jackie Dodson working there

3    at that time?

4        A.    She was working there, but I

5    think Jackie was working over in

6    refrigerators and washers and dryers.

7        Q.    Well, that's what I'm talking

8    about when you started selling major

9    appliances, who was working with you?

10       A.    Oh, yeah, Jackie Dodson and

11   Carolyn Landers.

12       Q.    She was working there in 2000?

13       A.    Well, not in 2000.  Well, she

14   came a few months before I was terminated.

15   But in 2000, was Jackie Dodson, it was

16   Frank James.

17       Q.    Do you recall anybody else, was

18   Ms. Smith there at that time?

19       A.    She wasn't working with us.  She

20   wasn't working over in the refrigerators.

21       Q.    You mean the vacuums?

22       A.    That's where she was working in

23   the vacuums.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 56

1    Q.    Okay.  Okay.  Do you have any

2    reason so I don't sit here and tax your

3    memory, do you have any reason to dispute

4    the employment records that Sears has

5    showing when these various people worked in

6    what department?

7    A.    Do I have any -- excuse me -- do

8    I have any reason to dispute it?

9    Q.    In other words, if Sears has

10   documents reflecting when certain

11   individuals worked in certain departments,

12   do you have any reason to think those

13   documents are inaccurate?

14   A.    Well, I mean, after looking at

15   mines, it says that forty hours or more but

16   I was only there part time.  So, I mean,

17   yes, I would doubt it.

18   Q.    Okay.  And what would you base

19   that on so you think that the records

20   showing when certain individuals worked in

21   certain departments wouldn't be accurate?

22   A.    Well, considering who we was

23   working under, I would have a lot of doubt.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 57

1  Because, actually, you would think from

2  looking at this that I worked -- that I

3  started out working forty hours.

4      Q.    Defense Exhibit 1, correct.  Did

5  you fill that out?

6      A.    I filled it out.

7      Q.    Is that your handwriting?

8      A.    And I was saying that I wanted to

9  work forty hours, but the supervisors

10  worked with my schedule.  I didn't go in

11  working forty hours.

12      Q.    Sure, I understand that.  But you

13  filled that out, though, correct?

14      A.    Yeah.

15      Q.    To say --

16      A.    Yeah.

17      Q.    -- forty hours or more?

18      A.    And you would believe that that's

19  what I was working by looking at this.

20      Q.    It says available though, is that

21  correct, that's telling them when you were

22  available and you actually filled that out;

23  is that right?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 58

1     A.    Uh-huh, that's my writing.

2     Q.    That's you filling that out

3  saying when you were available forty hours

4  a week and that you were available any

5  time, right?

6     A.    Right, I filled that out.  But

7  that wasn't how it was.

8     Q.    That's when you were telling the

9  company when you were available when you

10 filled out this application; is that right?

11    A.    That's what I told them.  But my

12 supervisor had me to put that on there.

13    Q.    And who was your supervisor at

14 that time?

15    A.    Jeffrey Smith.

16    Q.    Okay.  But they said that they

17 would work with your schedule?

18    A.    Yeah.

19    Q.    Because they understood that you

20 just wanted to be part time?

21    A.    For three years, they worked with

22 my schedule.

23    Q.    Okay.  Now, well, let me ask you

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 59

1    this:  At the time you were terminated, who

2    was working in appliances with you?

3          A.    Jackie Dodson.

4          Q.    And is she white or black?

5          A.    She's black.  Carolyn Landers.

6          Q.    Is she white or black?

7          A.    She's white.  Merrill, what was

8    Merrill's name --

9          Q.    Miller?

10         A.    Miller, yeah.

11         Q.    Is he white or back?

12         A.    He's white.

13         Q.    Denise Smith?

14         A.    Yeah, Denise Smith, yeah, she's

15   black.

16         Q.    Anyone else?

17         A.    I'm thinking Stephanie Darby was

18   still there.

19         Q.    Are you sure that Stephanie Darby

20   was still there or do you know?

21         A.    I'm not really, really sure.  But

22   I'm thinking she was.  I know Carolyn

23   Landers was there.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 60

1    Q.   Okay.  But you don't know if
2    Darby was there or not?
3    A.   I'm not really sure about
4    Stephanie.
5    Q.   Okay.  Anyone else?  Now, this is
6    at the time of your termination.
7    A.   That I can remember, it was just
8    the ones that I called out.
9    Q.   Okay.  So Jackie and she's
10   African American, Carolyn, you said she's
11   white, Merrill is white, Denise is black
12   not sure about Stephanie Darby and
13   yourself; is that correct?
14   A.   Right.
15   Q.   Okay.  Now, when you worked at
16   Sears were you ever verbally warned about
17   anything?
18   A.   Never.
19   Q.   You were never verbally warned
20   about any problems you were having with
21   cash?
22   A.   Uh-uh.
23   Q.   Okay.  You were never written up

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 61

1    for any kind of cash issues?

2         A.    Never.

3         Q.    Okay.  Now, you continued to work

4    in appliances from I think you said 2000,

5    right?

6         A.    Uh-huh.

7         Q.    2000 until the time of your

8    termination, you didn't work in any other

9    departments; is that right?

10        A.    No, just appliances.

11        Q.    Now, you told me that part of

12   your duties were to work the cash register

13   and to keep the area clean, unpack some of

14   the appliances and that kind of thing.  Did

15   you also -- well, let me ask you this:

16   What shift did you work usually, do you

17   know?

18        A.    Open.

19        Q.    Okay.  Did you ever close at all?

20        A.    Hardly ever.

21        Q.    Okay.  Do you know what the

22   closing associate's responsibilities were

23   as far as turning in items to the hub

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 62

1    office or anything like that?

2        A.    Uh-huh.

3        Q.    Okay.  And what did that entail?

4        A.    Well, you take them all the

5    detail, you get your detail, all your

6    receipts and all that stuff and your roll,

7    which it would be the register tape and the

8    money and you take it to the back.

9        Q.    Okay.  So you printed out the

10   register tape at the end of the night?

11       A.    Yes.

12       Q.    And turned it in?

13       A.    Yes.

14       Q.    Do you know if the other

15   associates did that?

16       A.    They were supposed to.

17       Q.    Now, do you know if the -- when

18   you say you printed out the tapes, are you

19   referring to the journal tapes?

20       A.    Yes, ma'am.

21       Q.    And you turned those in.  Okay.

22   Do you know if Sears' policies changed when

23   they got new registers and the registers

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 63

1    had memory on them and so they quit

2    printing them out, do you know anything

3    about that?

4         A.   I didn't.

5         Q.   No?

6         A.   No.

7         Q.   Was Byron Mason working at Sears

8    when you were working in appliances?

9         A.   Yes.

10        Q.   Was he working at Sears when you

11   were hired?

12        A.   When I was hired, he wasn't

13   working at the Auburn store.  I think he

14   transferred from Columbus to Auburn.

15        Q.   But you don't know if he was

16   there when you were initially hired?

17        A.   He wasn't.

18        Q.   He was not?

19        A.   Uh-uh.

20        Q.   Now, as far as the pay that you

21   received, you said you worked on straight

22   commissions, correct?

23        A.   Uh-huh.

Page 64

1     Q.    And basically that means the more

2  you sale, right, the more money you can

3  make; is that right?

4     A.    Right.

5     Q.    Now, part of your duties as a

6  sales associate in appliances, you said you

7  needed to know how to work the register,

8  correct?

9     A.    Uh-huh.

10     Q.    And you also needed to know how

11  to deal with coupons; is that correct?

12     A.    Uh-huh.

13     Q.    Is that a "yes"?

14     A.    Yes.

15     Q.    Now, Sears has a variety of

16  coupons that it provides to its customers;

17  is that right?

18     A.    Yes.

19     Q.    Okay.  And these coupons allow

20  customers to receive certain discounts on

21  merchandise; is that right?

22     A.    Yes.

23     Q.    And these coupons have terms and

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 65

1    conditions on them stating when they can be

2    used, what types of merchandise they can be

3    use for, how much the discount is; is that

4    correct?

5        A.    Well, yes.

6        Q.    Now, coupons also have bar codes

7    on them; is that right?

8        A.    Yes.

9        Q.    And that's what's actually

10   scanned to give the customer the discount;

11   is that right?

12       A.    Yes.

13       Q.    Now, the bar code is different

14   for each type of coupon; is that right?

15       A.    I'm not sure.

16       Q.    But the bar code is a way of

17   identifying the coupon; is that right?

18       A.    I guess, I'm not sure.

19       Q.    You don't know?

20       A.    I don't know.

21       Q.    Okay.  Do you know if there is

22   any other way of identifying the coupon

23   besides the bar code?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 66

1    A.    I mean, for whatever the amount

2    is is on the coupon, the amount is on that

3    actual coupon.

4    Q.    Right.  But if you have two

5    coupons discounting the same amount, do you

6    know how you can distinguish which one is

7    used for what?

8    A.    Well, if you scan it, if that

9    merchandise qualifies then it's going to

10   take it off.

11   Q.    Right.  But I'm talking about is

12   there a way -- do you know of a way to

13   decipher which coupon was used other than

14   looking at the bar code on the coupon?

15   A.    We never looked at the bar codes

16   on coupons, we just scanned them.  The only

17   way we look at the bar codes is if we can

18   scan the coupon and it didn't go in, then

19   we'll punch in the numbers.

20   Q.    Correct.  So that's the way to

21   identify the coupon, correct?

22   A.    Right.

23   Q.    Is there any other way of

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 67

1  identifying a particular coupon or linking

2  it to a discount other than that bar code

3  that you're aware of?

4      A.  No, we just scanned it.

5      Q.  Okay.  So that's the way you

6  identified it then was through the bar

7  code?

8      A.  Right.

9      Q.  And you're not aware of any other

10 way?

11     A.  No.

12     Q.  Now, when you began working for

13 Sears, you received an employment handbook,

14 is that right, an employee handbook?

15     A.  Yes.

16     Q.  Now, does this look like -- I'm

17 going to mark Defense Exhibit 3.

18 (Defendant's Exhibit No. 3 was

19  marked for identification.)

20     Q.  Does this look like the handbook

21 you received or is that the handbook you

22 received?

23     A.  It is.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 68

1    Q.    It is?

2    A.    Yes, ma'am.

3    Q.    Now, this handbook contains

4    copies of Sears' policies; is that right?

5    A.    Yes.

6    Q.    Now, if you'll turn with me to

7    page five of the handbook, Defendant's

8    Exhibit 3.  It has a section in here

9    talking about code of business conduct; is

10   that right?

11   A.    Which one you said, what page?

12   Q.    Page five, it's the start of the

13   code of business conduct; is that right?

14   A.    Okay, I got you.

15   Q.    Code of conduct?

16   A.    Okay.

17       MR. MCINTYRE:  While you're

18   looking at that, I have to make a quick

19   call, it's almost noon.

20       MS. HEMSTREET:  Okay.  Well,

21   let's go off the record.  I don't want to

22   continue this without Robin here.

23       (Break taken.)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

1      Q.   (By Ms. Hemstreet) So you

2  understand that looking at this handbook

3  that Sears had a code of conduct that it

4  expected its employees to follow; is that

5  right?

6      A.   Yes.

7      Q.   Now, if you look on page eight.

8  Now, where it says workplace conduct, do

9  you see that at the top of the page?

10     A.   Uh-huh.

11     Q.   And right underneath that it says

12  the following are examples of business or

13  personal conduct that can lead to the

14  termination of employment.  Do you see that

15  there at the top?

16     A.   I see it, yes.

17     Q.   Okay.  And then under that, it

18  goes on to list examples of unacceptable

19  business conduct; is that right?

20     A.   Yes.

21     Q.   Now, if you look at the fifth

22  example down, it says giving unauthorized

23  markdowns to customers and associates.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 70

1    That's a violation of the code of conduct,

2    correct?

3         A.    That's per company policy.

4         Q.    But that's what it says, correct?

5         A.    Per company's policies, yes.

6         Q.    So this means that associates

7    shouldn't give discounts to customers or

8    other associates when they're not eligible

9    for them; is that right?

10        A.    That's per the company's policy.

11        Q.    Okay.  And, also, as an example

12   from that list, it says it prohibits the

13   removing of company resources, is that

14   right, for non-business use?

15        A.    And that too is per company

16   policy.

17        Q.    Okay.  So you can't remove

18   anything from Sears that's a part of Sears

19   for non-work related use; is that right?

20        A.    Per company policy, yes.

21        Q.    Okay.  And those are two things

22   that you can be terminated for; is that

23   correct?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 71

1    A.    That's what Sears' policy says.

2    Q.    Now, were y'all required to --

3    well, let me rephrase.  Did y'all have any

4    kind of online training or E-learning of

5    any sort while you were employed with

6    Sears?

7    A.    We had so much stuff going on,

8    I'm not sure.

9    Q.    Okay.  So you don't know if Sears

10   had an E-learning program, you don't

11   remember going over any kind of policies or

12   anything on the computer?

13   A.    I know we had the annual survey.

14   Q.    And was that done on the

15   computer?

16   A.    No.  I mean, we had to meet in a

17   room and we did that.

18   Q.    I'm sorry, meet in what?

19   A.    We had to meet in a setting like

20   we are in now.  And, you know, the whole

21   store had to do that once card a year.

22   Q.    You don't remember doing any kind

23   of online training via the computer or

Page 72

1    anything?

2         A.    About the appliances, just about

3    the appliances.

4         Q.    Nothing about company policy or

5    anything like that?

6         A.    Uh-uh, uh-uh.

7         Q.    Do you know if you were required

8    to do that?

9         A.    If we was, nobody told me.

10        Q.    Do you know if other associates

11   did that?

12        A.    I don't know what they did.   I

13   can only speak for me.

14        Q.    Okay.  But you don't recall?

15        A.    I don't, no.

16        Q.    Taking any kind of online

17   training regarding Sears' policies?

18        A.    No, just the merchandise.

19        Q.    Now, during your employment at

20   Sears, the managers would hold meetings

21   with the sales associates; is that right?

22        A.    Yes.

23        Q.    And during these meetings, did

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 73

1    you discuss the promotions that were going

2    on?

3         A.    If we had promotions we did.

4         Q.    Did you discuss the sales that

5    were going on in the store?

6         A.    Yeah, the sales, yeah.

7         Q.    Potential discounts that were

8    happening on various types of merchandise?

9         A.    They didn't ever discuss the

10   discounts.

11        Q.    Okay.  Did you ever talk about

12   unauthorized discounts?

13        A.    No.

14        Q.    So they never discussed anything

15   about how to use coupons or unauthorized

16   discounts during these meetings that you

17   recall?

18        A.    Never.

19        Q.    Did you attend all of these

20   meetings?

21        A.    The ones that I attended, they

22   didn't discuss it.

23        Q.    And how often do they have these

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 74

1    meetings?

2        A.    Well, they'll have like meetings

3    about once a week.  But what they're trying

4    to do at that time is talk about PAs.

5        Q.    Meaning protection agreements?

6        A.    Yes, and credit apps.

7        Q.    And what would they talk about

8    with respect to that?

9        A.    Well, all the peoples that wasn't

10   doing well, they need to do better.  You

11   know, it's a part of your job duty to sell

12   PAs, along that line.  But basically that

13   was all that was discussed.  And you're

14   required to have so many credit apps a

15   month.  And they would run different

16   contests and all that trying to get the

17   credit apps and all that stuff going.

18       Q.    Credit card application, you

19   mean --

20       A.    Right.

21       Q.    -- for applying for a Sears'

22   card, that kind of thing?

23       A.    Right.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 75

1      Q.    Now, while you were employed with

2    Sears, they had a $65 service coupon; is

3    that right?

4      A.    Yes.

5      Q.    I'm going to mark this as Defense

6    Exhibit 4.

7    (Defendant's Exhibit No. 4 was

8     marked for identification.)

9      Q.    Now, is this a copy of the $65

10    service coupon?

11      A.    Yes.

12      Q.    Now, these coupons were given to

13    customers who had a service call and

14    declined a repair; is that correct?

15      A.    Yes.

16      Q.    And they were given out by the

17    service technicians; is that right?

18      A.    Yes.

19      Q.    So a service technician would go

20    to somebody's house, the customer would say

21    I don't want a repair because it's too

22    expensive.  And then the service technician

23    might give them a coupon as an incentive