**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 76

1    for them to return to Sears; is that right?

2        A.    Yes.

3        Q.    So the customers would then bring

4    that coupon in towards a replacement item;

5    is that right?

6        A.    Yes.

7        Q.    So this type of coupon is

8    specifically presented to one customer by

9    the service technician; is that right?

10       A.    I guess, yes.

11       Q.    And that's a copy of the service

12   coupon?

13       A.    It is a copy of it.

14       Q.    Now, if you will look with me at

15   that coupon.  It's two pages.  The first

16   page, now this coupon indicates it's $65

17   off on a replacement item, correct?

18       A.    Yes, ma'am.

19       Q.    Okay.  And it also indicates that

20   it's for those who have had a service call

21   and declined a repair; is that right?

22       A.    That's what it say.

23       Q.    Okay.  Now, at the bottom in the

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 77

1    bottom right-hand corner where there is a

2    note to the sales associate, do you see

3    where it says that at the bottom of the

4    page on the right-hand side?

5        A.    Uh-huh.

6        Q.    Okay.  And at the very bottom, it

7    says please collect the coupon and destroy

8    it; is that correct?

9        A.    That's what this is saying, yes.

10       Q.    Okay.  And it also states that it

11   expires two weeks from the date of the

12   service receipt; is that correct?

13       A.    Where are you at?

14       Q.    The same paragraph where there is

15   a note to the sales associate.

16       A.    I see, I see, yeah.

17       Q.    It says verify decline service

18   receipt is dated within two weeks from

19   today.  So it expires two weeks from the

20   date of the service receipt; is that

21   correct?

22       A.    That's if you're reading them,

23   yes.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 78

1    Q.   And this also says it's not valid

2    for use with any other coupons; is that

3    right?

4    A.   Yes.

5    Q.   Okay.  And it's valid for -- this

6    particular coupon is valid for home

7    appliance of 399 or more, correct?

8    A.   Yes, ma'am.

9    Q.   And it also says any other use of

10   this coupon constitutes fraud; is that

11   correct?

12   A.   That's if you're reading them.

13   Q.   Okay.  But that's what it says,

14   right?

15   A.   Okay.  I see it here.  That's

16   what the coupon says.

17   Q.   It says one coupon per purchase;

18   is that right?

19   A.   Yeah.

20   Q.   Okay.  Now, on the second page,

21   is that the bar code that we were talking

22   about before?  There are two bar codes

23   there, is that right, at the bottom

Page 79

1    left-hand corner?

2        A.    Yes.

3        Q.    And the first bar code, my

4    understanding is that that's the 10 percent

5    discount on a protection agreement; is that

6    right?

7        A.    I guess.

8        Q.    Okay.  And then you don't know or

9    you guess, you're not sure?

10        A.    I didn't ever read it.

11        Q.    So you don't know what that bar

12    code, what you would scan that bar code

13    for?

14        A.    No, my focus was the $65.

15        Q.    So you don't know what the first

16    bar code stands for?

17        A.    If I scan that, I scan the bar

18    code and it didn't qualify then nothing

19    would happen.

20        Q.    Okay.  So you were scanning, you

21    were looking for the second bar which is

22    the $65 discount, correct?

23        A.    Right.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 80

1    Q.    And is that number on there

2    5770200195?

3    A.    That's the number, yes.

4    Q.    And that indicates that that

5    would be a $65 discount on the purchase,

6    correct?

7    A.    What you do is you just scan that

8    bar code, if that merchandise applies then

9    it will take it off.

10    Q.    Okay.  Now, you applied this

11    coupon to several sales transactions during

12    your employment at Sears; is that right?

13    A.    I'm not going to say that I did.

14    I don't know.

15    Q.    You don't remember if you applied

16    this service coupon to transactions at

17    Sears?

18    A.    I used it, but I couldn't tell

19    you without actually seeing the customers

20    whether I actually ran that or not.  Just

21    because it was in my number doesn't mean

22    that I ring the sales.

23    Q.    Okay.  I understand that.  But

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 81

1    what I'm asking you is -- you're not

2    answering my question.  What I'm asking you

3    is:  Did you --

4          A.   I have used it, yes.

5          Q.   -- during your employment at

6    Sears use this coupon?

7          A.   I have used it, yes.

8          Q.   Do you know if the customers that

9    you awarded this discount to had had a

10   service call?

11         A.   I'm not sure.

12         Q.   So you don't know if they did or

13   not?

14         A.   I'm not sure.

15         Q.   Do you know if the only time that

16   you gave out this coupon was when a

17   customer had had a service call and brought

18   it into the store?

19         A.   Repeat that.

20         Q.   Do you know if the only time that

21   you used this service coupon and applied it

22   to a sale was only when the customers

23   brought it into the store and had had a

service call?

A. No.

Q. So you used it other times than when a customer brought it in and had a service call?

A. Right.

Q. And you understood that customers who hadn't had a service call weren't eligible for this coupon according to its terms, correct?

A. Well, that was a practice at that store.

Q. But according to the terms of the coupon, that customer unless they brought it in and had a service call were not eligible for it, correct?

A. I mean, I didn't ever read the coupon.

Q. Okay. But that's what the coupon says, correct?

A. I didn't never read it.

Q. Okay. But we just went over the coupon and that's what it said, correct?

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 83

1    A.    I mean, I see it today, but I

2  didn't never read it.

3    Q.    Do you know if you awarded this

4  discount to customers who purchased an item

5  under 399?

6    A.    I'm not sure.

7    Q.    Did anyone in management ever

8  tell you that you were allowed to use the

9  service coupon for customers who had not

10  had a service call?

11    A.    Well, they didn't tell us not to

12  use them either.

13    Q.    Okay.  But did anybody ever

14  specifically tell you that it was okay to

15  use the service coupon for customers who

16  had not had a service call?

17    A.    Everybody, all associates in that

18  department use these coupons.  I have

19  asked, I mean, I've actually seen other

20  peoples use them.

21    Q.    Okay.  Well, Ms. Willis --

22    A.    And if it had been a problem with

23  us using the coupons, then management

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 84

1    should've told us.

2        Q.    Okay.  Well, Ms. Willis, we're

3    going to get into that in a minute.  But my

4    question is:  Did anybody in management

5    ever tell you that it was okay to use this

6    coupon which is Defense Exhibit 4 in

7    circumstances when the customer had not had

8    a service call?

9        A.    No, they didn't tell us not to

10   either.

11       Q.    Okay.  But did they tell you that

12   it was okay to use them is what I'm asking.

13       A.    They didn't tell us not to.

14       Q.    Ms. Willis, you're not answering

15   my question.  Either they did or didn't

16   tell you.  My question is:  Did they tell

17   you that you were permitted to use this

18   service coupon for customers who did not

19   have a service call?

20       A.    I can't say that they did, no.

21       Q.    Now, the coupon says to please

22   collect and destroy the coupon; is that

23   correct?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 85

1    A.    That's if you're reading them.

2    Q.    Okay.  But that's what it says;

3  is that right?

4    A.    Yeah, I seen that today.

5    Q.    So when you applied this coupon

6  to sales, did you destroy it or throw it

7  away?

8    A.    I put it back in the drawer where

9  it was.

10    Q.    But you didn't throw it away?

11    A.    No.

12    Q.    Did anyone in management tell you

13  specifically to keep this service coupon

14  and not throw it away?

15    A.    Well, the managers would be in

16  the register and they didn't move it.

17    Q.    Okay.  But did anyone ever tell

18  you in management not to throw away the

19  service coupon?

20    A.    No, they didn't tell me not to

21  throw it away.

22    Q.    Now, did you have an associate

23  number when you worked at Sears?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 86

1      A.    I did.

2      Q.    And what was that number, do you

3  recall?

4      A.    506063 and 2428.

5      Q.    2428?

6      A.    506063.

7      Q.    Okay.

8      A.    And 2428.

9      Q.    Okay.  So you had two?

10     A.    Two.

11     Q.    And the second one you said was

12  2428?

13     A.    Right.

14           MS. HEMSTREET:  Off the record.

15           (Off-the-record discussion.)

16     Q.    Do you recall, Ms. Willis, using

17  Sears' service coupon during the month of

18  October 2004?

19     A.    Yeah, I did use it sometimes.

20     Q.    I'm going to show you Defendant's

21  Exhibit 5.

22  (Defendant's Exhibit No. 5 was

23   marked for identification.)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 87

1    Q.   Okay.  Have you ever seen those

2    before?

3    A.   The register receipts or the --

4    Q.   The associates summary, have you

5    seen those --

6    A.   Oh, yeah.

7    Q.   -- seen those particular ones

8    before?

9    A.   Yeah.

10   Q.   Do you recall seeing these

11   before, Ms. Willis?

12   A.   Oh, yeah.

13   Q.   Okay.  Now, associate summaries,

14   tell who the associate is and the

15   customer's last name, is that right?  And

16   the date of the transaction and the sales

17   check number.

18   A.   Well --

19   Q.   And also the reduction amount; is

20   that right?

21   A.   Repeat that.

22   Q.   Okay.  The associate summaries.

23   A.   Okay.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 88

1        Q.    If you look at the first page.

2        A.    Uh-huh.

3        Q.    This top typed portion.

4        A.    I know what you're saying.

5        Q.    Not the receipt-looking thing,

6    but the typed portion, that's an associate

7    summary; is that correct?

8        A.    Well, that's the associate

9    number.

10       Q.    Right.  But this whole thing is

11   an associate summary, it's labeled

12   associate summary at the top; is that

13   right?

14       A.    Right.

15       Q.    Okay.  Just so we're on the same

16   page, what I'm going to refer to as the

17   associate summary is this top typed portion

18   here excluding the receipt-looking thing

19   that's copied onto it at the bottom.  Do

20   you see that?

21       A.    I see that.  But I also see that

22   associate number which don't mean that

23   associate ring that.

Page 89

1       Q.    Okay.  Well, basically what I'm

2   asking you is that if I talk about the

3   associate summary while we go through these

4   documents --

5       A.    Okay.

6       Q.    So just you and I are on the same

7   page, it's this typed portion, correct?

8       A.    Okay.

9       Q.    Okay.  Now, that typed portion,

10  the top portion of the first page of

11  Exhibit 5, that shows the sales check

12  number; is that right?

13      A.    Right.

14      Q.    Okay.  The date of the

15  transaction; is that right?

16      A.    Right.

17      Q.    The customer's last name?

18      A.    Right.

19      Q.    Okay.  The total amount?

20      A.    Right.

21      Q.    A reduction amount which is the

22  total reduction that was given in that

23  transaction; is that right?

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 90

1        A.    Right.

2        Q.    And then also at the top which

3    you were pointing out, it has an associate

4    number, correct?

5        A.    Right.

6        Q.    Okay.  Now, your associate number

7    you said was 2428?

8        A.    Uh-huh.

9        Q.    Is that right?

10       A.    Uh-huh.

11       Q.    Okay.  Now, looking at this

12   document, this first page which I'm going

13   to refer to them by the Bates stamp numbers

14   down at the bottom in the right-hand

15   corner.  Do you see where it says produced

16   by defendant?

17       A.    Right.

18       Q.    Okay.  So Document 116, do you

19   see that?

20       A.    Yes.

21       Q.    Okay.  Now, the sales check

22   number ending in 0071, do you see that for

23   customer Moto?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 91

1          A.    Yes.

2          Q.    Now, the journal tape that's

3    printed out on the bottom, that shows that

4    the coupon ending in 00195 was used in

5    that transaction; is that right?

6          A.    Let me see where -- okay.  I see

7    it, yeah.

8          Q.    Okay.  And a discount was given

9    using that coupon of $65; is that right?

10         A.    Yes.

11         Q.    Okay.  And down at the bottom of

12   that receipt, it shows associate number

13   2428 conducted that transaction; is that

14   right?

15         A.    Well, no.

16         Q.    Well, that's --

17         A.    Just because associate 2428 is on

18   there, that doesn't mean that she ring

19   that.

20         Q.    Okay.  But 2428 is your number?

21         A.    It is on here, but that doesn't

22   mean that I am ringing this.

23         Q.    Okay.  But that's what it

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 92

1    indicates; is that correct?

2         A.   Well, that was any associate

3    number.  But it still don't mean that I

4    rang the sale.

5         Q.   Do you recall if you rang the

6    sale?

7         A.   I don't.

8         Q.   But that is your associate number

9    correct?

10        A.   That's my number.

11        Q.   Now, do you know if that customer

12   had a service call?

13        A.   I don't even know whether I rang

14   the sale.

15        Q.   Okay.  But do you know if that

16   customer had a service call?

17        A.   I don't even know the customer.

18        Q.   But do you know if that customer

19   received a service call?

20             MR. MCINTYRE:   Objection, it's

21   asked and answered.

22             MS. HEMSTREET:   Robin, she wasn't

23   answering my question.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 93

1        A.    I don't know.

2        Q.    Okay.  Thank you.  Now, if you'll

3    look at document 00120.

4        A.    Okay.

5        Q.    120, 120, it's just the next

6    couple of pages over.  Okay.  Now, at the

7    top of that associate summary, it gives the

8    associate number 2428; is that right?

9        A.    Yes.

10       Q.    Okay.  And it shows that on sales

11   check number ending in 0343 on 10/22/04

12   there was a $65 discount given; is that

13   right?

14             MR. MCINTYRE:  Just a moment.

15   She's got to get on the right page, back

16   up.

17             MS. HEMSTREET:  We're on produced

18   by defendant 120.

19             MR. MCINTYRE:  This is it.

20             MS. HEMSTREET:  Yeah, that's it.

21       A.    Okay.  You say 03?

22       Q.    Transaction ending in 0343

23   customer Youngblood.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 94

1       A.    Youngblood, okay.

2       Q.    Now, do you see that there is a

3   $65 reduction; is that right?

4       A.    I see it, yes.

5       Q.    Now, the journal tape shows a $65

6   reduction with coupon number ending in

7   00195; is that right?

8       A.    Yes.

9       Q.    Okay.  And is that the same

10  coupon, same bar code that's on the service

11  coupon?

12      A.    That's what's on this paper.

13      Q.    Okay.  So that indicates that a

14  $65 reduction was used giving the service

15  coupon, correct?

16      A.    That's what's on here.

17      Q.    Okay.  Now, also on that receipt

18  it shows that it was the associate number

19  of 2428; is that right?

20      A.    That's the number.

21      Q.    Do you know if this customer had

22  a service call?

23      A.    I don't know the customer.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 95

1        Q.    So you don't know if they had a

2    service call?

3        A.    I don't know the customer.

4        Q.    So this particular --

5        A.    I would be wrong if I sat here

6    and told you that I didn't know whether

7    this customer had a service call because I

8    don't even know who the customer is.

9        Q.    Okay.

10       A.    I don't even know whether I even

11   ring this sale.

12       Q.    Okay.  Do you recall ringing the

13   sale?

14       A.    How would I know?

15       Q.    I'm just asking do you recall the

16   sale.

17       A.    I don't know.

18       Q.    Okay.

19       A.    I don't know Youngblood.  I was

20   Sears top sales person and I would be lying

21   if I sat here and told you that I knew who

22   this person was.  If she looked me in my

23   face right, I probably wouldn't know her.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 96

1      Q.   So you don't recall ringing the

2  sale and you don't know if this person had

3  a service call; is that right?

4      A.   I don't know the person.

5      Q.   So, therefore, you don't know if

6  they had a service call?

7      A.   I don't know.

8      Q.   Thank you.  Now, if you look at

9  document produced by defendant 123, the

10  associate summary.  Are we on the same

11  page?

12     A.   Uh-huh, uh-huh.

13     Q.   Okay.  Sales check ending in

14  20105 on date 10/5/04.  That indicates that

15  there was a $65 reduction given; is that

16  right?

17     A.   It's on here, yes.

18     Q.   Okay.  And if you look at the

19  journal tape which is on the next page,

20  that indicates that that reduction was

21  given using coupon 00195 which is the

22  service coupon; is that right?

23     A.   I see it on this paper, yes.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 97

1      Q.    Okay.   And that was rung up under

2    associate number 2428; is that right?

3      A.    That's the number they got down

4    here.

5      Q.    Okay.   Do you know if this

6    customer had a service call?

7      A.    I don't know the customer.

8      Q.    Okay.  Do you recall ringing up

9    the sale?

10      A.    I don't.

11      Q.    So you don't know if you did or

12    not?

13      A.    I don't.

14      Q.    If you look under document 127,

15    the associate --

16      A.    Okay.

17      Q.    The associate number at the top

18    is 2428.  And the sales check number for

19    customer Hand ending in 0157.

20      A.    Okay.

21      Q.    And the journal tape shows a $65

22    reduction using the service coupon or the

23    bar code attached to the service coupon; is

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 98

1    that right?

2        A.    That's what they got on here.

3        Q.    Okay.  And that was under

4    associate number 2428; is that right?

5        A.    That's the number that's on here,

6    yes.

7        Q.    Now, if you look at 131, which is

8    the next page.

9        A.    Okay.

10       Q.    Customer Macon, the date of the

11   transaction was 10/11/04 sales check

12   ending in 0262.

13       A.    Okay.

14       Q.    And the reduction amount was $65;

15   is that right?

16       A.    Yes.

17       Q.    And the journal tape shows a $65

18   reduction with the service coupon; is that

19   right?

20       A.    That's what they got on the

21   sheet, yes.

22       Q.    Okay.  And it's associate number

23   2428; is that right?

Page 99

1       A.    That's the number.

2       Q.    Okay.  Do you know if this person

3  had a service call?

4       A.    I don't know these people.  So it

5  wouldn't be no different than me and you

6  today.  I don't know them.

7       Q.    Do you recall if you rang the

8  sale?

9       A.    I don't recall that either.

10      Q.    Okay.  If you look at 132,

11 document number 132.

12      A.    I got it.

13      Q.    Customer Turner, sales check

14 ending in 0239 on 10/14, there is a $65

15 reduction; is that right?

16      A.    That's what they have on this

17 sheet.

18      Q.    Okay.

19      A.    Yes.

20      Q.    If you look on the journal tape,

21 it shows that it was rung under associate

22 2428; is that right?

23      A.    That's what they got on this

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 100

1    sheet of paper, yes.

2        Q.    Okay.    There was a $65 reduction

3    using a service coupon; is that right?

4        A.    That's what they got down here.

5        Q.    And, again, do you know if this

6    customer had a service call?

7        A.    I don't know the customer.

8        Q.    Okay.    Do you recall ringing this

9    sale?

10       A.    I don't.

11       Q.    Now, if you look at document 134,

12   customer Cummings, sales check ending in

13   20225.

14       A.    I see it.

15       Q.    Okay.    The associate number on

16   the associate summary is 2428; is that

17   right?

18       A.    Yes, that's what's on here.

19       Q.    Okay.    And on the second page of

20   one or on the page behind that, 135, it

21   indicates that there is a $65 reduction

22   using the service coupon in that

23   transaction; is that right?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 101

1    A.    Let me see where they have it

2    highlighted, yes.

3    Q.    And that's 2428 was the associate

4    number?

5    A.    That's the number.

6    Q.    Okay.  Do you know if you rang

7    this sale?

8    A.    I really don't.

9    Q.    Do you recall using a service

10   coupon here?

11   A.    I don't even know the customer.

12   Q.    Okay.  Do you know if the

13   customer had a service call?

14   A.    I don't know the customer.

15   Q.    So you don't know if they had a

16   service call?

17   A.    I don't know who it is.  I mean,

18   just looking at this, it's not telling me

19   who the customer is.  I couldn't tell you

20   that I sit here and ring this stuff because

21   I don't know.  All of the associates ring

22   in other associate's number.  So I'm not

23   going to sit here and own up to something

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 102

1    that I don't know whether I did or not.

2        Q.   Do you know if this customer had

3    a service call?

4        A.   I don't even know who the

5    customer is.

6        Q.   Okay.  So therefore you don't

7    know --

8        A.   I don't know.

9        Q.   Okay.  Thank you.  Now, document

10   number 137, the first customer Eden, the

11   transaction was on 10/14/04.  The sales

12   check number ending in 0313.  There is a

13   $65 reduction.  And if you look on page

14   138, the journal tapes show that that

15   reduction was given using the $65 service

16   coupon; is that right?

17       A.   That's what's on this sheet.

18       Q.   Okay.  And it was rung under

19   associate number 2428; is that right?

20       A.   That's what they have on here.

21       Q.   And that's your number; is that

22   right?

23       A.   That was my number, but that

Page 103

1    don't mean I rang the sale.

2        Q.    Okay.  Do you know if this

3    customer had a service call?

4        A.    I don't even know who the

5    customer is.

6        Q.    So you don't know if they had a

7    service call?

8        A.    I don't even know who it is.  So

9    I can't say whether they had a service

10   call.

11       Q.    Okay.  Do you recall ringing the

12   sale?

13       A.    I don't know the customer.

14       Q.    Okay.  So you don't recall

15   ringing the sale?

16       A.    I can't say that I did or didn't,

17   I don't know.

18       Q.    Now, if you look at document 139.

19   Customer Bryant, there is a $65 reduction

20   given there; is that right?

21       A.    Yes.

22       Q.    Okay.  And the journal tape shows

23   that it was done with a service coupon; is

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 104

1    that right?

2         A.    That's what it shows, yes.

3         Q.    Okay.  And it was under associate

4    number 2428; is that right?

5         A.    Yes.

6         Q.    Okay.  Do you know if this

7    customer had a service call?

8         A.    I don't know.

9         Q.    Do you know if you rang up the

10   sale?

11        A.    I don't even know -- I don't know

12   any of these peoples.  These peoples are --

13   I don't know them.  They're just customers

14   coming in, I don't know them.

15        Q.    Now, document 140, same thing.

16   Customer Moto, there is a $65 reduction; is

17   that right?

18        A.    That's what it says.

19        Q.    Okay.  Now, looking at the

20   journal tape, it shows that a $65 reduction

21   was given with the service coupon; is that

22   right?

23        A.    That's what it says, yes.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 105

1     Q.   Okay.  And it's under associate

2   number 2428; is that right?

3     A.   Yes, that's what's on this paper.

4     Q.   Okay.  Again, do you know if that

5   customer had a service call?

6     A.   I don't know them.

7     Q.   Do you know if you rang the sale?

8     A.   I honestly don't.

9     Q.   Document number 141, associate

10   summary shows the last customer on there

11   customer Wilson with a sales check ending

12   in 0022.  There is a $65 reduction given

13   there; is that correct?

14     A.   That's what it have in writing

15   here.

16     Q.   Okay.  Now, the journal tape

17   associated with that transaction which is

18   on page 142 shows that the $65 reduction is

19   given using the service coupon; is that

20   right?

21     A.   Yes, yes.

22     Q.   Okay.  And that was under

23   associate number 2428; is that right?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 106

1      A.    That's what's written down here.

2      Q.    Okay.  So a service coupon was

3  used to give that reduction?

4      A.    Yeah.

5      Q.    Okay.  Do you know if that

6  customer had a service call?

7      A.    I don't know any of these

8  peoples.

9      Q.    Okay.  Do you know if that

10  particular customer had a service call?

11     A.    I don't.  I don't even know her.

12     Q.    Do you recall ringing the sale?

13     A.    No.

14     Q.    Now, document number 151,

15  customer Sellers, do you know that

16  customer?

17     A.    I don't know any of these

18  peoples.

19     Q.    Okay.  Do you know if they had a

20  service call?

21     A.    Sellers, I don't know.

22     Q.    Okay.  Now, if you look on the

23  journal tape associated with that

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 107

1    transaction, it shows that a reduction was

2    given using the $65 service coupon; is that

3    right?

4         A.    You said Sellers?

5         Q.    That's right.

6         A.    Okay.  Okay.  Yeah, I see that

7    now, yes.

8         Q.    Okay.  And it was under associate

9    number 2428; is that right?

10        A.    It's under that number.  But just

11   because it's under that number doesn't mean

12   I ring it.

13        Q.    Okay.  Do you recall ringing it?

14        A.    I don't.

15        Q.    Okay.  Do you know if that

16   customer had a service call?

17        A.    I don't know the customer.

18        Q.    So you don't know if they had a

19   service call?

20        A.    I don't.

21        Q.    Okay.  Now, same thing with

22   Youngblood on there, it shows on that

23   associate summary on 151 that they were

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 108

1    given a $65 discount, correct?

2       A.    That's what they have down here.

3    I thought we covered Youngblood before.    I

4    mean, I don't know these peoples.

5       Q.    I understand.

6       A.    I really don't.

7       Q.    Now, on the journal tape

8    associated with Youngblood's transaction,

9    it shows a $65 discount was given with the

10   service coupon; is that right?

11      A.    Yes.

12      Q.    And that was under associate

13   number 2428?

14      A.    Yes.

15      Q.    Now, on document number 155,

16   customer Berry, sales check ending in 0440.

17      A.    Well, I was looking at this

18   because you've got Youngblood on here two

19   times.

20      Q.    Is that the same transaction

21   sales check number?

22      A.    The address is the same so it's

23   got to be the same person.

Page 109

1      Q.    Sure, but is it the same

2    transaction?  Tell me what number -- which

3    ones you're comparing, what numbers you're

4    comparing.

5      A.    152 and 120, I knew I had seen

6    that name before.

7      Q.    But these transactions are on

8    different dates, correct?

9      A.    Let's see.  The one here is the

10   26th.  One on the 25th and one on the 26th.

11     Q.    Okay.  And they're actually

12   different sales check numbers, so they're

13   different transactions, right?

14     A.    Wait a minute, that's a

15   refrigerator.  It's in forty-six too.

16   That's a refrigerator, division forty-six

17   is refrigeration, so both of them are

18   refrigerators.

19     Q.    Okay.  But they're different

20   sales check numbers; is that right?

21   They're different transactions, if you look

22   at -- and on different dates.

23     A.    A day apart.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 110

1    Q.    Well, one was on the 25th and the

2    other one was on the 22nd; is that right?

3        A.    I don't see it on here.

4        Q.    It's on the associate summary.

5        A.    Oh, the 22nd, okay.  I knew I had

6    seen that before.  See, but that's what I'm

7    saying, I can't honestly sit here and tell

8    you I ring up any of this stuff because I

9    would be lying.  I don't know.  I just

10   noticed the Youngblood.

11       Q.    Okay.  Now, customer Berry on

12   155.

13       A.    Okay.

14       Q.    Now, they were given a $65

15   discount; is that correct?

16       A.    That's what they have on this

17   paper.

18       Q.    Okay.  And the journal tape entry

19   associated with that transaction shows a

20   $65 reduction using the service coupon; is

21   that right?

22       A.    Yeah, and they got it on here.

23       Q.    Okay.  Do you know if that

Page 111

1    customer had a service -- if that customer

2    had a service call?

3        A.    I don't.

4        Q.    Do you recall if you rang up the

5    sale?

6        A.    I don't even know Harvel Berry.

7    I don't know this person.

8        Q.    So you don't know if you rang it

9    up yourself?

10       A.    I don't know any of these

11   peoples, I don't, I really don't.

12       Q.    Now, sales check number 0077 on

13   document 159, customer Brackin.

14       A.    Okay.

15       Q.    They were given a $65 discount,

16   is that correct, on 10/02/04?

17       A.    That's what they got on here.

18       Q.    Okay.  And the journal tape shows

19   on page 160 that a $65 reduction was given

20   using the service coupon; is that right?

21       A.    That's what's on this sheet of

22   paper.

23       Q.    Okay.  And it was under associate

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 112

1      number 2428; is that right?

2          A.    It's under that associate number.

3          Q.    Do you know if this customer had

4      a service call?

5          A.    I don't know the customer.

6          Q.    So you don't know if they had a

7      service call?

8          A.    I don't know the customer.

9          Q.    So do you know if they had a

10     service call or not?

11         A.    I can't tell you that, I don't

12     know them.

13         Q.    Okay.  Do you recall ringing the

14     sale?

15         A.    I don't know customer Brackin.

16         Q.    So you don't recall ringing the

17     sale?

18         A.    I don't even know who this person

19     is.  Now, if we didn't ring in other

20     associate's numbers, then yes, I could

21     vouch for yes, I ring these.  But all the

22     associates ring in other associate's

23     numbers.  So why would I sit here and tell

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 113

1    you that I ring this when I might not have.

2         Q.    Okay.    But you don't know if you

3    did or not?

4         A.    I don't.

5         Q.    Okay.    But it was under your

6    associate number; is that correct?

7         A.    It's my number, but that don't

8    mean I ringed it.

9         Q.    Okay.    But you recall using the

10   service coupon in the month of October?

11        A.    Yeah, I have used it.

12        Q.    And you don't know if those

13   people had service calls that you used them

14   for; is that right?

15        A.    Well, even on here some of them

16   said that that person had service calls.

17   So I would be wrong to sit here and tell

18   you --

19        Q.    When you say on here, are you

20   referring to the notes made?

21        A.    On one of the ones, it said that

22   customer did have a service call.

23        Q.    Okay.    Do you know who made those

Page 114

1    notes?

2    A.    I don't know.  This is my first

3    time seeing this.

4    Q.    You don't know if they were made

5    by Terry Gandy during the course of the

6    investigation?

7    A.    I don't know what he did.

8    Q.    Okay.  But you admit to using the

9    coupon when you didn't know if customers

10   had a service call or not; is that correct?

11   A.    I have used it, yes.

12   Q.    And you didn't know that the

13   customers had a service call when you used

14   it?

15   A.    You're asking me --

16   Q.    In other words, Ms. Willis, when

17   you used -- at times when you used this

18   coupon, you used it at times when the

19   customer didn't have a service call; is

20   that right?

21   A.    I have, yes.

22   Q.    Okay.

23   A.    And management was well aware of

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 115

1  it.

2      Q.    Now, the journal tapes that we

3  looked at, those are stored in the register

4  for thirty days; is that right?  Well, at

5  the time of your termination, they were

6  stored in the register for thirty days

7  about; is that right?

8      A.    Well, a journal tape, yes.

9      Q.    Okay.

10     A.    They only have a thirty-day

11 memory.  But they could've gone in the

12 local system and went back as far as six

13 months to a year.

14     Q.    When you say local systems, what

15 do you mean by that?

16     A.    The computer, pull up all the

17 customer's information.

18     Q.    Okay.  Do you know --

19     A.    All the different sales

20 associate's sales --

21     Q.    Do you know if the journal tapes

22 are stored in the local systems?

23     A.    Yeah, I mean, it's these things,

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 116

1    this is what you would pull up right here.

2    And it could go back six months to a year.

3         Q.    Tell me what things you're

4    referring to when you say, the associate

5    summaries?

6         A.    Right, the summaries.

7         Q.    But not the journal tapes?

8         A.    Not the journal tapes.

9         Q.    Okay.  The associate summaries

10    are stored for six months, correct?

11         A.    For six months.  But they're

12    supposed to take the journal tape off the

13    register every night.  So there is ways for

14    them to go back.

15         Q.    Do you know if they were doing

16    that at the registers in appliances at the

17    time you were terminated?

18         A.    They was.

19         Q.    Taking the journal tapes off?

20         A.    They were supposed to have been.

21         Q.    Okay.  Do you know if they were?

22         A.    I'm not really sure.  But I know

23    that that register was still set up so that

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 117

1    you could take the register tape off.

2        Q.    But do you know if they were

3    doing that and if Sears was actually

4    storing them?

5        A.    They should've been if they were

6    following Sears' policy, they should have

7    been.

8        Q.    Where does it say that they need

9    to pull off the journal tapes and store

10   them?

11       A.    If I close that night, that was

12   one of the things that I would have to do,

13   turn in the tape too.

14       Q.    Okay.  But you don't know if

15   other associates were doing that; is that

16   right?

17       A.    No, I don't.

18       Q.    And you hardly ever closed; is

19   that right?

20       A.    Hardly ever.  But the same

21   information they have on the register tape,

22   they have in the associate summary, same

23   information.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 118

1    Q.    Okay.  Well, let me let me ask

2    you -- let's look at an associate summary

3    then.  Does it tell you the bar code on the

4    associate summary of what coupon was used?

5    A.    Well, not in this information.

6    But if they printed it out, they could get

7    this here off of the --

8    Q.    Journal tapes?

9    A.    -- off the journal tapes.

10    Q.    But the journal tapes are erased

11    after thirty days, correct?

12    A.    Huh?

13    Q.    The journal tapes are gone after

14    thirty days unless somebody pulls them at

15    the time of the sale; is that right?

16    A.    I'm not really sure about that.

17    Q.    Okay.  But you see that there

18    isn't any indication of what coupon was

19    used on the associate summary; is that

20    right?  It just gives you the total

21    reduction amount, it doesn't tell you what

22    coupon was used, is that right, on the

23    associate summary?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 119

1        A.    Well, that's what this is saying.

2        Q.    Okay.

3        A.    But it really depends on what

4    they're looking for or if they were looking

5    for anybody else's.  Just like they found

6    this information that's supposed to have

7    been under my number, if they had wanted

8    to, they would've given you a list of

9    everybody in that department for the past

10   six months with that same information.

11       Q.    Now, do you know if other people

12   were investigated?

13       A.    You know what, I don't know.  I

14   just know that I was the first one they

15   said that they investigated.  And the day

16   that they investigated me was the day I was

17   terminated.

18       Q.    Okay.  So you don't know if

19   others were investigated or not?

20       A.    I really don't know.  Because if

21   they had truly been investigated, they

22   wouldn't be there either if they was going

23   to follow the company policy.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 120

1    Q.   And, again, the associate summary

2   doesn't show you what coupons were used to

3   give the reduction; is that right?

4    A.   No, it don't show.  But what it

5   does show, you see that $65, that was the

6   only $65 coupon that they could have used.

7    Q.   Delivery wasn't $65, out of area

8   delivery wasn't $65 at that time?

9    A.   Out of area, yes.  Depending on

10   where they were going.  I think the basic

11   delivery charge at the time was $50.

12    Q.   Okay.  Now, at the end of October

13   of 2004 -- well, let me back up.  In

14   October of 2004, who was your immediate

15   supervisor, was that John Lawry?

16    A.   Yes.

17    Q.   And he was the hard line

18   supervisor; is that right?

19    A.   Yes.

20    Q.   Now, the lost prevention manager

21   at the time was Terry Gandy; is that right?

22    A.   Yes.

23    Q.   Okay.  And the SGM was Kenny

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 121

1    Reese; is that correct?

2         A.    Right.

3         Q.    And Byron Mason was the soft

4    lines lead; is that right?

5         A.    Yes yes.

6         Q.    And Byron, he's African American,

7    correct?

8         A.    Right.

9         Q.    And the others are white; is that

10   right?

11        A.    Right.

12        Q.    Now, at the end of October, do

13   you recall John Lawry coming up to you and

14   asking you if you had given a customer, I

15   think his name was Strickland, free

16   delivery?

17        A.    I do.

18        Q.    What did he say to you?

19        A.    He asked me why didn't Mr.

20   Strickland pay for delivery.  I explained

21   to him that I had talked with the delivery

22   guy.

23        Q.    Do you remember who that was?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 122

1      A.    Fred, he was working for Joel

2  Smith.  And --

3      Q.    Fred, do you know his last name,

4  I'm sorry?

5      A.    I don't know his last name.

6      Q.    Okay.

7      A.    Joel Smith would know.  When I

8  talked with him, he told me that --

9      Q.    Who is he?

10      A.    Fred.

11      Q.    Okay.

12      A.    The guy that was working with him

13  had a class at 6 o'clock, so he wouldn't be

14  able to deliver the refrigerator by

15  himself.  So when I went back to the store

16  to tell the customer, I told him that I had

17  to have the -- had to have him on the load

18  sheet by 4 o'clock.  If he wasn't on the

19  load sheet by 4 o'clock then they wouldn't

20  be able to deliver his refrigerator.  So he

21  told me he was going to leave and go and

22  try to get his brother-in-law to pick up

23  his refrigerator.  And that's what happened

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 123

1    there.  I told him he had until 9 o'clock

2    that night to bring me in the money or else

3    it wouldn't be delivered.  Because it would

4    be easier for me to take it off the load

5    sheet than it would be to not have him on

6    there.

7        Q.    So you actually entered him on

8    the load sheet?

9        A.    I entered him on the load sheet.

10       Q.    Okay.  So you had scheduled

11   delivery; is that right?

12       A.    I scheduled delivery, but he

13   needed to have that money in there to me

14   before 9 o'clock.  But he came in at 8

15   o'clock and picked up his refrigerator.

16       Q.    Okay.

17       A.    And I told Mr. Lawry that.

18       Q.    Okay.  Do you know if Mr. Smith

19   complained to Sears that you were trying to

20   give customer Strickland free delivery?

21       A.    I don't believe he did.

22       Q.    Do you know if he did?

23       A.    No.  They never brought it to my

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 124

1    attention.  When I heard anything about

2    delivery, it was Mr. Strickland and I told

3    Mr. Lawry then what had happened.  Of all

4    the customers that I dealt with in a day,

5    if delivery was a problem, it would be more

6    than one customer.

7        Q.    Okay.  So you don't know if Joel

8    Smith --

9        A.    I don't believe he did.

10       Q.    But do you know if he did?

11       A.    I don't.  Because I didn't even

12   talk with Joel Smith about the sale.  It

13   was the guy that worked with him.

14       Q.    Now, giving free delivery, that's

15   that violation of Sears' unauthorized

16   discount policy; is that right?

17       A.    Yeah.

18       Q.    And the out-of-area delivery fee

19   was $65 at that point; is that right?

20       A.    The guy didn't live out of the

21   area, the guy lived in Opelika.

22       Q.    Okay.  Well, my question is the

23   out of area fee was $65 at that point?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 125

1       A.    I don't know.

2       Q.    You don't know?

3       A.    I don't know.  But Mr. Strickland

4    lived in Opelika, so that would've been

5    local delivery, which would've been $50.

6       Q.    Now, do you recall around that

7    time Terry Gandy and John Lawry approached

8    you and asked you about the correct

9    procedures regarding the coupon and whether

10   to disregard them or turn them in or what

11   associates were supposed to do with them?

12      A.    He asked me what was the

13   procedure, yes.

14      Q.    Okay.  And when was that, do you

15   know?

16      A.    November 1st.

17      Q.    And what did you tell him?

18      A.    I told him it was my

19   understanding that you were supposed to

20   throw them away.  I said but you know that

21   wasn't happening.  Because he was using

22   them, so he knew it wasn't happening.

23      Q.    Okay.  Then on that same day you

Page 126

1   met with Terry Gandy and Nina Fitzwater, is

2   that correct, about misusing the service

3   coupon?

4        A.   Yes.

5        Q.   Okay.  Did they ask you to

6   explain during that meeting why the service

7   coupons had been used on so many sales when

8   the customer didn't receive a service call?

9        A.   They did and I told them the same

10  thing that I'm telling you.  I don't even

11  know whether I rang the sales.  I told him

12  that he could've ringed them for all I

13  knew.  He used to be a sales associate, he

14  knew how it worked.

15       Q.   So you told him you didn't know

16  if you had rung the sales?

17       A.   Right.

18       Q.   Anything else you said during

19  that meeting?

20       A.   And I told him I said that if I

21  used any of them, it was -- management was

22  aware of it.  So are you going to fire the

23  whole store.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 127

1    Q.    Anything else that you said

2    during that meeting?

3    A.    Well, no.  He told me I could go

4    back to the floor and not to discuss -- not

5    to discuss it with anybody because that

6    would be grounds for termination.  And I

7    told him that you could be terminated for

8    anything around this place.  And I went

9    back to the floor.

10   Q.    Okay.  Anything else that you

11   recall that was said during that meeting?

12   A.    Not that I'm aware of.

13   Q.    Did you write a statement?

14   A.    No.

15   Q.    During that meeting?

16   A.    No, not that I can remember.  I

17   think if I wrote anything, it was what he

18   said.  I don't think I did.

19   Q.    You didn't write a statement

20   saying that you've been told the $65 coupon

21   from service is only to be used for

22   customers bringing them in after a repair?

23   A.    That's what he said and that's

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 128

1    what I wrote down there.

2         Q.    Okay.   Let me mark this as

3    Defense Exhibit 6.

4    (Defendant's Exhibit No. 6 was

5     marked for identification.)

6         A.    Terry Gandy said that and that

7    was what I wrote.

8         Q.    Okay.   Is that the statement that

9    you wrote?

10        A.    See, you can see the date,

11   11/1/04, that's what he said.   And that's

12   what I wrote down there.

13        Q.    Okay.   So you wrote down that

14   you've been told that the $65 coupon from

15   service is only to be used if a customer

16   brings them in after a repair has been done

17   on the merchandise?

18        A.    Terry said it and that's what I

19   wrote down.   But I told him this on the

20   floor.   That, you know, that was -- well,

21   uh-uh, he asked me about coupons.   He

22   didn't ask me about $65, he asked me about

23   coupons.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 129

1    Q.    You had an opportunity to write a

2    statement, is that right, in the meeting?

3    A.    Oh, yeah.

4    Q.    And that is the statement that

5    you wrote; is that right?

6    A.    I jotted down what he was saying.

7    That's what he was talking about.

8    Q.    Okay.  You didn't write anything

9    in there about that you may not have rung

10   the sales?

11   A.    I told him.

12   Q.    Okay.  But you didn't write

13   anything in your statement about that, did

14   you?

15   A.    I wasn't giving him one.  Because

16   see, I knew that was a just a bunch of

17   bologna.

18   Q.    Okay.  But you didn't include

19   that in your statement, did you?

20   A.    No.  This is what he said right

21   here and that was what I wrote.  This is

22   what he was telling me and I wrote that

23   down there.

Page 130

1      Q.    Okay.  But you had an opportunity

2  to write a statement as to your position,

3  correct?

4      A.    Yeah, I could've written one.

5      Q.    Okay.  And you didn't make any

6  statements in Defense Exhibit 6 that

7  management was aware that these service

8  coupons were being used like this, did you?

9      A.    I didn't even write a statement.

10  What I wrote down was what he had told me,

11  that was what I wrote down.

12      Q.    So you opted -- what you're

13  telling me is that opted not to write

14  anything else but what's in Defense Exhibit

15  6; is that right?

16      A.    Right, because I didn't even know

17  that these people was getting ready to

18  terminate me.  I didn't know that.  Because

19  I felt at that time I hadn't done anything.

20  When I found out I was getting ready to be

21  terminated was when Kenny Reese called me

22  in his office.  I didn't have a clue that

23  this is what was happening.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 131

1    Q.    So you didn't provide any

2    explanation to them when they asked you why

3    they were giving you -- why you were giving

4    out the service coupons to customers who

5    weren't eligible for them?

6    A.    It's just like I'm telling you, I

7    could not honestly sit here and say that I

8    even ring this stuff.  I told Terry, I said

9    for all I knew, you could've ringed it.  It

10   would've been just as easy for him or Kenny

11   to it as it would have been for me.  Our

12   associate numbers was not a secret.  Every

13   associate there knew our numbers.

14   Q.    Now, you said after you met with

15   Terry and Nina, you met on the same day

16   with Terry and Kenny; is that right?

17   A.    Yeah, about three or four hours

18   later.

19   Q.    Okay.

20   A.    Then Kenny called me to his

21   office.

22   Q.    Okay.  And you understood during

23   that meeting that Sears was terminating you

Page 132

1    for unauthorized discounts using the

2    service coupon; is that right?

3         A.    That was what Kenny told me.

4         Q.    Okay.  Anything else that was

5    said during that meeting with you and Kenny

6    and Terry?

7         A.    I mean, I was just shocked.  I

8    couldn't believe it because I felt that I

9    hadn't done anything.

10         Q.    Can you tell me everything that

11    you said during that meeting?

12         A.    I mean, I'm in a state of shock.

13    And I told Kenny I said, you know, you're

14    wrong.  If you was going to fire anyone for

15    using a coupon, you should fire the whole

16    store.

17         Q.    Did you tell him anything else?

18         A.    Because they was very much aware

19    of the coupon use.  I mean, if for whatever

20    reason the bar codes wouldn't scan, they

21    would come out there with their Social

22    Security number and swipe it for the

23    reduction.

Page 133

1      Q.    So at that point it was

2  authorized, is that right, when the

3  management approved it?

4      A.    Yeah.

5      Q.    Okay.

6      A.    Whether it scanned or not, they

7  could come out there and approve it.

8      Q.    That was done by somebody in

9  management, correct?

10     A.    Yeah, yeah.  They knew.  Terry, I

11  mean, he used coupons.

12     Q.    Anything else that you recall

13  that was said during that meeting?

14     A.    Not to my recollection, I don't.

15  I just told him that he was going to get

16  what was coming to him.

17     Q.    Did you at any point tell Terry

18  and Kenny that it was BS and you could get

19  a job selling anywhere?

20     A.    Well, I told -- I told Terry that

21  when I was sitting in there talking to him.

22     Q.    At the first meeting?

23     A.    Yeah.  At that point, I was

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 134

1    really upset.  I sure did.  And Byron Mason

2    brought me my -- I called to the floor

3    after Terry terminated me for somebody to

4    bring me my purse.  And Byron Mason brought

5    it.  So when I walked out of Terry's

6    office, he was standing behind the wall and

7    he asked me what happened.  And I told him,

8    I'll just tell you this, be careful.

9        Q.    Did you say anything else to

10   Byron?

11       A.    No.

12       Q.    Did you have any other

13   conversations with Byron after your

14   termination?

15       A.    Well, I mean, I was invited to a

16   little going away thing for one of the

17   other associates that worked there.  One of

18   the older ladies, but we didn't discuss

19   what was going on with the case.  But they

20   did invite me.

21       Q.    So no other conversations that

22   you had with Byron since your termination?

23       A.    No.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 135

1      Q.   Any other conversations that

2  you've had with Terry or Kenny since your

3  termination?

4      A.   No.

5      Q.   What about John Lawry, any other

6  conversations with him?

7      A.   I seen him once and, you know, we

8  just spoke and went on.

9      Q.   Okay.  Any conversations that

10 you've had with anybody from Sears which it

11 be a current employee or former employee

12 regarding your termination?

13     A.   Not to my knowledge.

14     Q.   So you never spoke to Ms. Smith

15 about it?

16     A.   Well, in front of my attorney.

17     Q.   Okay.  Did you ever speak to

18 Shannon Bryant about it?

19     A.   In front of my attorney.

20     Q.   Anyone else that you've spoken to

21 about it?

22     A.   That's it that I can remember.

23     Q.   Okay.  So you haven't had any

Page 136

1    conversations outside the presence of your

2    attorney with anyone from Sears whether it

3    be former employees or current employees

4    regarding your termination or the use of

5    coupons?

6         A.    Not to my knowledge.

7         Q.    Now, after you were terminated,

8    did you ask Ms. Smith to take documents

9    from Sears for you?

10        A.    Yes.

11        Q.    Okay.  So you were --

12        A.    I mean, if they would have

13   allowed me to get my blue book, I would

14   have had information in there that I did

15   get to take home.

16        Q.    But that was for company

17   purposes, correct?

18        A.    Yes.

19        Q.    Okay.  So you were asking Ms.

20   Smith to take documents from Sears for

21   personal reasons at that point, correct?

22        A.    Well, so, I mean, we could show

23   that other associates were doing the same

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 137

1    thing that they claim that we did.

2        Q.    Okay.  But that's for personal

3    reasons, correct?

4        A.    Well, so we could bring them to

5    our attorney.

6        Q.    But that's not work related,

7    correct?

8        A.    Well, I wanted get them for my

9    attorney.

10        Q.    And that's for personal reasons,

11    right?

12        A.    I wasn't working there anymore.

13        Q.    Did you have an attorney at that

14    point?

15        A.    I was going to get him.  We

16    needed the evidence because I knew you guys

17    wasn't going to produce any.

18        Q.    So but it was for preparation to

19    file --

20        A.    Exactly.

21        Q.    -- a lawsuit and not related to

22    Sears' sales associate business, correct?

23        A.    Just so that they'll know that we

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 138

1    wasn't the only ones using this coupon.

2        Q.   Now, have you given me all of

3    those documents that you have obtained from

4    Sears through Ms. Smith?

5        A.   Yes.

6        Q.   Okay.  Now, you filed an EEOC

7    charge, correct, after you were terminated?

8        A.   Yes.

9        Q.   Okay.  And in that EEOC charge,

10   you allege that Sears terminated you

11   because of your race; is that right?

12       A.   Yes.

13       Q.   I'm going to mark Defense

14   Exhibit 7.

15   (Defendant's Exhibit No. 7 was

16    marked for identification.)

17       Q.   Is this the EEOC charge that you

18   filed against Sears?

19       A.   That's it.

20       Q.   Okay.  And you're claiming that

21   Sears terminated you but not others because

22   of your race; is that right?

23       A.   Uh-huh, I think so.  Because if

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 139

1   they had of went back to doing it the right

2   way then they would've fired the store.

3        Q.   So the sole basis of your claim

4   here is based on your termination; is that

5   right?

6        A.   Pretty much, yeah.  Because it

7   was only -- they only chose to fire two

8   peoples when this was a practice all the

9   associates in the department was doing it.

10       Q.   Now, were you aware that the EEOC

11  dismissed your charge and found that it was

12  unable to conclude that Sears had violated

13  Title 7 and discriminated against you?

14       A.   Probably because the peoples they

15  were talking to were still working there.

16  They're not going to do nothing in your

17  favor.

18       Q.   Did you receive that from the

19  EEOC?

20       A.   I think so.

21       Q.   I'm marking as Defense Exhibit 8

22  the dismissal and notice of rights to sue.

23  (Defendant's Exhibit No. 8 was

Page 140

1    marked for identification.)

2        Q.   And you see on the side where it

3    has that X marked and it says the EEOC is

4    closing the file on this charge for the

5    following reasons?

6        A.   Yeah, I see.

7        Q.   And doesn't it say that based on

8    its investigation the EEOC is unable to

9    conclude that the information obtained

10   establishes a violation of the statutes; is

11   that right?

12       A.   Uh-huh.

13       Q.   Okay.  Now, Ms. Willis, can you

14   tell me every reason that you think that

15   you were terminated because of your race?

16       A.   Well, every reason.

17       Q.   Every reason you believe that you

18   were terminated because of your race.

19       A.   Because I was outspoken.  There

20   was a lot of things that Mr. Reese was

21   doing that was not right.  I called the

22   ethics line about the scheduling.  He

23   brought Carolyn Landers in which is a white

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 141

1    female.  And he started working her the

2    hours that we worked.  And during the time

3    that I worked there out of the whole ten

4    years, it has always been where the part

5    timers work around the full-timer's

6    schedule.  But he changed all that.  And

7    when she started, it was just black females

8    there anyway.

9        Q.   And those black females -- so

10   Sears had black females in that department;

11   is that right?

12       A.   Yes.

13       Q.   Only?

14       A.   I think Stephanie Darby, she was

15   over there.

16       Q.   So it had three black people and

17   one white person?

18       A.   Yeah.  And it wasn't just us

19   four.  The rest of them was white, there

20   was only three black females.

21       Q.   Okay.  So you're telling me every

22   reason you think you were terminated

23   because of your race?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 142

1          A.    Just truly, the way he went about

2     doing things.

3          Q.    And one was because you said you

4     were you outspoken.  One was you think you

5     were terminated because of your race

6     because you called the ethics line --

7          A.    Yeah.

8          Q.    -- about the scheduling?

9          A.    Yeah.

10         Q.    And what else, he hired Carolyn

11    Landers who happened to be white and there

12    were only or mostly black females working

13    there?

14         A.    And he started working us

15    flexible hours.  And, I mean, just the way

16    he just -- I mean, he would speak -- he

17    would speak to the white associates and

18    you're standing right there.  He would call

19    me off the floor to come to his office to

20    tell me he wanted me to call Lowe's to find

21    out about their delivery charge.  Once I

22    find it out to come back to his office.

23    I'm a commission salesperson.  I should be

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 143

1    on the floor at all times.

2        Q.    Okay.  Any other reason that you

3    think you were terminated because of your

4    race besides what you've named?

5        A.    Well, that's all I can think of

6    now.

7        Q.    Do you know who made the decision

8    to terminate you?

9        A.    Well, Kenny Reese was the one

10   that told me that I was terminated.  But I

11   think they would have to go through

12   associate service center.  But then that's

13   going to be based on what Kenny Reese told

14   them.

15       Q.    But do you know who made the

16   decision?

17       A.    I really don't.

18       Q.    But Kenny Reese informed you of

19   the decision?

20       A.    He's the store manager so he

21   would have --

22       Q.    But he informed you of the

23   decision, right?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 144

1       A.    Right.

2       Q.    Okay.  But you don't know who

3   actually had input into the decision,

4   correct?

5       A.    No.

6       Q.    Did Kenny Reese ever tell you

7   that Sears was terminating you because of

8   your race?

9       A.    No, he wouldn't tell me that.

10      Q.    Okay.  Did Terry ever tell you

11  that you were being terminated because of

12  your race?

13      A.    He wouldn't tell me that either.

14      Q.    Okay.  In fact, he told you the

15  reason you were terminated was because of

16  the misuse of the service coupon, correct?

17      A.    That's what they said.

18      Q.    Okay.  And it's because you were

19  giving it to customers who weren't eligible

20  to receive it; is that right?

21      A.    That's what that allowed to

22  happen at that store.  They were very much

23  aware of who was doing what at that store

Page 145

1    because they were doing it themselves.

2        Q.    Did Reese ever say anything

3    derogatory to you based on your race?

4        A.    Well, he didn't even talk to me.

5        Q.    So he never said anything, you

6    never heard him make any derogatory remarks

7    about African Americans or anything?

8        A.    Never heard him.

9        Q.    What about Terry Gandy?

10       A.    Never heard it.

11       Q.    Did he ever make any derogatory

12   remarks?

13       A.    I never heard him.  But, you

14   know, they -- I don't know what they did.

15   I just never heard them.

16       Q.    Okay.  Now, you said management

17   was aware of what was going on.  Tell me

18   what you mean by that.

19       A.    I have stood there and watched

20   Terry Gandy purchase merchandise.  And the

21   associate go in the drawer, scan that

22   coupon and he at no time said one word.  I

23   have been standing there when --

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 146

1       Q.    Okay.    Let's start with Terry.

2    Okay.   When was this, do you know?

3       A.    I don't keep up with dates.

4       Q.    Okay.   Do you know who the

5    associate was, who the sales associate was?

6       A.    Denise Smith and he purchased a

7    television, high definition.

8       Q.    Gandy purchased a television?

9       A.    For his friend.

10      Q.    Okay.   Do you know what coupon

11   she used, Ms. Smith used?

12      A.    I think it was a $30 coupon.   I

13   think it was $30 because the guy that he

14   purchased it for, I stood there and talked

15   to him.

16      Q.    So the coupon she used was a $30

17   coupon?

18      A.    Uh-huh.

19      Q.    Do you know if Terry was eligible

20   to receive this coupon?

21      A.    Well, he didn't give it her, she

22   got it out of that drawer.   But he didn't

23   say anything either.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 147

1      Q.   Do you know if by the terms of

2  coupon he was eligible to receive it?

3      A.   Well, I wasn't ringing the sale.

4  I'm telling you I seen this associate use

5  the coupon.  I don't know.

6      Q.   So you don't know what the terms

7  of the coupon was or if Terry was, in fact,

8  eligible to receive it, correct?

9      A.   He didn't bring it in.

10     Q.   I understand that.  But was he

11 eligible to receive it?

12     A.   He didn't bring it in.

13     Q.   Do you know what the coupon said?

14     A.   I seen her get that coupon out of

15 the drawer.

16     Q.   I understand that.  But my

17 question is:  Do you know what the coupon

18 said?

19     A.   I don't know what it said, no.

20     Q.   Okay.  Because you said before --

21     A.   He didn't bring it in.

22     Q.   -- Ms. Willis, that you didn't

23 read coupons, correct?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 148

1      A.    But he didn't bring it in.

2      Q.    Okay.  Do you know what the terms

3  of the coupon was that Ms. Smith used?

4      A.    Uh-uh.  Why would I be over there

5  reading it?

6      Q.    Okay.  Do you know if he was

7  eligible to receive it?

8      A.    Evidently, he was.  It went on

9  there and he didn't say anything.  But I

10  know that she got it out of the drawer.  He

11  didn't bring it in.

12      Q.    But you don't know if he was

13  eligible to receive it or not?

14      A.    Uh-uh.

15      Q.    Okay.  Now, any other instance

16  where you say that management was aware of

17  this?

18      A.    Yeah.

19      Q.    That was one, tell me another

20  one.

21      A.    Kenny Reese purchased a $1,500

22  refrigerator for $299.

23      Q.    Okay.  Who was the sales

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 149

1    associate on that one?

2        A.    It was myself.

3        Q.    Yourself, okay.

4        A.    And out of the ten years I worked

5    for the company, I've never seen any

6    manager, any management SGM purchase a

7    side-by-side refrigerator that cheap,

8    never.

9        Q.    Okay.  Now, did you use any

10   coupons in that sale?

11       A.    No.  Cheap as it was, he didn't

12   have to.  You can't buy a top mount

13   refrigerator for $299.

14       Q.    Okay.  Now, any other instance

15   where you claim that management was aware

16   that the service coupon or other coupons

17   were being given out when they weren't

18   supposed to?

19       A.    All of them was aware of it.

20       Q.    Well, give me a specific instance

21   of how you know they were aware of it.

22       A.    Because you would have to if for

23   whatever reason it wouldn't scan, you would

Page 150

1    have to page for one to come to the floor

2    to okay it.  And they will come and swipe

3    their card so that the sale would go

4    through.

5         Q.    So at that point management

6    approved the use of the coupon, correct?

7         A.    Yeah, yeah.

8         Q.    So at that point the discount is

9    authorized because it's been approved by

10   management, correct?

11        A.    Well, I mean, if what you're

12   saying -- if we're using coupons and if it

13   wouldn't scan and we're using them

14   illegally, then why would they come out

15   there and okay it?

16        Q.    But you had asked management --

17   you would call management and tell them

18   it's not scanning, correct?

19        A.    Uh-huh.

20        Q.    And they would come out and have

21   the option at that point to approve it or

22   not, correct?

23        A.    Right.  But they would approve