Page 151

1  it, they would.

2      Q.   Okay.  So at that point, the

3  discount was authorized, correct, and the

4  associate had management's approval to go

5  ahead and give that coupon, correct?

6      A.   Yes, yes.

7      Q.   Now, any other specific instance

8  you can recall that management was aware

9  that coupons were being given out to

10 customers who weren't eligible for them?

11     A.   Well, Terry Gandy bought a cook

12 top and a dishwasher from Stephanie Darby.

13     Q.   Okay.

14     A.   Using two $30 coupons.

15     Q.   Do you know if he was eligible to

16 receive those coupons?

17     A.   No, because she got them out of

18 the drawer.

19     Q.   Well, that's not my question.

20     A.   He didn't bring them in.

21     Q.   Do you know what the terms of

22 those coupons were?

23     A.   But it's only legal by Sears'

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 152

1    policy if you bring them in.

2        Q.    But what I'm asking you is those

3    $30 coupons according to the terms on the

4    coupon, was there anything that you know of

5    on those terms of the coupons that would

6    prevent Terry Gandy from being eligible for

7    it?

8        A.    Well, I was thinking that if he

9    didn't bring them then he wasn't eligible

10   anyway.  It should have been his own

11   personal coupon that Sears sent him.

12       Q.    But the terms of the coupon --

13       A.    I don't know.  I couldn't tell

14   you what the terms of the coupons were.

15       Q.    So you don't know under the terms

16   of the coupon if he was entitled to that

17   discount?

18       A.    Well, I know he wasn't because he

19   didn't bring them in.  That was what every

20   customer --

21       Q.    Other than not bringing them in,

22   do you know if according to what the coupon

23   said and the instructions on the coupon

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 153

1    were that they were permitted for anybody

2    to use?

3        A.    Well, it's one coupon per

4    customer you said.

5        Q.    No, that was on the -- that was

6    on the service coupon.

7        A.    Well, I'm sure --

8        Q.    The specific terms of the service

9    coupon.  Do you know what this $30 coupon

10   said that Stephanie Darby used in that

11   transaction?

12       A.    I didn't never read it, I really

13   didn't.  But I know it wasn't his, I know

14   that.

15       Q.    But you don't know if he was

16   eligible for it or not?

17       A.    No, I don't.  But I doubt it.

18       Q.    Any other instance where you

19   claim that management was aware of coupons

20   being given to customers --

21       A.    They were.

22       Q.    -- ineligible, but any other

23   specific instance that you can recall that

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 154

1    you're aware of?

2        A.   I'm not claiming that they were,

3    they were.

4        Q.   Any specific facts you have to

5    support your conclusion that they were

6    other than what you --

7        A.   They were.

8        Q.   Other than what you've already

9    give me?

10       A.   I've seen it, they were.

11       Q.   Okay.

12       A.   I never read the coupons, but

13   believe this, they were.

14       Q.   Okay.  I understand that's your

15   conclusion, Ms. Willis.  And I'm really not

16   trying to be difficult.  And you've given

17   me two examples where you say that

18   management was aware that these coupons

19   were being given out to customers who were

20   not eligible for them.  Any other examples

21   besides those that you have given me that

22   you can think of?

23       A.   Not at this moment, no.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 155

1      Q.    Okay.  Are there any employees

2   that you claim that were not terminated for

3   giving the service coupon to customers who

4   were not eligible to receive it?

5      A.    I didn't understand.

6      Q.    Okay.  Are there any employees

7   that you are aware of that were not

8   terminated that you claim were giving

9   customers the service coupon who were not

10  eligible to receive it?

11     A.    Stephanie Darby and Carolyn

12  Landers.

13     Q.    Anyone else?

14     A.    I know those two for sure.

15     Q.    Okay.  Anybody else?

16     A.    You said that's still employed

17  there?

18     Q.    No, not necessarily.  Not

19  necessarily still employed there but were

20  not terminated.

21     A.    Well, Carolyn Landers and

22  Stephanie Darby.  Now, Jackie Dodson has

23  used them too.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 156

1    Q.    Okay.

2    A.    Probably all of them.

3    Q.    Do you know if -- let's start

4    with Stephanie Darby.  Do you know if

5    Stephanie Darby gave the service coupon to

6    anyone who did not receive a service call?

7    A.    Yes.

8    Q.    Okay.  How do you know?

9    A.    Because actually I have seen her

10   give reductions to customers.

11   Q.    Using the service coupon?

12   A.    Using the service coupon.

13   Q.    Okay.  Do you know if that

14   customer had a service call?

15   A.    I don't know.

16   Q.    So you don't know if they were

17   eligible for it or not?

18   A.    No.

19   Q.    Okay.  Now, when was that that

20   you saw her use that?

21   A.    I'm not really sure, but I know

22   she used it.

23   Q.    Okay.  Was anyone else present?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 157

1       A.    I don't know.  I don't know.

2       Q.    Do you know if management was

3   aware that she used the service coupon?

4       A.    Yes, they were.

5       Q.    How do you know?

6       A.    Because I have seen Terry Gandy

7   standing back there talking to her while

8   she rang up the sales.

9       Q.    Using the service coupon?

10       A.    Using the service coupons too.

11       Q.    And when was that?

12       A.    I can't recall an exact time.

13       Q.    Do you know if Gandy knew that

14   this customer had a service call or not?

15       A.    He knew that they didn't because

16   she got it out of the drawer.

17       Q.    Okay.  Do you know if Gandy saw

18   her get it out of the drawer?

19       A.    I do and he did because I was

20   standing right there.

21       Q.    Do you know if he understood what

22   coupon it was?

23       A.    Uh-huh.  Terry Gandy used to be a

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 158

1    sales associate.

2        Q.   But do you know if he read the

3    terms of the coupon?

4        A.   One thing about the coupons, you

5    know the difference.  That was just a

6    little envelope.

7        Q.   Do you know if he read the terms

8    of the coupon?

9        A.   Service only gave out one

10   coupon --

11       Q.   Ms. Willis, my question is --

12       A.   -- for a service call, he knew.

13       Q.   Do you know if he read --

14       A.   He knew.

15       Q.   -- the terms of the coupon when

16   Stephanie was using it?

17       A.   I mean, he never asked her any

18   questions.

19       Q.   I'm asking you:  Did you know if

20   he read the terms of the coupon?

21       A.   He didn't just grab it and look

22   at it.

23       Q.   But do you know if he read it or

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 159

1    not?

2         A.    I don't know.  But he's seen it.

3    I mean, it was obvious that was the service

4    coupon.  He knew them.  He knew the

5    difference.

6         Q.    Do you know if Terry called

7    service at that point in time to find out

8    if this customer had a service call?

9         A.    I doubt it.

10         Q.    Do you know if he did?

11         A.    No, he didn't.

12         Q.    Do you know if he did?

13         A.    He didn't.

14         Q.    Do you know if he did?

15         A.    He didn't.

16         Q.    How do you know he didn't?

17         A.    I know he didn't.

18         Q.    Okay.  Tell me every fact you

19    have to support your conclusion that you

20    know he didn't call service.

21         A.    I know he didn't.

22         Q.    Tell me every fact you have.

23         A.    He probably didn't call on mines

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 160

1    either.

2        Q.    Tell me every fact you have that

3    supports your conclusion that Terry

4    Gandy --

5        A.    I just don't believe it.

6        Q.    Okay.  You say you don't believe

7    it?

8        A.    I don't believe it.

9        Q.    That's your belief, you don't

10   have any facts to support your belief that

11   he didn't call to find out if she received

12   a service call --

13       A.    I'm sure it wouldn't be hard to

14   get.

15       Q.    I'm sorry?

16       A.    It wouldn't be hard to get.

17       Q.    What wouldn't be hard to get?

18       A.    The facts because I truly don't

19   believe that he called.

20       Q.    So that's your belief is that he

21   didn't call?

22       A.    I definitely don't believe he

23   did.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 161

1    Q.    But you don't know if he did or

2    not that's just what you believe?

3    A.    I don't, no.

4    Q.    Do you know the circumstances of

5    when Darby used this coupon?

6    A.    No.

7    Q.    The service coupon, do you know

8    if the customer had brought it in?

9    A.    No, I know she got it out of the

10   drawer.   I was looking at her.

11   Q.    And you don't recall when this

12   was?

13   A.    No.

14   Q.    And you don't know what customer

15   it was for?

16   A.    No, I don't.

17   Q.    Do you have any documents to

18   support this?

19   A.    Well, I have documents that show

20   that she has used some of the coupons.

21   Q.    Okay.  Do you have documents to

22   show that she used the service coupon?

23   A.    You had them in your stack

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 162

1    somewhere.  We produced them for you.  It's

2    on the same thing here, associate summary,

3    869, that's her associate number.

4        Q.   Are these what you're referring

5    to associate summary for associate 869?

6        A.   Uh-huh.

7        Q.   Okay.  I'm going to go ahead and

8    mark those as Defense Exhibit 9, put that

9    sticker on there for me.  Thank you.

10   (Defendant's Exhibit No. 9 was

11    marked for identification.)

12       Q.   Now, on page eighty-one, does

13   that indicate that Darby used the service

14   coupon to give a discount on associate

15   summary associate number 869?

16       A.   That's not -- on here, she

17   didn't.  But on eighty-two she did.

18       Q.   Okay.  Let's start with

19   eighty-two.  Eighty-two, which one are you

20   looking at?

21       A.   6839.

22       Q.   Okay.  Do you know if customer

23   Herrick had a service call?

Page 163

1      A.    Uh-uh.

2      Q.    Okay.  Do you know if that, in

3  fact, was that discount was given using the

4  service coupon?

5      A.    I know for a fact.

6      Q.    How do you know?

7      A.    Because, I mean, I worked at

8  Sears a long time and I know that's the

9  only way you could get a $65 reduction is

10 if you had used that service coupon.

11     Q.    But you already said out of area

12 delivery was $65; is that correct?

13     A.    It would not be the same.  This

14 shows a reduction here, a reduction of 65.

15     Q.    Correct.

16     A.    If it was out of area delivery,

17 it wouldn't be on here.

18     Q.    Okay.  But if she were

19 reducing --

20     A.    This was a reduction and that's

21 -- if you pull that original tape, that's

22 what it's going to show.

23     Q.    Okay.  Now, that's the total

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 164

1    reduction amount, correct?

2         A.    Yes.

3         Q.    Okay.  So there could've been

4    various discounts totaling 65; is that

5    correct?

6         A.    Uh-uh.

7         Q.    There couldn't have been?

8         A.    Uh-huh.

9         Q.    Why not?

10         A.    Because Sears' coupons wasn't

11    that way.  If you take for an instance

12    on --

13         Q.    So she couldn't have had, you

14    know, a $5 coupon and then a $55 or a $60

15    coupon?

16         A.    Uh-huh, this was a service

17    coupon.

18         Q.    Just what is your belief based on

19    that that's a service coupon?

20         A.    I know it is.

21         Q.    Just because the amount of $65?

22         A.    If you go back to Sears and have

23    them give you that original receipt, it

Page 165

1    will show -- if you look at the receipt, it

2    will show that same $65 service coupon.

3         Q.    Okay.  That's what you claim

4    it -- do you have that receipt?

5         A.    Oh, I don't have the receipt.

6         Q.    Okay.

7         A.    But that's what this was about.

8         Q.    Okay.  Is there any way you can

9    show it without that receipt?

10        A.    Well, if you go back and pull up

11   that original sale.

12        Q.    Okay.  Is there any other way to

13   show by looking at that that was a $65

14   coupon?

15        A.    Uh-uh.

16        Q.    Now, you said on the next page,

17   eighty-three.

18        A.    Eighty-three.

19        Q.    Okay.  That has a $95 reduction

20   amount.  Is that what you're looking at for

21   customer Jones?

22        A.    Right.  That's a $65 coupon and a

23   $30.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 166

1    Q.    Okay.  How do you know that?

2    A.    I just knew the coupons.

3    Q.    You're just assuming that was a

4    $65 coupon given there?

5    A.    I know that it was.

6    Q.    How do you know?

7    A.    I mean, you know your job.  I did

8    this for years.

9    Q.    I'm asking you --

10    A.    I know that that's a $30 coupon

11    and that is a $65 service coupon.

12    Q.    So you just believe that that's

13    what it is?

14    A.    I know that it is.

15    Q.    You don't have any facts to

16    support that?

17    A.    If you go back and get the

18    original receipt.  They have it in that

19    store somewhere.

20    Q.    Do you have the original receipt?

21    A.    I don't have the original but

22    they got it.  If you go back to that date

23    then you'll see what I'm telling you.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 167

1    Q.    Okay.  But do you have that

2    receipt?

3    A.    No.

4    Q.    Do you have any documents to

5    establish that the $65 coupon was used?

6    A.    Uh-uh.  I'm telling you if you

7    want to find out for sure that's what you

8    can do.

9    Q.    Okay.  But you don't have that

10   document here today, correct?

11   A.    Oh, no, no.

12   Q.    Okay.  So that's just based on

13   your assumption that a $30 coupon  was used

14   and a $65 coupon  was used, correct?

15   A.    Uh-huh.

16   Q.    Is that a "yes"?

17   A.    Yes.

18   Q.    Do you know if customer Jones had

19   a service call?

20   A.    I don't know.

21   Q.    So you don't know if he was

22   eligible to receive that coupon?

23   A.    No.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 168

1     Q.   Same thing with customer Herrick,

2   you don't know if he was eligible for she

3   was eligible to receive that coupon?

4     A.   Even if he would have had a

5   service call, you wouldn't have had two $65

6   coupons.  She got two $65 coupons.

7     Q.   So couldn't have declined repair

8   on two things, is that right, for the same

9   amount?

10     A.   Oh, no.  You get one $65 coupon.

11     Q.   Do you know if anybody in

12   management was aware of these transactions?

13     A.   I don't know.

14     Q.   Any other instance you claim that

15   Darby used the service coupon?

16     A.   Uh-uh.  This is all you had, so

17   this is probably all she had in there.

18     Q.   Any other uses by Darby of the

19   service coupon that you're aware of other

20   than these that we just went over?

21     A.   Not to my knowledge.

22     Q.   Now, you also mentioned Carolyn

23   Landers.  You claim that she also gave the

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 169

1    service coupon to customers who were

2    ineligible for it; is that right?

3        A.    Yes.

4            MR. MCINTYRE:  Don't you want to

5    get your sticker on this?

6            THE WITNESS:  Wait a minute, she

7    gave me one.

8            MS. HEMSTREET:  They're all

9    together.

10       Q.    Here you go, Ms. Willis, that

11   will probably --

12       A.    Thank you.

13       Q.    Sure.  Now, do you know if

14   Stephanie Darby -- I'm sorry -- do you know

15   if Carolyn Landers gave the service coupon

16   to a customer who didn't receive a service

17   call or wasn't eligible for it?

18       A.    I know she did, yeah.

19       Q.    Okay.  How do you know?

20       A.    Because that was a practice.

21       Q.    Tell me specifically how you know

22   that she gave this coupon to people who

23   weren't eligible for it.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 170

1      A.    I've seen her.

2      Q.    You've seen her.  Do you know

3  when?

4      A.    No.

5      Q.    And tell me what the

6  circumstances were.

7      A.    Well, I mean, she wanted to close

8  the sale.

9      Q.    Do you know what customer it was?

10     A.    No.  I mean, it was nothing

11  unusual.  All of them did it.

12     Q.    And how do you know this customer

13  didn't receive a service call?

14     A.    Because I looked at her when she

15  pulled it out of the drawer.

16     Q.    So you saw her pull it out of the

17  drawer?

18     A.    I saw her.

19     Q.    Was anybody else there?

20     A.    I'm not really sure.  But, I

21  mean, all of them was aware of it.

22     Q.    But was anybody else there?

23     A.    Not to my knowledge, I don't

Page 171

1    know.

2        Q.    Okay.  So you claim you saw her

3    take it out of the drawer.  And do you know

4    if the customer had a service call?

5        A.    No.  If she took it out of the

6    drawer, they didn't.

7        Q.    But do you know if they had a

8    service call?

9        A.    I know they didn't.  She took the

10   coupon out of the drawer.  They didn't

11   bring it in with them.

12       Q.    But do you know if they had had a

13   service call?

14       A.    They hadn't.

15       Q.    How do you know they hadn't?

16       A.    I mean, if they had had a service

17   call, then would've brought the coupon in

18   with them.  If she took it out of the

19   drawer, then they didn't bring it in with

20   them.

21       Q.    Do you know if management

22   approved this transaction?

23       A.    Well, not all of them they had to

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 172

1    approve now.  Just the ones that wouldn't

2    scan.

3         Q.   But do you know if management

4    gave her permission to do this?

5         A.   No, management didn't even come

6    over there.

7         Q.   Do you know if they had given her

8    permission to do this?

9         A.   Management didn't come over

10   there.

11        Q.   So you don't know when this

12   happened.  You don't know what customer it

13   was.  But you saw her take the coupon out

14   of the drawer.  And you don't know if the

15   customer had a service call or not?

16        A.   Well, I know they didn't because

17   she pulled the coupon out of the drawer.

18   They didn't bring it in with them.  I was

19   standing right there when she opened the

20   drawer and got it.

21        Q.   So you're assuming they didn't

22   have a service call because she got it out

23   of the drawer?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 173

1    A.    I know they didn't.  If they had

2  of had a service call, they would've

3  brought it in with them.  She pulled it out

4  of the drawer.

5    Q.    Do you know if anybody in

6  management was aware of this particular

7  transaction that you're talking about?

8    A.    I can't say that they were.

9    Q.    Now, Ms. Willis, you told me that

10  you thought that Carolyn Landers had used

11  the service coupon.  Do you know if

12  management was aware of her use of the

13  service coupon?

14    A.    I'm more than sure they was.

15    Q.    Okay.  How do you know that?

16    A.    Because I'm just sure that they

17  was.

18    Q.    What facts do you have to support

19  your conclusion?

20    A.    I don't have any facts, but you

21  can rest assure they knew.

22    Q.    Okay.  That's your assumption is

23  that they knew?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 174

1      A.    They knew.

2      Q.    But do you have any facts at all

3  to support your assumption?

4      A.    They knew that I used them.

5      Q.    I'm sorry?

6      A.    They knew that I used them.  They

7  knew what was going on.  They allowed it.

8      Q.    Do you have any facts

9  specifically with respect to Ms. Landers

10  that management was aware that she was

11  using these service coupons?

12      A.    You know what, I know that they

13  knew.

14      Q.    Okay.  Tell me how you know that.

15      A.    Because they knew everybody that

16  was using that around there and that was

17  everybody in the store that worked in

18  appliances.

19      Q.    Okay.  How do you know that they

20  knew that everybody was using them?

21      A.    I know that they did.  If they

22  had to come out there and sometimes give us

23  permission, you know, swipe their cards to

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 175

1    okay it, they knew what was going on.

2        Q.    So --

3        A.    They okayed it.

4        Q.    Did you ever tell management that

5    Landers was using the service coupon when a

6    customer wasn't eligible for it?

7        A.    That wasn't my business.

8        Q.    Okay.  Do you know if anybody

9    else did?

10       A.    I don't know what nobody else

11   did, I just didn't.

12       Q.    Do you know of any other way that

13   management would be aware that anybody else

14   was misusing service coupons?

15       A.    They knew that that service

16   coupon was being used.  I've stated over

17   and over again that they knew.

18       Q.    Right, but I'm asking you for --

19       A.    They would have to come out there

20   in some instances and swipe for us to give

21   the reduction.

22       Q.    On the service coupon?

23       A.    On any of them.  If they didn't

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 176

1    swipe and we called them, called

2    management --

3        Q.   I'm specifically talking about

4    the service coupon.  That's what I'm

5    specifically talking about.  How do you

6    know if management was aware that Landers

7    was giving the service coupon out when she

8    wasn't supposed to?

9        A.   Because that was the practice

10   around the store.  Management knew it.

11       Q.   Okay.  Just generally because

12   that was the practice?

13       A.   I worked there so I knew that

14   management knew.

15       Q.   You don't have any specific facts

16   to back that up?

17       A.   I don't, but I know that they

18   knew it.

19       Q.   Okay.  Now, do you know if Darby

20   was working in October of 2004 in

21   appliances?

22       A.   I'm not really sure whether she

23   had went out to work with the remodel or

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 177

1    not.  I'm not really sure.

2         Q.    Okay.  Now, do you know --

3    Landers was employed in October of 2004; is

4    that correct?

5         A.    Yeah, she was.

6         Q.    Okay.

7         A.    I think it was me -- I don't

8    think Stephanie was there at that time.

9         Q.    Do you have any evidence to

10   support or to show that Landers used the

11   coupon or misused the service coupon in

12   October of 2004?

13        A.    No.  I know that she used it.

14   She might not have used it in October, but

15   she used it.

16        Q.    Okay.  Do you know if she used it

17   in October of 2004?

18        A.    I don't know how many times she

19   used it, but she used it.

20        Q.    Do you know if she used it in

21   October of 2004?

22        A.    I'm more than sure she did.

23        Q.    Okay.  How do you know, do you

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 178

1    have any documents to back that up?

2        A.    You've got the summaries, don't

3    you, you've got the one for Stephanie so

4    I'm more than sure you got the summary for

5    her.  I'm telling you it was a practice.

6        Q.    And what was her associate

7    number, was it 414?

8        A.    Yeah, 414.

9        Q.    I'm going to mark as Defense

10   Exhibit 10.

11   (Defendant's Exhibit No. 10 was

12    marked for identification.)

13       Q.    Let me find my copy here.  Okay.

14   So these are the only documents you have

15   that show when Ms. Darby -- I mean, when

16   Ms. Landers used the service coupon, is

17   that right, or supposedly used the service

18   coupon?

19       A.    Yes.

20       Q.    Okay.  Now if you look at

21   document 86.

22       A.    86?

23       Q.    Correct.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 179

1        A.    I have got 89.

2              MR. MCINTYRE:   What?

3        A.    Wait a minute, here it is.  I put

4    it on.

5              MR. MCINTYRE:   In the wrong

6    place.

7        A.    Yeah, there we go.

8        Q.    Okay.  Does this show that

9    associate 414 used a service coupon?

10       A.    That 11699, that's what you're

11   talk about?

12       Q.    No, any of them, any of the

13   transactions on this page.

14       A.    I don't know what she did there

15   to be giving that kind of reduction.   I

16   couldn't tell you what she did there.

17       Q.    On any of these transactions, you

18   can't tell which ones --

19       A.    Uh-uh, I don't know what she did.

20   You'll have to look back at the receipt for

21   these.

22       Q.    Okay.  What about on page

23   eighty-nine, can you tell if she used the

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 180

1    service coupon on that one?

2        A.    Uh-uh, uh-uh.

3        Q.    Okay.   What about document number

4    ninety, any indication that she used the

5    service coupon on that one?

6        A.    Hite.

7        Q.    Hite, okay, a $65 reduction; is

8    that right?

9        A.    Yes.

10       Q.    Do you know if that customer had

11   a service call?

12       A.    I don't.

13       Q.    Okay.   Do you know if management

14   was aware of this transaction?

15       A.    I don't.   I'm not going to say

16   that because I don't know.   I mean, we were

17   commission salespeople.   So I didn't just

18   stand there and watch her all day.   I just

19   knew that they knew that that was a

20   practice.

21       Q.    Okay.   What about page

22   ninety-one, there is a $65 reduction there.

23   Do you know if that was a service coupon?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 181

1      A.    That was a coupon, yes, it was.

2      Q.    Do you know if it was a service

3  coupon?

4      A.    It was a service coupon is what

5  I'm telling you.

6      Q.    How do you know, just because of

7  the $65 amount?

8      A.    Uh-huh.

9      Q.    Okay.  But there is no indication

10  as to what bar code was scanned on that, is

11  there?

12     A.    You've got that original receipt

13  which it is on there.

14     Q.    Okay.  But you can't tell by

15  looking at this, can you?

16     A.    Oh, no, not by looking at that.

17  But I know that that's what it is.

18     Q.    Okay.  But you can't tell by

19  looking at this, the associate summary,

20  what coupon it specifically it was, can

21  you?

22     A.    Uh-uh.

23     Q.    Okay.  Do you know if that

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 182

1    customer had a service call?

2        A.    I don't.

3        Q.    Same thing on number ninety-two.

4        A.    Scaife, that's what it is.

5        Q.    $65 reduction, do you know if the

6    service coupon was used to give that?

7        A.    Uh-huh, it was the service

8    coupon.

9        Q.    How do you know, just because of

10   the amount?

11       A.    Yeah.

12       Q.    Okay.  But you don't have the bar

13   code to link that to that particular

14   amount, do you?

15       A.    It's on that receipt.

16       Q.    Okay.  But it's not --

17       A.    That original receipt is on

18   there.

19       Q.    Have you seen that?

20       A.    I know it's on there.

21       Q.    But have you seen it?

22       A.    If you bring it in here, you'll

23   see that $65 reduction was from that

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 183

1    service coupon.

2        Q.    Right.  But those are purged

3    after thirty days, correct?

4        A.    What do you mean?

5        Q.    The journal tapes, the receipts

6    are purged after thirty days?

7        A.    They keep them.  They keep them.

8        Q.    You think that they keep them?

9        A.    They do.  And on the back side

10   here, the $253 --

11       Q.    Who keeps them?

12       A.    They are kept in the hub.

13       Q.    Who keeps them?

14       A.    The 253.79, the $65 reduction

15   that's on here, that was the service

16   coupon.

17       Q.    Okay.  Who keeps the receipts?

18       A.    They used to be kept back in the

19   hub.

20       Q.    They used to be kept in the hub?

21       A.    Uh-huh.

22       Q.    Okay.  Do you know if they

23   stopped doing that at some point?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 184

1        A.    I've been gone almost two years.

2    I don't know what they are doing now.

3        Q.    Okay.  Do you know if they kept

4    the receipts when you were terminated?

5        A.    They did at the time.  They did

6    at the time I was there.  I don't know what

7    they're doing now.

8        Q.    Okay.  But you think that they

9    kept them at that time?

10       A.    Yeah, they did.

11       Q.    At the time you were terminated?

12       A.    They did.

13       Q.    How do you know that?

14       A.    I mean, I told you we would have

15   to turn in the rolls.

16       Q.    You said you would turn them in,

17   but you didn't know if other people turned

18   them in; is that correct?

19       A.    Well, I said that if they were

20   following Sears' policy, then they were

21   doing the same thing.

22       Q.    Okay.  But you don't know if

23   other associates were turning them in; is

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 185

1    that right?

2        A.    Uh-uh.

3        Q.    Now, do you know on page

4    ninety-three if customer Pitts had a

5    service call?

6        A.    I don't, but I doubt it.

7        Q.    Okay.  But do you know if he did

8    or not?

9        A.    I don't know, no.

10       Q.    So do you know if that customer

11   was eligible to receive that coupon?

12       A.    I don't know.

13       Q.    Okay.  Do you know if management

14   was aware of this transaction and whether

15   or not they had received a service call?

16       A.    I don't know.  Because, see, you

17   would actually have to know the customer,

18   you know, to be able to --

19       Q.    What about on -- have we gone

20   through all of these?  Now, on any of

21   these, do you know if any of these

22   customers from the associate summaries that

23   we looked at had a service call?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 186

1    A.   I don't.

2    Q.   And what about on Darby's which

3    was exhibit -- what was that?

4    A.   Nine.

5    Q.   Nine, do you know if any of her

6    customers that were given the $65 discount

7    had a service call?

8    A.   I doubt it, but I don't know for

9    sure.

10    Q.   Anybody else besides those two

11   individuals that you claim used the service

12   coupon --

13    A.   Jackie Dodson, she used it too.

14    Q.   -- that were not terminated --

15   Jackie Dodson?

16    A.   Uh-huh.

17    Q.   Do you have any documents to

18   support the fact that you claim she misused

19   the service coupon?

20    A.   Well, I mean, it was a practice.

21    Q.   But do you have any specific

22   instances that you recall where she gave

23   the service coupon and she wasn't supposed

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 187

1    to?

2        A.    Let me think.    I know that she

3    did though.    I know that she did.    I'm not

4    really sure on that one, but I know she

5    did.

6        Q.    You don't know of any specific

7    instances where she gave the service coupon

8    and she wasn't supposed to?

9        A.    Not specifics.

10       Q.    And Dodson is African American,

11   correct?

12       A.    Yes.

13       Q.    And she is not terminated,

14   correct?

15       A.    I guess.    She wasn't when I --

16       Q.    She wasn't terminated; is that

17   right?

18       A.    During the time when I was

19   terminated.

20       Q.    And she's still working there,

21   correct?

22       A.    I guess, I don't know.

23       Q.    Do you know if Dodson misused

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 188

1    this coupon during the month of October of

2    2004?

3         A.    I don't know.

4         Q.    Do you know what Sears did to

5    investigate the coupon and the misuse of

6    the service coupon?

7         A.    Well, the only thing I heard was

8    that Kenny told me that Terry had called

9    service.

10        Q.    Called the service department?

11        A.    Service department, yes.

12        Q.    To verify who had a service call?

13        A.    That's what he said.

14        Q.    Okay.  That's what Terry told

15   you?

16        A.    That's what Kenny told me.

17        Q.    That Terry had done?

18        A.    Yes.

19        Q.    Okay.  Do you have any other

20   information regarding who conducted the

21   investigation?

22        A.    No.

23        Q.    Do you know what the

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 189

1    investigation showed into the misuse of the

2    service coupon?

3        A.    No.

4        Q.    Do you know how the results of

5    this investigation for certain associates

6    compared to yours?

7        A.    No.

8        Q.    Do you know if the other

9    departments in the brand central were

10   investigated?

11       A.    I doubt it, but I don't know.

12       Q.    Do you know what that

13   investigation revealed?

14       A.    Uh-uh.

15       Q.    Is that a "no"?

16       A.    No.

17       Q.    Okay.  Do you know what service

18   told Terry regarding these transactions

19   that they were investigating as to whether

20   or not these customers had service calls or

21   not?

22       A.    I don't believe he called them,

23   but I don't.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 190

1      Q.    So you don't know what service

2    told Gandy or anybody else in management --

3      A.    I don't believe he called them.

4      Q.    -- regarding these transactions?

5      A.    I don't believe he called them.

6      Q.    Okay.  But do you know what

7    service told him or if they told him

8    anything?

9      A.    I don't.

10      Q.    You filed a complaint, is that

11    right, alleging that you were discriminated

12    against because of your race?  This is

13    different than your EEOC, you actually

14    filed a lawsuit in court; is that right?

15      A.    Uh-huh.

16      Q.    Is this a copy of the complaint

17    -- I'm marking this as Defense Exhibit 11.

18    (Defendant's Exhibit No. 11 was

19     marked for identification.)

20      Q.    Is that a copy of the complaint

21    you filed in federal court against Sears?

22      A.    (Witness reviewing document.)

23    Yes, it is.

Page 191

1     Q.    Okay.  Now, you're claiming in

2  your complaint that you were discriminated

3  against based on your termination; is that

4  right?

5     A.    Uh-huh.

6     Q.    Okay.  Is that the only basis of

7  your claim for race discrimination is your

8  termination?

9     A.    Well, yeah, because, I mean --

10     Q.    But that's what -- I'm just

11  confirming --

12     A.    Yes.

13     Q.    -- that that's the case.

14     A.    Yes.

15     Q.    Okay.  Now, have you told me

16  about every other white associate that you

17  think had misused the service coupon that

18  you refer to in your complaint?

19     A.    Yes.

20     Q.    Okay.  So Stephanie Darby?

21     A.    That I can recall.

22     Q.    So Stephanie Darby and Carolyn

23  Landers are the only two that you claim

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 192

1    misused -- well, and Jackie Dodson misused

2    the service coupon and were not

3    terminated --

4        A.    Well, I'll say that I seen

5    personally use these coupons.

6        Q.    Okay.

7            MR. MCINTYRE:  Let me interject.

8    She mentioned earlier which was different

9    was that Miller --

10           THE WITNESS:  Yeah, he worked in

11    the department with us.

12        Q.    Okay.  Do you have -- well, what

13    I'm getting at here, Ms. Willis, if you

14    look you say in your complaint you say

15    other white associates were doing the same

16    thing meaning that they too were misusing

17    the service coupon.  You've told me about

18    specifically about Stephanie Darby and

19    Carolyn Landers.  Any other white

20    associates that you claim misused the

21    service coupon and were not terminated?

22        A.    Those were the two that I knew

23    used them and I knew nothing happened to

Page 193

1    them.

2         Q.    Okay.  Anybody else besides

3    Jackie Dodson but she's not white, she's

4    black?

5         A.    Right.  That wasn't terminated,

6    right?

7         Q.    Correct.

8         A.    Okay.  Just those two.

9         Q.    Okay.

10        A.    Now, Merrill, he was, if I'm not

11   mistaken, he was still training.  And see,

12   even when they're in training, they ring up

13   under our number.  That's why I could not

14   just sit here and tell you that I ring all

15   the sales.

16        Q.    Okay.  Do you have any

17   information that Merrill misused the

18   service coupon, personal knowledge that

19   Merrill misused the service coupon?

20        A.    I can't tell you I sit here and I

21   seen him.  You know, because he would wait

22   on his customers and I would wait on mine.

23        Q.    Now, it's my understanding from

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 194

1    your complaint that you are seeking back

2    pay; is that right?

3         A.    Well --

4         Q.    As damages?

5         A.    Yeah.

6         Q.    Is that correct?

7         A.    Yeah.

8         Q.    Okay.  It's also my understanding

9    from your interrogatory responses and your

10   complaint that you're not making a claim

11   for mental anguish or emotional stress?

12        A.    No.

13        Q.    And you're not seeking any

14   compensatory damages?

15        A.    What do you mean?

16        Q.    Mental anguish damages, you're

17   not claiming you've seen doctors or

18   anything as a result of this?

19        A.    No.

20        Q.    Okay.  Haven't experienced mental

21   anguish or emotional distress in any way?

22        A.    No.

23        Q.    Okay.  And you have produced your

Page 195

1    tax returns to us for the years that we've

2    asked for; is that right?

3        A.   I think all except for 2000.  I

4    think 2000 is missing.

5        Q.   Yeah, but 2001 through 2005; is

6    that right?

7        A.   Yeah.

8        Q.   Okay.  Do you recall how much you

9    made in 2005?

10       A.   I was just working at Dillard's

11   in 2005.  That was about 16,000.

12       Q.   Okay.  Until you got that second

13   job, but your income has increased since

14   then; is that right?

15       A.   Not really.

16       Q.   Since you've obtained that second

17   job?

18       A.   Not really.  Because the reason I

19   obtained that second job was because I

20   needed insurance.  And standing on my feet

21   was starting to bother my feet.  So that

22   was the reason, you know, one of the jobs I

23   stand and the other job I sit.  But I think

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 196

1    around the end of the year, I will probably

2    be either at 16,000 or less.

3        Q.   Now, can you tell me what

4    information Shannon Bryant has related to

5    your claim against Sears?

6        A.   I don't know.

7        Q.   You don't know.

8        A.   I mean, she's aware of how the

9    coupons and stuff was used because she was

10   there.

11       Q.   Anything else that you claim Ms.

12   Bryant has knowledge of?

13       A.   I just know about the coupons.  I

14   know she knew how that was.

15       Q.   Have you had any conversations

16   with her about this or your termination?

17       A.   No.  The only conversation I had

18   was when I was with my attorney with her.

19       Q.   Do you know if Ms. Bryant was

20   investigated at Sears for writing bad

21   checks?

22       A.   I wouldn't know.  I really

23   wouldn't because see, she was in

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 197

1  management, so I wouldn't know.

2      Q.   Okay.  So that's the only

3  information you claim Ms. Bryant has is how

4  coupons were being used at the store?

5      A.   Well, I know that she knew that

6  because she was one of the managers that

7  would have to okay these things too.  So I

8  know she would be aware of that.

9      Q.   What about Wilborn Sanders, what

10  information do you claim that he has?

11      A.   Well, he knew about the coupon

12  use.

13      Q.   Anything else?  When you say knew

14  about the coupon use, what do you mean?

15      A.   He knew that if we called one of

16  the managers, the only thing they would do

17  is come out and okay it.  So they was very

18  much aware of how we were using coupons

19  because it was a practice there.

20      Q.   Any other information you claim

21  that he has regarding your allegations

22  against Sears?

23      A.   That's about it.

Page 198

1    Q.   Okay.  What about Geraldine

2    Barnes, any information you claim that she

3    has?

4    A.   Well, I mean, they knew about the

5    coupons too.  Because not only were they

6    using them, they was using them all over

7    the store not just in brand central.

8    Q.   They were using the service

9    coupons all over the store?

10   A.   Not the service coupon, every

11   area have their own coupons.

12   Q.   Okay.  But we're talking

13   specifically about the service coupon.

14   A.   So the other coupons don't

15   matter?

16   Q.   So did Wilborn Sanders know how

17   the service coupon was being used or just

18   generally coupons?

19   A.   Well, he knew that management was

20   very much aware of the coupon use around

21   the store.  Not only the service coupons,

22   any other coupon.

23   Q.   But do you know if Wilborn

Page 199

1    Sanders has any information regarding how

2    the service coupon was used?

3         A.    I don't know.

4         Q.    Okay.  What about Geraldine, what

5    information do you claim that she has to

6    support your claim against Sears?

7         A.    Like I said, she could tell you

8    about the coupon use.

9         Q.    And, again, you're not talking

10   specifically about the service coupon; is

11   that right?

12        A.    No, I'm talking about all of

13   them.

14        Q.    Okay.  Anything else that you

15   claim that she has information about

16   regarding your allegations against Sears?

17        A.    No.

18        Q.    What about Jimmie Tyson, any

19   information?

20        A.    Just the coupon use.  That's what

21   I was terminated for, so that's what I'm

22   trying to --

23        Q.    So, again, not necessarily the

Page 200

1    service coupon but --

2          A.    All over the store.

3          Q.    Okay.

4          A.    Coupons in general.

5          Q.    So you don't know if he has any

6    information regarding how the service

7    coupon was used?

8          A.    I don't know.

9          Q.    What about Byron Mason, what

10   information do you claim he has?

11         A.    Well, Byron, he knows exactly

12   what was going on, how the coupons was

13   used, service coupon and all of them.  He

14   knew because he was a part of management.

15         Q.    Any other information you claim

16   Mr. Mason has regarding your allegations

17   against Sears?

18         A.    Well, he knew about Kenny and

19   Terry and them was, because they didn't

20   even make him aware that I was being

21   terminated.

22         Q.    He was --

23         A.    He was a part of management and

Page 201

1    he didn't know it.

2         Q.    Was he your direct manager?

3         A.    No, John Lawry was my direct

4    supervisor.

5         Q.    Okay.  But Byron was head of soft

6    lines, right, which is not your --

7         A.    Right, but still he was assistant

8    store manager.  John Lawry and Byron Mason

9    was assistant store managers.

10        Q.    And Lawry was your direct

11   supervisor?

12        A.    Right.

13        Q.    Okay.  What about James Benson,

14   what information does he have?

15        A.    He worked in hardware.  So, I

16   mean, he knew how the coupon use worked.

17        Q.    Do you know if he has any

18   information regarding the service coupon?

19        A.    He knew that management was aware

20   that we were using the coupons.  Because he

21   also used them down in hard lines in

22   hardware.

23        Q.    The service coupon?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 202

1    A.    I wouldn't doubt it.  I believe

he has too.

3    Q.    Do you know if he did or not,

used the service coupon?

5    A.    He was aware that they allowed us

to use them.  This was something management

knew.  And he was aware that management

knew about it.

9    Q.    Any other information you claim

Mr. Benson has regarding your allegations

against Sears?

12    A.    No.

13    Q.    What about Anthony Smiley, what

information do you claim he has?

15    A.    Same thing on the coupon.

16    Q.    How generally coupons were being

used, not specifically the service coupon,

but just coupons in general?

19    A.    Right.

20    Q.    Okay.  What about Mr. Collins?

21    A.    Well, he knew about the coupon

use, my work ethics, you know, because I

worked under him for years.  And he knew

Page 203

1    that all that stuff that they got claiming

2    that I did, he knows that I wouldn't have

3    done that.

4        Q.    But he wasn't managing at that

5    time; is that right?

6        A.    Exactly.  Kenny had only been a

7    store manager eight months.

8        Q.    What about Greg Newton, what

9    information do you claim that he has?

10       A.    He knew what type salesperson I

11   was and that I would not have done the

12   things that they say that I did.

13       Q.    What about the use of coupons,

14   would he know about the use of coupons?

15       A.    He should, he should.

16       Q.    Is that what --

17       A.    He knew that all that stuff that

18   they put in my records that that wasn't me.

19   And I wouldn't do anything that I wasn't --

20   that they wasn't aware.

21       Q.    What do you mean all the stuff

22   they put in your records?

23       A.    About all those coupons, that I

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 204

1    ring all those coupons.  As I'm firmly

2    sitting here, I don't believe it.  And like

3    I told Terry and Kenny, for all I know, you

4    all could've ring them.  Now, I'm not

5    saying I didn't ring some of them.  I'm

6    just not aware of which ones.  But I'm not

7    saying that I rang them all.

8         Q.   So you're not denying that you

9    did ring some of them?

10        A.   Oh, rang --

11        Q.   And that those customers didn't

12   have service calls; is that correct?

13        A.   Well, I have rang customers that

14   didn't have service calls.

15        Q.   Now, Nina, what information does

16   she have regarding your --

17        A.   Well, she sit in on the

18   interrogation when they was --

19        Q.   The meeting?

20        A.   Yeah.

21        Q.   With you and Terry, the first

22   meeting?

23        A.   Right, right.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 205

1    Q.    Okay.  Any other information you

2  claim she has?

3    A.    She knew about coupons too.

4    Q.    Do you know if she has any

5  information regarding specifically the

6  service coupon?

7    A.    I don't know what she has.

8    Q.    Okay.  What about Stephanie

9  Darby?

10    A.    She definitely knew about it.

11    Q.    The use of the --

12    A.    Coupons.

13    Q.    -- service coupons?

14    A.    Yeah.

15    Q.    What about Carolyn Landers?

16    A.    She did too.

17    Q.    The use of coupons?

18    A.    Yes.

19    Q.    Clint Teal?

20    A.    He did too.

21    Q.    And Jason Patrick?

22    A.    Jason, he was security.  He would

23  have to know too.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 206

1      Q.    About what?

2      A.    About the coupons.  Most of the

3  one that's on there is the ones that knew

4  about the coupons.

5      Q.    Okay.  When you say knew about

6  the coupons --

7      A.    They knew how they were being

8  used around the store.

9      Q.    You mean taken out of the

10 register; is that right?

11     A.    Right.

12     Q.    Okay.  Now, Jackie Dodson, same

13 thing?

14     A.    Yeah, she knew.  Now, whether

15 they own up to it or not, they still knew.

16     Q.    Now, I'm going to give you

17 Defense Exhibit 12.

18 (Defendant's Exhibit No. 12 was

19  marked for identification.)

20     Q.    Can you tell me when you wrote

21 that?

22     A.    I can't remember the exact date.

23     Q.    Do you remember why you wrote it?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 207

1      A.    To let you guys know what was

2   going on and what I had said.

3      Q.    Was it after you had filed a

4   lawsuit or before?

5      A.    After.

6      Q.    After you filed the EEOC charge?

7      A.    Yeah.

8      Q.    And after you had filed the

9   lawsuit?

10      A.    Yeah.

11      Q.    Okay.  Now, you state in this

12   statement here that -- did you give this to

13   anybody?

14      A.    Uh-uh, just my attorney.

15      Q.    Okay.  You didn't give it to

16   anybody at Sears?

17      A.    No.

18      Q.    Okay.  Now, you say in here

19   Carolyn Landers and Stephanie Darby had

20   used the same store coupon, you're talking

21   the service coupons and no adverse action

22   was taken against them, correct?

23      A.    Right.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 208

1    Q.    Have you told me about all the

2    facts that you know about that, have we

3    gone over all that regarding Ms. Darby and

4    Ms. Landers?

5    A.    That I could remember.

6    Q.    Okay.  Now, the second paragraph,

7    you say you called the Sears' ethics line

8    to report certain managerial improprieties.

9    Now, was that when you called them to

10   discuss scheduling; is that right?

11   A.    Exactly.

12   Q.    Okay.  And you were unhappy with

13   the fact that you weren't getting the

14   schedule that you had wanted; is that

15   right?

16   A.    Well, for this associate to come

17   in after a couple of months and then she

18   get the better hours.  Usually your better

19   sales associate get the better hours.  And

20   the part-timers work around our hours.

21   Q.    Okay.  Now, this associate that

22   you're talking about is Carolyn Landers?

23   A.    Carolyn landers.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 209

1      Q.    Now, was she part time?

2      A.    Uh-huh.

3      Q.    Okay.  Was she a student, do you

4  know?

5      A.    It didn't matter.

6      Q.    But do you know if she was a

7  student?

8      A.    All the ones I ever worked with

9  were students.

10     Q.    Okay.

11     A.    But they still worked around our

12  schedules.

13     Q.    So she was a student; is that

14  right?

15     A.    I don't know, I guess.

16     Q.    Do you know what her availability

17  was?

18     A.    I don't know that either.

19     Q.    Okay.

20     A.    But I'm thinking she was hired

21  for nights.  That's what I'm thinking.

22     Q.    Okay.  But do you know what her

23  availability was, when she was available to

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 210

1    work?

2        A.    I don't know, no.

3        Q.    So you don't know what her class

4    schedule was?

5        A.    Uh-uh.  But it wouldn't make any

6    sense if you got three daytime peoples to

7    hire somebody just to bring them in and you

8    don't need them for the morning.  That

9    wouldn't make any sense.

10       Q.    But y'all were available,

11    required to be available sixty-five out of

12    the seventy-three hours that Sears was

13    open, correct?

14       A.    Well, yeah.

15       Q.    Okay.

16       A.    But it was only until Kenny Reese

17    got there that we didn't have -- they

18    always had their better associates working

19    during the day.  That's when the biggest of

20    the customers are there.  It was only when

21    he got there that this changed.

22       Q.    Do you know what Carolyn's

23    availability was?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 211

1      A.    I didn't, I didn't have nothing

2  to do with her availability.  But I know it

3  was unfair for him to bring her in after

4  being there a couple of months.

5      Q.    Okay.  And you called the ethics

6  hotline or Sears 1-800-assist number,

7  right?

8      A.    Yes.

9      Q.    Now, when you were in this

10 meeting with Terry and Nina, did you tell

11 him or Nina specifically who else was

12 misusing the service coupon?

13     A.    I didn't tell him anything.  I

14 told you, I didn't have a clue that I was

15 getting ready to lose my job.

16     Q.    But you didn't mention anybody

17 else was misusing the service coupon; is

18 that right?

19     A.    Uh-uh, if they was doing the

20 investigation, they should've known.  And

21 it wasn't like Terry and them didn't know,

22 they knew.

23     Q.    Okay.  At the bottom of page

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 212

1    thirty-nine, the very last sentence. It

2    says that all the years you've been

3    employed with Sears, you never had the fear

4    of losing your job because you were a black

5    female; is that right?

6         A.    Right.

7         Q.    Now, when you called the HR, the

8    1-800-assist number, do you remember what

9    you told them?

10        A.    Well, what it was I asked them

11   did he have the authority to just up and

12   just change our schedules and stuff. Take

13   our off days from us because that's what he

14   was trying to do. You know, we had just

15   set every Tuesday and Sunday was my days

16   off. So, you know, he was saying that all

17   that was going to change. And, you know,

18   our availability was when he needed us.

19   And, you know, I just called them to see.

20   And what they told me was that they could

21   guarantee me one regular day off a week.

22   And rest of it was left up to management.

23        Q.    Okay. Is that all you told them?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 213

1      A.   Yeah.  Actually, that's what I

2   was trying to find out whether he could

3   actually do that.  Because all the other

4   store managers that I've worked under, they

5   have always had their better associates

6   there during the better hours.  Because if

7   we chose to work for Sears full time, then

8   we would get the better hours.

9      Q.   Now, have you told me every

10  instance that you know of where Terry Gandy

11  has made a purchase using a coupon that was

12  pulled from the drawer?

13     A.   I know he bought a dishwasher,

14  cook top and a TV that I know of.

15     Q.   So we've talked about that

16  already though, right?

17     A.   Right.

18     Q.   Now, Mr. Johns, George Johns is a

19  customer, correct, of Sears?

20     A.   Yes.

21     Q.   Okay.  Is he a friend of yours?

22     A.   No, he's not a friend but I know

23  him.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 214

1    Q.    Okay.   Does he have any knowledge

2    regarding your reason for termination?

3    A.    What do you mean?

4    Q.    Like does he have any idea why

5    management terminated you, does he have any

6    information about your termination?

7    A.    Well, he said that he went into

8    the store and one of the associates in the

9    store told him that I had been terminated.

10    Q.    Okay.   Do you know if he talked

11    to management about it?

12    A.    I don't know.

13    Q.    Okay.   Do you know if he has any

14    information as to whether or not other

15    Sears associates gave out the service

16    coupon when they weren't supposed to?

17    A.    I don't know whether he has any

18    information on the service coupon.   But I

19    know that he has information on coupons

20    that was pulled out of the drawer.

21    Q.    Okay.   Same thing with Ms. Johns,

22    do you know if she has any information

23    about your termination?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 215

1    A.   Well, that's her husband so, I

2  mean, and they had to go in there together.

3  So they probably told both of them at the

4  same time.

5    Q.   Do you know if she discussed your

6  termination at all with management?

7    A.   I don't know.

8    Q.   Okay.  Do you know if she has any

9  information or facts to show that other

10  sales associates misused the service coupon

11  who weren't terminated?

12    A.   Well, no.  But I do know that she

13  came in to make a purchase from me but I

14  wasn't there.  So she had to buy it from

15  another associate that ringed it in my

16  number.

17    Q.   And who was that associate?

18    A.   Jackie Dodson.

19    Q.   Do you know if she used the

20  service coupon on that?

21    A.   I don't think she -- it wasn't

22  the service coupon, but it was a $50

23  coupon.

Page 216

1        Q.    Okay.

2        A.    And she used a $50 coupon on both

3    of the transactions.  But I didn't ring

4    that sale.  She ringed it.  And I wasn't

5    even at the store.  That's a violation of

6    the company policy to ring in other

7    associates' numbers.

8        Q.    On those associate summaries that

9    we looked at regarding Stephanie Darby, do

10   you know if she rang all of those sales or

11   if they were just rung under her number?

12       A.    You know what, I can't honestly

13   sit here and tell you that I do.  Because

14   I don't even know whether all these --

15   whether someone rung them under mine, I

16   don't know.

17       Q.    Same thing for Carolyn Landers,

18   do you know if she rung those sales under

19   her number?

20       A.    I can't honestly say that she

21   rang them either.  I don't know.  But if

22   you're looking at it, that's her associate

23   number, just like 2428 is mines.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 217

1      Q.    I'm going to show Defense Exhibit

2    13 is your response to our -- whoops, I put

3    that upside down.  Responses to Sears'

4    discovery requests.

5    (Defendant's Exhibit No. 13 was

6     marked for identification.)

7      Q.    I'm trying to find my copy here.

8    Hang on a second.  If you look on the -- i

9    don't know what page it is.  But it's the

10   statement that's attached to it.

11     A.    Yeah.

12     Q.    Okay.  Do you know when you

13   drafted that?

14     A.    I'm not sure of the date.

15     Q.    Do you know the approximate time

16   that you would've drafted that?

17     A.    I don't.

18     Q.    You don't?

19     A.    (Witness nodding head.)

20     Q.    Can you tell me if it was before

21   or after you filed your lawsuit against

22   Sears?

23     A.    It was after, I know that.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 218

1    Q.    Now, you say in that statement

2    Carolyn Landers used the coupon on August

3    28th, 2004 and September 30th, 2004.    Were

4    those some of the transactions that we

5    looked at a while ago?

6    A.    It should be in here, yeah.

7    Q.    And you said you don't know if

8    those customers have received a service

9    call; is that right?

10    A.    I don't.

11    Q.    And in here you say Stephanie

12    Darby used the coupon on May 8th, 2004, May

13    18th, May 24th and July 30th and no adverse

14    action was taken against her.    Do you know

15    -- and you stated earlier you didn't know

16    if those times she used the coupon, if

17    those customers had had a service call; is

18    that right?

19    A.    I don't.

20    Q.    Okay.    And you don't know if

21    management was aware of those transactions

22    or if those customers had had a service

23    call; is that right?

Page 219

1      A.   I don't.

2      Q.   Okay.  Same thing with Carolyn

3  Landers, management didn't know if those

4  customers had had a service call; is that

5  right?

6      A.   I don't know.

7      Q.   You don't know?

8      A.   Uh-uh.

9      Q.   Okay.  Now, you say here, Ms.

10  Willis, this basically -- second sentence

11  from the end in the first paragraph:  I had

12  not done anything different than I had been

13  doing under the other store managers prior

14  to Mr. Reese being hired and it was never a

15  problem before.

16      A.   I hadn't did anything any

17  different.

18      Q.   Okay.  And are you referring to

19  the fact of using the coupons?

20      A.   Well, no, I'm talking about if I

21  used the coupons, it was because that's

22  what management allowed.  I mean, I've done

23  my job.  I did my job while I was there.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 220

1    Q.    When you said you weren't doing

2    anything different, what are you saying

3    there?

4    A.    I did my job, that's what I'm

5    saying.

6    Q.    And it was never a problem

7    before --

8    A.    The coupon use came under Kenny

9    Reese.

10   Q.    Okay.  So before Kenny Reese, you

11   didn't use coupons out of the drawer, is

12   that what you're saying?

13   A.    If the customers brought them in,

14   I used them.

15   Q.    And that was the only time you

16   used them if the customers brought them in?

17   A.    During other store managers.

18   Q.    Okay.  Now, when you called to

19   report unemployment, is that right, they

20   interviewed you, do you recall that?

21   A.    Yeah.

22   Q.    Okay.  And they asked you what

23   happened and you told them the

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 221

1    circumstances, is that right, do you recall

2    that?

3         A.    I don't recall what I told them.

4         Q.    Regarding your termination?

5         A.    I still don't recall what I told

6    them.

7         Q.    Okay.  I'm marking this as

8    Exhibit 14.

9    (Defendant's Exhibit No. 14 was

10     marked for identification.)

11        Q.    Have you seen that before?  Does

12   it show it's a document from the Department

13   of Industrial Relations records; is that

14   right?  At the bottom where it's stamped --

15        A.    Yeah.

16        Q.    -- it says certified and true

17   copy of Alabama Department of Industrial

18   Relations; is that right?

19        A.    Okay.

20        Q.    Okay.  At the top left-hand

21   corner, it says Beatrice Willis; is that

22   right?

23        A.    Yeah.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 222

1    Q.    It says separation resulted from

2    claimant statement; is that right?

3    A.    Yeah, that's what it says.

4    Q.    Okay.  Now, on the right-hand

5    side, it indicates that in your statement

6    you said that you were terminated by Kenny

7    Reese, the store manager for violation of

8    company policy, do you see that at the top

9    right-hand side?

10    A.    Yeah, yeah.

11    Q.    Okay.  And it says you were

12    accused of illegal use of coupons.  And

13    here it says you never illegally used any

14    coupon, is that right, is that what you

15    told them?

16    A.    Again, I used them in the manner

17    management allowed us to use them in.

18    Q.    So if the customers brought in

19    the coupons; is that right?

20    A.    Some of the customers did.

21    Q.    Okay.  The service techs were

22    supposed to give the coupons to customers

23    who called in for repairs.  But they also

Page 223

1    gave them to the sales associate to use, is

2    that what you told them?

3         A.    I'm not going to say that I did.

4    I don't know.

5         Q.    It says you never received any of

6    the coupons.  So, in fact, this statement

7    is saying that you only used the coupons

8    when the customer brought them in; is that

9    right?

10         A.    Well, no, I'm not saying that.

11         Q.    That's not what that says?  It

12    says I never illegally used coupons, the

13    customers brought them in?

14         A.    I said under other store

15    managers, customers brought them in.

16         Q.    It doesn't say that there, Ms.

17    Willis.

18         A.    Not up under Kenny Reese.

19         Q.    It says that you never illegally

20    used any coupons.  They were taking your

21    statement and you said that I never

22    received any of the coupons.  And that you

23    used the coupons when the customers brought

Page 224

1    them in, is that not what that says?

2         A.    That's what this paper says.

3         Q.    Okay.  And you didn't tell them

4    that?

5         A.    I'm not sure.

6         Q.    Okay.  Because this is

7    inconsistent with what you told me earlier

8    about you used the coupons out of the

9    drawer.  And then when you called and gave

10   this statement, you said that you didn't

11   use the coupons illegally.  That you only

12   used them when the customers brought them

13   in; is that right?

14        A.    I said under other managers, I

15   used them if the customers brought them in.

16   Under Kenny Reese, yes, it was a practice.

17        Q.    Okay.  But that's not what this

18   says though, right?

19        A.    That's what I'm saying.

20        Q.    It says you didn't illegally use

21   them, but you only used them when the

22   customers brought them in.

23        A.    I did, management was aware of

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 225

1    the coupon use.

2         Q.   And when was this statement

3    given?  So basically you told the

4    Department of Industrial Relations that you

5    only used the coupon when the coupons were

6    brought in by the customers; is that right?

7         A.   Under other store managers.

8         Q.   It doesn't say under other store

9    managers there, does it?

10        A.   I'm telling you that that's what

11   I'm saying under other store managers,

12   under Kenny Reese, it was practice.

13        Q.   Now, in this same statement,

14   let's go back to Exhibit 13, you say also

15   that you were being -- in the second

16   paragraph -- I'm sorry -- that you are

17   being discriminated against because of

18   reprisal because you called Sears' ethics

19   hotline.  So is that my understanding you

20   think that you were terminated because you

21   called the Sears' hotline to complain about

22   scheduling?

23        A.   Well, I think that was part of