**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3                EASTERN DIVISION

4

5    CASE NUMBER:   3:05-CV1018-M      **ORIGINAL**

6    DENISE L. SMITH,

7            Plaintiff,

8            vs.

9    SEARS ROEBUCK & COMPANY,

10           Defendant.

11

12         S T I P U L A T I O N

13         IT IS STIPULATED AND AGREED by

14   and between the parties through their

15   respective counsel, that the deposition of

16   Shannon Bryant may be taken before Anita

17   Thebo, Commissioner, at the offices of

18   Burr & Forman, at 201 Monroe Street,

19   Montgomery, Alabama 36104, on the 6th day

20   of September, 2006.

21

22         DEPOSITION OF SHANNON BRYANT

23                          (50102)

"Exhibit 2"

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 2

1          IT IS FURTHER STIPULATED AND

2     AGREED that the signature to and the

3     reading of the deposition by the witness

4     is waived, the deposition to have the same

5     force and effect as if full compliance had

6     been had with all laws and rules of Court

7     relating to the taking of depositions.

8          IT IS FURTHER STIPULATED AND

9     AGREED that it shall not be necessary for

10    any objections to be made by counsel to

11    any questions except as to form or leading

12    questions, and that counsel for the

13    parties may make objections and assign

14    grounds at the time of the trial, or at

15    the time said deposition is offered in

16    evidence, or prior thereto.

17         IT IS FURTHER STIPULATED AND

18    AGREED that in accordance with Rule 5(d)

19    of The Alabama Rules of Civil Procedure,

20    as Amended, effective May 15, 1988, I,

21    Anita Thebo, am hereby delivering to Mieke

22    A. Hemstreet the original transcript of

23    the oral testimony taken on the 6th day of

Page 3

1    September, 2006, along with the exhibits.

2              Please be advised that this is

3    the same and not retained by the Court

4    Reporter, nor filed with the Court.

5              *   *   *   *   *   *   *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 4

1                          I N D E X

2                       E X A M I N A T I O N

3                                                      P a g e

4    By Ms. Hemstreet ...................... 6

5    By Mr. McIntyre ..................... 101

6              E X A M I N A T I O N   C O N T I N U E D

7                                                      P a g e

8    By Ms. Hemstreet ................... 115

9    By Mr. McIntyre ..................... 124

10   By Ms. Hemstreet ................... 127

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 5

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  EASTERN DIVISION

4

5     CASE NUMBER:  3:05-CV1018-M

6     DENISE L. SMITH,

7              Plaintiff,

8              vs.

9     SEARS ROEBUCK & COMPANY,

10             Defendant.

11

12    BEFORE:

13             Anita Thebo, Commissioner.

14

15    APPEARANCES:

16             ROBIN T. MCINTYRE, ESQUIRE,

17    Attorney at Law, 2101 Executive Park

18    Drive, Opelika, Alabama 36801, appearing

19    on behalf of the Plaintiff.

20             MIEKE A. HEMSTREET, ESQUIRE, of

21    Burr & Forman, 420 North 20th Stree, Suite

22    3100, Birmingham, Alabama 35203, appearing

23    on behalf of the Defendant.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 6

1          I, Anita Thebo, a Court Reporter

2   of Prattville, Alabama, acting as

3   Commissioner, certify that on this date,

4   as provided by the Federal Rules of Civil

5   Procedure and the foregoing stipulation of

6   counsel, there came before me at the

7   offices of Burr & Forman, 201 Monroe

8   Street, Montgomery, Alabama 36104,

9   beginning at 1:20 p.m., Shannon Bryant,

10  witness in the above cause, for oral

11  examination, whereupon the following

12  proceedings were had:

13          SHANNON BRYANT,

14  being first duly sworn, was examined and

15  testified as follows:

16          EXAMINATION

17  BY MS. HEMSTREET:

18          COURT REPORTER:  Usual

19  stipulations?

20          MS. HEMSTREET:  That's fine.

21          MR. MCINTYRE:  Yes, that's

22  fine.

23          Q.    Can you state your name for

Page 7

1    the Record, please.

2           A.    Shannon Bryant.

3           Q.    May I call you Shannon?

4           A.    Yes.

5           Q.    Shannon, I'm Mieke Hemstreet,

6    we met a few minutes ago, and I'm an

7    attorney for Sears.

8           And you understand you're here

9    pursuant to a subpoena that we sent you

10   regarding a lawsuit that Ms. Smith has

11   filed against Sears; is that right?

12          A.    Yes.

13          Q.    Have you ever had your

14   deposition taken before?

15          A.    No.

16          Q.    Well, let me just go over a

17   few quick rules.  One is that I'm going to

18   ask you some series of questions this

19   afternoon, and I'm going to assume that

20   you understand those questions unless you

21   ask me to clarify it or to rephrase it; if

22   you don't understand it or need me to do

23   so, then I'll be happy to do that.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 8

1      The second thing is when you answer

2   my questions, try to do so in the form of

3   a verbal answer, a yes or a no, try to

4   avoid the head shakes or the nods; it just

5   makes it easier for the court reporter to

6   take down.

7      Also, if you have a -- need to take

8   a break for any reason, just let me know,

9   and be happy to do that.  The only thing I

10  ask is if I've asked you a question, then

11  you can -- if you can go ahead and answer

12  that question before we take a break, that

13  would be helpful.

14     Are you represented by counsel,

15  Mrs. Bryant?

16     A.    Am I represented -- What you

17  mean represented by counsel?

18     Q.    Have you retained a lawyer or

19  do you have a lawyer here with you today?

20     A.    No, I have not.

21     Q.    And you understand

22  Mr. McIntyre is here as Denise Smith's

23  lawyer; is that right?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 9

1      A.      Yes.

2      Q.      Are there any medical

3  conditions that you have that I need to be

4  sensitive to today, just to let me know so

5  I can be aware of them?

6      A.      The only thing is I do take

7  blood pressure medicine and it has

8  diuretics, and so when I'm drinking I may

9  have to go to the restroom.  Other than

10  that, nothing else.

11          MR. MCINTYRE:  Let's go off the

12  Record a second.

13                  (Off the Record.)

14          MS. HEMSTREET:  Back on.

15      Q.      Now, Mrs. Bryant, were you --

16  do you go by another name or have you gone

17  by another name in the past?

18      A.      Well, Callaway was my maiden

19  name before I got married.

20      Q.      And when did you get married?

21      A.      I got married January 6, 1997.

22      Q.      And before that your name was

23  Callaway; is that right?

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 10

1      A.    Yes.

2      Q.    And what is your date of

3   birth?

4      A.    July 28, 1971.

5      Q.    Have you gone by any other

6   names?

7      A.    No.

8      Q.    So Bryant is your married

9   name; is that right?

10     A.    Yes.

11     Q.    Are you still currently

12   married?

13     A.    Yes, I am.

14     Q.    Do you have any children?

15     A.    Yes.

16     Q.    Are they all under the age of

17   eighteen?

18     A.    Yes.

19     Q.    What is your address?

20     A.    4207 Oak Bowery Road, Opelika,

21   Alabama 36801.

22     Q.    And is that a house?

23     A.    Yes.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 11

1        Q.    Are you owning that house,

2   renting that house?

3        A.    I'm owning that house.

4        Q.    You live there with your

5   husband; is that right?

6        A.    Yes.

7        Q.    Anybody else live there with

8   you?

9        A.    Our three children.

10       Q.    And what are their ages?

11       A.    Sixteen, fourteen, eleven.

12       Q.    Now, in preparation for this

13  deposition today, did you do anything to

14  prepare for it?

15       A.    No.

16       Q.    Did you have any conversations

17  with anybody about it?

18       A.    No.

19       Q.    Did you talk to Ms. Smith

20  about it?

21       A.    No.

22       Q.    What about Ms. Willis?

23       A.    No.

Page 12

1        Q.      Anybody else?

2        A.      No.

3        Q.      Now, are you currently

4   employed, Mrs. Bryant?

5        A.      Yes, I am.

6        Q.      And where do you work?

7        A.      Morningside Assisted Living.

8        Q.      And what do you do there?

9        A.      I'm the assistant executive

10  director.

11       Q.      And what are your duties?

12       A.      My duties is assisting the

13  executive director, marketing, payroll,

14  financials.  I'm mostly responsible for

15  the financial part of the business.

16       Q.      Do you do anything with the

17  residents there?

18       A.      Yes.  I communicate with the

19  residents as far as, you know, talking to

20  them, playing games with them sometimes on

21  my spare time.

22       Q.      Do you plan activities for

23  them --

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 13

1          A.     No.

2          Q.     -- or anything as a part of

3    your job?

4          A.     No.

5          Q.     Who is your supervisor?

6          A.     Jan Yarbrough.

7          Q.     And where is Morningside

8    Assisted Living located?

9          A.     871 Twin Forks, T-W-I-N

10   F-O-R-K-S, Avenue, Auburn, Alabama 36830.

11         Q.     And how long have you worked

12   there?

13         A.     Almost two years; December 13

14   will be two years.

15         Q.     So you started in 2004 then;

16   is that right?

17         A.     Yes.

18         Q.     And I'm sorry, what did you

19   say your title was again?

20         A.     Assistant executive director.

21         Q.     And is that the title you've

22   held the entire time you were there?

23         A.     My previous title was business

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 14

1    office manager.

2         Q.    And what did you do as

3    business office manager?

4         A.    I pretty much did the same

5    thing other than now I have more

6    authority, you know, to do financials.

7         Q.    Does your job at all involve

8    -- Do they have vans and things that they

9    transport residents in?

10        A.    Yes.

11        Q.    Does your job include driving

12   those vans or anything like that?

13        A.    Well, actually, they have

14   someone who does that.  But if they're

15   tied up with other residents, maybe like

16   taking them to doctor's appointments, me,

17   my executive director, or nursing

18   director, someone would take them.

19        Q.    So you're authorized to drive

20   those vans?

21        A.    Yes, I am authorized to drive

22   the van.

23        Q.    Are those the gray vans?

Page 15

1      A.    Yes.

2      Q.    And they're owned by

3 Morningside Assisted Living; is that

4 right?

5      A.    Yes.

6      Q.    Now, is that the job that you

7 held right after you started working for

8 -- stopped working for Sears?

9      A.    No.

10      Q.    So there was a job in between

11 there?

12      A.    Yes.  I left Sears going to

13 another job.

14      Q.    What -- Where did you go to

15 work after you quit working Sears?

16      A.    Ross Department Store, Dress

17 for Less.

18      Q.    And when did you start working

19 there?

20      A.    I started there, I think it

21 was November 1, 2004.

22      Q.    And what did you do there?

23      A.    Well, I started out working at

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 16

1    the customer service desk, which

2    encounters ringing up customers, doing

3    returns; and then also I would do price

4    checks to markdown prices on merchandise.

5         Q.    And you were there for less

6    than two months; is that right?

7         A.    No.  I started at Morningside

8    in December, and I still worked at Ross.

9    I think I may have left Ross in January.

10        Q.    Okay.  So when did you

11   start --

12        A.    Of 2005.

13        Q.    I'm sorry.  2005?

14        A.    I think it was January 2005.

15        Q.    And why did you leave there?

16        A.    Well, I left because I had a

17   Monday-through-Friday job, the pay was

18   pretty decent, and I stayed to help my

19   previous store manager, which was Lewis

20   Collin, at Ross.  I helped him out a

21   little while until he was able to find

22   someone, then I just gave it up.

23        Q.    So you resigned from there?

Page 17

1    A.    Uh-huh (positive response).  I

2  resigned from there.

3    Q.    Because you went to work at --

4  or because you were already working at --

5    A.    Right.

6    Q.    -- Morningside?

7    A.    And I do have a family with

8  three kids and a husband, so I didn't need

9  to work two jobs.  But I stayed there to

10  help him out until he was able to get

11  someone.

12    Q.    Now --

13    A.    To take my place at Ross.

14    Q.    Now, this is Lewis Collins, he

15  used to work at Sears; is that right?

16    A.    Yes.

17    Q.    And where is this Ross store

18  located?

19    A.    It's Tiger Town; don't know

20  the address, I just know it's Tiger Town

21  in Opelika, Alabama.

22    Q.    Now, when you were working at

23  Ross, were you ever disciplined for any

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 18

1    reason?

2        A.    No.

3        Q.    What about since you've been

4    at Morningside Assisted Living, have you

5    been disciplined for any reason there?

6        A.    No.

7        Q.    No verbal warnings?

8        A.    No.

9        Q.    No write-ups?

10       A.    No.

11       Q.    And has your supervisor always

12   been Jan Yarbrough?

13       A.    Yes.

14       Q.    Have you ever been arrested,

15   Mrs. Bryant?

16       A.    No.

17       Q.    Never been charged with a

18   crime of any sort?

19       A.    No.

20       Q.    Do you remember when you began

21   working for Sears?

22       A.    I started March 13, 1990.

23       Q.    And what position did you

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 19

1    start off in?

2         A.    I started off in receiving.

3         Q.    And who did you work for in

4    receiving, do you recall?

5         A.    I worked for Anderson Johnson.

6         Q.    You still friends with

7    Mr. Johnson?

8         A.    I have not been friends with

9    Mr. Johnson since I left Sears.

10         Q.    Was he still there when you

11    left?

12         A.    Yes.

13         Q.    And what did you do in

14    receiving?

15         A.    Opened up boxes and manually

16    input at that time.  We was manually

17    inputting merchandise.

18         Q.    So if something would come in

19    from the manufacturer, you would enter it

20    into Sears's system?

21         A.    Right.  We would kind of enter

22    in by the stock number and skew number.

23         Q.    How long did you work in that

Page 20

1    capacity?

2         A.    Maybe nine months.

3         Q.    Where did you work after that?

4         A.    I went in the office and

5    worked.

6         Q.    Which part of the office?

7         A.    At that time it was where they

8    did payroll, input invoices that couldn't

9    be inputted into the receiving department

10   area.

11        Q.    Can you explain that to me

12   again?  I'm not sure I'm following, what

13   did you do?

14        A.    What they couldn't manually

15   input into the computer in receiving area,

16   those invoices came around to me, and I

17   had to manually input them in.  I think at

18   that time it was called "new fit" in the

19   system.

20        Q.    So it still was part of

21   entering in --

22        A.    Right.

23        Q.    -- merchandise that y'all

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 21

1    were --

2         A.    And filed paperwork for the

3    office, yes.

4         Q.    And who was your supervisor

5    then?

6         A.    Leatha Lipp.

7         Q.    And how long did you hold that

8    job?

9         Actually, what was the title of that

10   job?  I don't know if you gave that to me.

11        A.    I was just office clerk at

12   that time.  Can't remember the exact

13   title.

14        Q.    And how long did you work as

15   office clerk?

16        A.    I want to say maybe two years.

17   And then I went into the regional

18   management training program.

19        Q.    And when you went to the

20   training program, what did you do after

21   that?

22        A.    I worked on the sales floor in

23   the hardware department area under Byron

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 22

1    Mason.

2        Q.    And who was the SGM at that

3    time?

4        A.    Lewis Collins.

5        Q.    And how long did you work on

6    the sales floor?

7        A.    That program was like, I

8    think, eighteen weeks; I may have worked

9    on the sales floor a little longer than

10   that.

11       Q.    And then where did you go

12   after that?

13       A.    I went into -- I was human

14   resource supervisor.

15       Q.    Is that HR lead?

16       A.    Yes.

17       Q.    Do you recall what date that

18   was?

19       A.    No.

20       Q.    And who was your supervisor

21   then?

22       A.    Lewis Collins.

23       Q.    Who -- Did you want to move to

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 23

1   that position or how did you move to the

2   HR lead?

3        A.    It was a position that was

4   open, I applied for it, that's how I got

5   it.

6        Q.    And then after that, where did

7   you go?

8        A.    From that point on, I went out

9   onto the sales floor to seven hundred desk

10  seven manager, which was home improvement

11  manager, that Byron Mason was over because

12  he got promoted to loss prevention

13  manager.

14       Q.    So is home improvement like a

15  lead-type position?

16       A.    No.  It was a salary manager

17  position that I had.

18       Q.    And what was it called again?

19       A.    Seven hundred desk seven.

20  That was for the whole entire home

21  improvement department, which included

22  lawn and garden, hardware, sporting goods,

23  paint department.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 24

1    Q.    And who was the SGM at that

2    point?

3    A.    It was Lewis Collins.

4    Q.    Still Lewis.

5    A.    A little part of the time.

6    Then Greg Newton was there when I was in

7    that department also.

8    Q.    Do you know how long you were

9    in home improvement?

10    A.    It may have been three or four

11    years.  Not really sure.  But I requested

12    to move.  It was an opening for a salaried

13    job on the soft side, so I requested to

14    move on the softer side of Sears, which

15    was the clothing department area.

16    And Greg Newton promoted me over

17    there.

18    Q.    And what did you do over

19    there?

20    A.    I was the manager of ladies

21    department, lingerie, and home fashions.

22    Q.    And how long were you in that

23    capacity?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 25

1      A.    It may have been two or three

2  years.  I know Sears came out with a new

3  setup with having MCA lead and store

4  marketing leads, and all that.  And I

5  think operations in our store got cut out,

6  so Byron became the salary manager for the

7  whole soft side of Sears, and I worked

8  under him as MCA lead.

9      Q.    What does MCA stand for, do

10  you know?

11      A.    Merchandise customer assist.

12      Q.    And do you know when that

13  transition happened?

14      A.    I can't frankly.

15      Q.    Was it in 2000, late '90s?

16      A.    Had to be in the 2000s.

17      Q.    And Greg Newton was there at

18  that time?

19      A.    Yes.

20      Q.    So you worked as the MCA lead

21  for the soft lines department; is that

22  right?

23      A.    Right.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 26

1      Q.      And how long did you do that

2   for?

3      A.      I did it until, I think it was

4   -- until the end of June 2003 when Roy

5   Treadwell, which was the store manager

6   after Greg Newton, asked me if I would

7   take the in-store marketing lead position

8   because he needed help in that area.

9      Q.      Now, as MCA, what did your

10  duties involve in that?

11     A.      It was putting merchandise out

12  on the floor, making sure everything was

13  sized correctly on the rack, sometimes we

14  would help out the in-store marketing team

15  at that time do plan-o-grams and do floor

16  setups, and we did setting of the walls

17  with merchandise on them.

18     Q.      And what about as home

19  improvement manager, what did you do

20  there?

21     A.      I managed that whole area.  I

22  was responsible for, at that time, my

23  people doing plan-o-grams, us setting bulk

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 27

1    stacks per Sears advertising, price and

2    markdowns.

3         Q.    Now, in any of these jobs that

4    you mentioned, did you ever supervise

5    sales associates?

6         A.    In home improvements and soft

7    lines, yes, I did supervise sales

8    associates.

9         Q.    So they reported directly to

10   you; is that right?

11        A.    Right.

12        Q.    And in home improvement, who

13   was your direct supervisor?

14        A.    Lewis Collins was at that time

15   and then Greg Newton.

16        Q.    And soft lines, who was your

17   supervisor?

18        A.    As MCA lead or as soft lines

19   manager?

20        Q.    As soft lines manager.

21        A.    Greg Newton.

22        Q.    Then as MCA manager was Byron

23   Mason --

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 28

1      A.    Byron was my supervisor, yes.

2      Q.    He was an assistant manager;

3  is that right?

4      A.    Yes.

5      Can I refer back to one question you

6  asked me earlier?

7      Q.    Sure.

8      A.    On my preparation you were

9  asking -- were you talking about

10  preparation for today?

11      Q.    Correct.

12      A.    Well, that's fine.  No.

13      Q.    Now, during your time at Sears

14  after you were MCA you went to in-store

15  marketing lead you said until the end of

16  June 2003; is that right?

17      A.    Yes.

18      Q.    And what were your

19  responsibilities there?

20      A.    My responsibilities was

21  setting the plan-o-grams, markups,

22  markdowns, Sears advertising, hanging

23  signing, displays, hiring associates,

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 29

1    making out schedules.

2         Q.    Now, then you stayed there

3    until you left --

4         A.    Until I resigned.

5         Q.    And that was in --

6         A.    October 2004.

7         Q.    In 2004.

8         A.    And my last day was October

9    29, 2004.  Because I was asked to stay

10   through the grand opening.

11        Q.    And did you?

12        A.    Yes.

13        Q.    Who did you report to as

14   in-store marketing lead?

15        A.    Kenneth Reese.

16        Q.    Was that the whole time that

17   you were in-store marketing lead or did

18   you report to somebody else for part of

19   the time?

20        A.    I reported to Roy Treadwell

21   from the beginning of July 1st, I would

22   say, 2003, until he resigned in -- I think

23   it was October 2003.  Then Greg Newton

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 30

1    came and acted as interim store manager

2    until Kenny Reese came in 2004.

3         Q.    Did you ever work in Sears'

4    hub office?

5         A.    Yes, I did.

6         Q.    When was that?

7         A.    That was back when Leatha Lipp

8    was my supervisor.

9         Q.    When you were the office

10   clerk?

11        A.    Well, I was office clerk, then

12   they did -- the company did the change and

13   started calling it hub office, so they had

14   a package pick-up area and the office

15   area.

16        Q.    Did you ever work in the hub

17   office --

18        A.    Yes, I did.

19        Q.    -- doing any kind of payroll

20   activities or anything like that?

21        A.    Yes, I did.

22        Q.    And do you remember what year

23   that was?

Page 31

1      A.    I don't remember the years.

2  Probably back in the late '90s maybe,

3  middle, late '90s.

4      Q.    But hadn't worked in the hub

5  office since then?

6      A.    No.  Not since I -- prior to

7  me leaving Sears, no.

8      Q.    Have you ever filed a lawsuit?

9      A.    No.

10     Q.    Have you ever been a party in

11 a lawsuit?

12     A.    No.

13     Q.    Have you ever filed a charge

14 of discrimination with the EEOC?

15     A.    No.

16     Q.    Have you ever filed a charge

17 of discrimination with anyone?

18     A.    No.

19     Q.    Now, while you were working at

20 Sears, were you ever disciplined for any

21 reason, whether it be oral or written or

22 anything like that?

23     A.    I was not disciplined.  But

Page 32

1    back -- It was in 2004, I had cashed some

2    checks there, which the supervisor of the

3    hub office did approve those.  And the

4    checks went through the bank the first

5    time, well, the money wasn't there; but

6    the second time it did go through the

7    bank, was paid.  Then all of a sudden I

8    get called into the office with Terry

9    Gandy saying that I had some checks that

10   bounced.

11          Well, I tried to explain to Terry

12   Gandy that -- Well, the first check that I

13   got a notification from my bank saying

14   that it was withdrawn, I went to Terry

15   then and told Terry that I may be having a

16   check coming back, I wasn't sure, because

17   I don't know if it was the first or second

18   time that they had sent it through the

19   bank.  He said okay.

20          So after then, some type of report

21   came over to them and it was sent to them

22   in an email that that check had bounced.

23   Well, I went to Terry -- Well, he called

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 33

1    me into the office, and then I responded

2    to him that that check was paid.  Well,

3    then maybe a few days later, another one

4    came, and I explained to him that that

5    check was paid.

6         They called my bank, we called

7    Sergie (phonetic), Sergie is the company

8    that covers checks for Sears to get, you

9    know, their money back.  Sergie said they

10   didn't know why Sears had gotten those

11   checks because they was paid.  Even my

12   bank told Terry Gandy that my checks was

13   paid.  Terry Gandy made me pay extra money

14   after my checks was already paid, made me

15   pay the extra money.  And before I left, I

16   had a hard time trying to get my money

17   back from Terry Gandy.

18        Okay.  Then after all that, Kenny

19   Reese called me back in the office -- they

20   had done called the associate service

21   center.  I think they was trying to get me

22   fired for those checks that was paid.  I

23   called associate service center myself.  I

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 34

1    did.  Kenny had lied to them saying that I

2    had told him I was going home because they

3    was treating me like a criminal.  At that

4    point in time, I had not even had a

5    discussion with Kenny Reese about my

6    checks.  So Kenny -- I don't know if the

7    district office or Kenny decided himself

8    to write me up about those checks.  Well,

9    I could agree with that.

10        Q.    Let me ask you, Shannon, to

11   your knowledge, were you written up at all

12   for writing these checks?

13        A.    Yes.  He wrote me up about

14   writing those checks.

15        Q.    Who wrote you up?

16        A.    Kenny Reese.

17        Q.    Kenny Reese wrote you up

18   for --

19        A.    Yes.

20        Q.    -- trying to cash checks in

21   the hub office and the money wasn't there?

22        A.    No.  He had already wrote me

23   up after this fact here was going on.

Page 35

1    Q.    After what fact?

2    A.    After the checks -- I mean,

3    they already knew the checks was paid,

4    they took my money anyways.  This was

5    after the fact.

6    Q.    Were you supposed to be

7    writing checks to yourself and getting

8    money from the hub office?

9    A.    I didn't write -- What do you

10   mean writing the check to myself?  I wrote

11   the check to Sears.

12   Q.    But they would give you the

13   money; is that right?

14   A.    They would give me the money.

15   They would go give me the money.

16   Q.    So a cash advance?

17   A.    Exactly.  And other associates

18   done that as well.  That was a practice in

19   the store.  Even though it was against

20   company policy, it was a practice in the

21   store.

22   Q.    So they would give you a cash

23   advance and the checks came back as unpaid

Page 36

1    the first time; is that right?

2        A.    Only one of them came, I got

3    the notification; on the second one I

4    didn't get notification.

5        Q.    Do you know if Sears was

6    charged for the checks having to come

7    back?

8        A.    I don't know whether Sears was

9    charged for that or not.

10       Q.    And you understand that Kenny

11   Reese wrote you up for that; is that

12   right?

13       A.    He sat me in his office.  But

14   when I told Kenny, because Lewis Collins

15   had came into the store and offered me a

16   job at Ross because I --

17       Q.    Well, you're not answering my

18   question, Mrs. Bryant.

19       A.    Go ahead.

20       Q.    You said Kenny Reese wrote you

21   up?

22       A.    Yes.  He wrote me up, but he

23   said he was going to tear the write-up up.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 37

1      Q.    Okay.

2      A.    Whether he did or not, I don't

3  know, because I did not stay in the

4  office.

5      Q.    When was that?  You said in

6  2004; is that right?

7      A.    Yes.

8      Q.    And your understanding is that

9  was for the checks?

10     A.    The checks, yes.

11     Q.    And why did he tell you he was

12  going to tear it up?

13     A.    I have no idea why he said he

14  would tear them up.

15          But then he went on after saying

16  that that he was going to write me up

17  about my attitude.  So I'm figuring he

18  couldn't fire me over the checks because

19  they was paid, he was going to try to get

20  up something to fire me over my attitude

21  because I was vocal and asked questions

22  about the things that was done around the

23  store.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 38

1    Q.    And what did he say in that
2    conversation?  Was this the same
3    conversation?
4    A.    Yeah.  All of it was in the
5    same conversation.
6    Q.    And this was, I'm assuming, in
7    the middle of October, somewhere around
8    there; is that right?
9    A.    It may have -- I know the
10   checks and everything was discussed like
11   maybe in August or September, but it may
12   have been in October.
13   Q.    But it was all done at once;
14   is that right?
15   You had one meeting with Kenny
16   Reese --
17   A.    Right.  Exactly.
18   Q.    -- discussing the checks and
19   your attitude; is that right?
20   A.    Right.
21   Q.    And you're not sure when that
22   was; is that right?
23   A.    It may have been October.  I

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 39

1    just know the deal with them investigating

2    about the checks was around August and

3    September.

4          Q.    What was said about your

5    attitude?

6          A.    He just said he was going to

7    write me up about my attitude.  And I told

8    him I did not have an attitude.

9          Q.    Was anybody else in that

10   meeting with you?

11         A.    Yes.

12         Q.    Who was in there?

13         A.    Nina Fitzwater.

14         Q.    And what did you say?

15         A.    I told him that I did not have

16   an attitude.

17         Q.    And what happened at that

18   point?

19         A.    That I thought he was the one

20   that had an attitude.

21         Q.    And then at that point did you

22   give your resignation?

23         A.    Yes.

Page 40

1    Q.    So you told him at that point
2  you were resigning?

3    A.    Yes.

4    Q.    Did you give him a reason for
5  that?

6    A.    I told him I was tired of the
7  way he was treating, well, black people in
8  the store.  I was fed up.

9    Q.    And you stayed on; is that
10 right?

11    A.    Until the day of grand
12 opening, which was October 29.

13    Q.    And did Kenny Reese say
14 anything to you at that point?

15    A.    No.

16    Q.    And he asked you to stay and
17 you agreed; is that right?

18    A.    He said if I didn't mind, if I
19 would stay and help him get through the
20 grand opening, and I said yes.

21    Q.    Now, you mentioned previously
22 that you had -- somewhere in there that
23 you had called the associate services

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 41

1    center?

2         A.    Yes.

3         Q.    And when was that?

4         A.    That was, I'm thinking, back

5    in August 2004.

6         Q.    And why did you call them?

7         A.    I called to question about the

8    checks.

9         Q.    And what was your question to

10   them?

11        A.    My question was -- Well, I was

12   explaining to them about my checks, that

13   they was paid for.

14        Q.    And what did they say?

15        A.    They said that the store

16   manager had called them and told them that

17   I had left the store, I told him that I

18   couldn't stay there any longer because

19   they was treating me like I was a

20   criminal.

21        And which I did not make that

22   statement to Kenny Reese at all.

23        Q.    Did you say anything else to

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

1    the ASC?

2         A.    No.

3         Q.    Did you ever call the ASC for

4    any other reason?

5         A.    No.  Never had to.

6         Q.    So you basically called the

7    ASC to explain about your checks; is that

8    right?

9         A.    Exactly.

10        And I did not receive my money for

11   those checks after I had double paid until

12   after I had left Sears.

13        Q.    Any other times that you were

14   disciplined or warned about anything?

15        A.    No.  No.

16        Q.    Not under any other managers?

17        A.    No.

18        Q.    Now, besides making this

19   comment to -- well -- Now, did you ever

20   complain to anyone in management at Sears

21   about Kenny Reese other than the comment

22   that you made to Kenny Reese himself?

23        A.    Well, Stacy Dumas and Byron

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 43

1   Mason, we all used to talk about the way

2   Kenny was acting toward black people.

3       Q.    Now, is Stacy Dumas, where

4   does she work?

5       In the auto center?

6       A.    Yes.

7       Q.    And Kenny Reese promoted her;

8   is that correct?

9       A.    Yes.

10      Q.    And she's African-American; is

11  that right?

12      A.    Yes.

13      Which I think Byron Mason had input

14  on that also because she worked for Byron

15  Mason.

16      Q.    Byron Mason and Kenny Reese

17  were friends, correct?  Do you know?

18      A.    I don't know whether they was

19  friends or not.  They worked together.  I

20  mean, Kenny was Byron's boss.

21      Q.    Do you know if they went to

22  lunch together frequently?

23      A.    Yes, they did.

Page 44

1    Q.    What kind of TV do you have,

2    Mrs. Bryant?

3    A.    What do you mean what kind of

4    TV?

5    Q.    What kind of television do you

6    have?

7    A.    I have a Sony.

8    Q.    Ever owned a Magnavox LCD

9    thirty-two-inch TV?

10    A.    No.  I don't even like

11    Magnavox.  I only like Sony.

12    Q.    Now, my understanding is,

13    Mrs. Bryant, that you gave an affidavit;

14    is that right?

15    A.    Yes.

16    Q.    And did you prepare that on

17    your own?

18    A.    Yes, I did.

19    Q.    Anybody help you prepare that?

20    A.    No.

21    Q.    I understand you brought a

22    copy of that with you today; is that

23    right?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 45

1    A.    Yes, I have it right here

2    (indicating).

3    Q.    Now, who asked you to prepare

4    this?

5    A.    Robin McIntyre.

6    Q.    What did he ask you to

7    prepare?  Just a statement?

8    A.    Right.

9    Q.    And what specifically -- Did

10   he tell you what to include in that

11   statement?

12   A.    No, he did not.

13   Well, other than that I'm an

14   African-American, with Sears versus Denise

15   Smith, but everything else I included

16   myself.  The first -- the number one on

17   the declaration.

18   Q.    Now, my understanding is that

19   this is all the information that you have

20   pertaining to Ms. Smith's claim --

21   A.    Yes.

22   Q.    -- against Sears; is that

23   right?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 46

1     A.     Yes.

2     Q.     So basically this is what

3   you're -- basically this statement is what

4   you have that you're giving --

5     A.     What I have and my memories.

6     Q.     And this statement reflects

7   everything that you recall about your

8   experience at Sears?

9     A.     Other than my memories.  I

10  mean, I can't -- as I was doing this --

11    Q.     Everything you recall; is that

12  right?

13    A.     Right.  Exactly.

14    Q.     Now, you swore under the

15  penalty of perjury that this is correct;

16  is that right?

17    A.     Yes.

18    Q.     And that's on number

19  twenty-five of your --

20    A.     Yes.  And also number one.

21    Q.     Now, you understood, according

22  to this affidavit, that Sears had a policy

23  against unauthorized discount; is that

Page 47

1    right?

2        A.    Per the policy, yes.  But we

3    was not following that policy.

4        Q.    But they did have a policy; is

5    that right?

6        A.    Sears corporate policy did

7    have a policy.

8        Q.    That was published in a

9    handbook; is that right?

10       A.    Yes, it was.

11       Q.    Now, Ms. Smith -- I'm sorry,

12   Mrs. Bryant, you weren't there when the

13   investigation into the misuse of the

14   service coupon occurred, were you?

15       A.    It depends on when the

16   investigation started.  Because if an

17   investigation started, I wouldn't know

18   about it anyway, so I don't know whether I

19   was there or not.

20       Q.    But you left in --

21       A.    I left October 29, 2004.

22       Q.    Okay.  Anybody discuss this

23   investigation with you as far as

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 48

1    management goes?

2         A.    No.

3         And I'm sure they're not supposed

4    to.

5         Q.    Do you have any idea what

6    management did to investigate coupon abuse

7    that was going on regarding the service

8    coupon in the appliance department?

9         A.    No.

10        Q.    Do you know what the

11   investigation results showed?

12        A.    No, I don't.

13        I wouldn't know anything about the

14   investigation because I'm not supposed to.

15        Q.    Do you know if they

16   investigated other departments, like the

17   electronics department, or anything else?

18        A.    I don't know anything about

19   the investigation.  As I stated, I wasn't

20   supposed to.

21        Q.    Now, did you attend any sales

22   associate meetings?

23        A.    Yes, I did.  They had the

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 49

1    sales associate meeting, a storewide

2    meeting, in front of everybody.

3        Q.    Did you attend the sales

4    associate meetings for appliances, the

5    appliance department people?

6        A.    Not while Kenny Reese was

7    there, no.

8        Q.    Did you ever attend the --

9        A.    While I was there they didn't

10   have a separate meeting anyways to my

11   knowledge.

12       Q.    So you don't know if they had

13   separate meetings with the sales

14   associates in the various departments; is

15   that right?

16       A.    If they had those separate

17   meetings, it was at night; they didn't

18   during the day.  And then that -- Well,

19   during the time I did have to work at

20   night.

21       Q.    Well, you're not answering --

22       A.    I'm answering your question.

23   I'm aware of what you're saying.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 50

1          Q.     Let me rephrase it.  Maybe I'm

2    not being clear.  It might be my fault.

3    Let me try to be more clear.

4          Now, you were -- When Kenny Reese

5    was the store manager --

6          A.     Yes.

7          Q.     -- you were in the marketing

8    department?

9          A.     In-store marketing, yes.

10         Q.     Now, would you have any reason

11   to participate in sales associate meetings

12   as the in-store marketing person?

13         A.     Yes, I would.

14         Q.     Would you do that on a regular

15   basis?

16         A.     No.

17         Q.     So you wouldn't attend those

18   meetings if they had them on a regular

19   basis; is that right?

20         A.     Not on a regular basis, I

21   would not have.

22         Q.     Did you attend any sales

23   associate meetings?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 51

1      A.     Yes, I have been to sales

2   associate meetings.

3      Q.     While you were in marketing

4   lead?

5      A.     In-store marketing lead?  They

6   rarely had any other than storewide

7   meetings.

8      Q.     That you're aware of?

9      A.     Yes.

10      And in the storewide meetings they

11   talked about protection agreements, credit

12   applications, and sales performance.

13      Q.     In the meetings you attended;

14   is that right?

15      A.     Yes.

16      Q.     But there could have possibly

17   been others that you weren't aware of; is

18   that right?

19      A.     It could have been.

20      But the management staff that we had

21   didn't.

22      Q.     Now, you indicate in your

23   affidavit that Sears' Auburn store made it

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 52

1    a practice to reuse the coupons; is that

2    right?

3         A.    Yes.

4         Q.    Did you ever see anybody reuse

5    these coupons?

6         A.    Yes, I did.

7         Q.    Who is that?

8         A.    Stephanie Darby.

9         Q.    And what coupon was she using,

10   do you know?

11        A.    Thirty-dollar coupon.

12        Q.    Did you ever see Stephanie

13   Darby use a service coupon?

14        A.    No.

15        Q.    Do you remember when this

16   thirty-dollar coupon was used?

17        A.    It was back in, I think,

18   August 2004.

19        Q.    Do you know if whoever she

20   awarded it to was eligible to receive it?

21        A.    No.  Because she pulled it out

22   of the drawer.  Terry Gandy.

23        Q.    But do you know what the terms

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

1    of the coupon were?

2        A.    No.

3        Q.    So therefore you don't know if

4    he was eligible to receive it according to

5    the terms of the coupon?

6        A.    Right.  But it was pulled out

7    of the drawer, and that was against

8    company policy to reuse coupons.

9        And he was loss prevention manager,

10   and he knew that, but we made it a common

11   practice that that didn't matter.

12       Q.    What I'm asking you,

13   Mrs. Bryant, is do you know what the terms

14   stated on the coupon?

15       A.    I said no.  And I went on to

16   make a statement that it didn't matter.

17   Because that was a practice in the store,

18   that you can pull out coupons out of the

19   drawer, whether it be a sixty-five-dollar

20   coupon or any other coupon.

21       Q.    Did you ever see any

22   sixty-five-dollar coupons in the drawer by

23   the appliance department?

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 54

1    A.    I never looked in the register

2    drawer in the appliance because that

3    wasn't my business to look at it to see

4    whether there was any sixty-five-dollar

5    coupons in there.

6    Q.    So you don't know --

7    A.    I left that up to the sales

8    associates.

9    Q.    I'm sorry.  You don't know if

10   there were any sixty-five-dollar coupons

11   in there or not; is that right?

12   A.    No.  Because I didn't buy much

13   from the appliance department, every blue

14   moon.

15   Q.    Now, were you there when the

16   sales associates in the appliance

17   department were trained, like when they

18   started working?

19   A.    What you mean?

20   Q.    Were you responsible for

21   training any of the sales associates who

22   worked in the appliance department?

23   A.    When I was in human resource,

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 55

1    yes, I did orientation with them.

2         Q.    And that was when?

3         A.    That was back, like I say, in

4    the '90s.

5         Q.    Okay.  But when you were

6    in-store marketing lead, you didn't have

7    anything to do with training --

8         A.    Training, no.

9         Q.    -- the associates?

10        A.    No.

11        Q.    So you don't have any

12   knowledge what Stephanie Darby would have

13   learned when she was training to work on

14   the sales floor, do you?

15        A.    No, I don't.

16        Q.    What about Carolyn Landers,

17   did you involve training her at all?

18        A.    No.

19        Q.    What about Clint Teal,

20   involved in his training at all?

21        A.    No.

22        Q.    What about Merle Miller,

23   involved in his training at all?

Page 56

1    A.    No.

2    Q.    Carolyn Landers?

3    A.    You already said Carolyn.  No.

4    Q.    Jackie Dodson?

5    A.    Jackie Dodson, when she came

6  into the store, I can't actually remember

7  what I did, what position I had, because

8  I'm not aware of the year she came.

9    Q.    Did it involve training her?

10    A.    I may have.  Like I say, I'm

11  not for sure when she came to the store.

12  I can't remember if I was in the hub

13  office when Jackie came or in the

14  receiving area when Jackie came or human

15  resource.  So I can't say that I wasn't

16  involved in any training with her because

17  I'm not sure.

18    Q.    You don't know?

19    A.    I'm not sure when she actually

20  came.

21          (Recess was taken.)

22    Q.    Now, Jackie Dodson is

23  African-American; is that correct?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 57

1    A.    Yes.

2    Q.    Did anyone in management

3  discuss Willis's or Smith's termination

4  with you?

5    A.    Byron Mason discussed Beatrice

6  Willis.  The day Beatrice Willis was

7  terminated, Byron Mason called me off

8  Denise Smith's cell phone.

9    Q.    And what did he say?

10    A.    And he told me that Beatrice

11  Willis had been terminated and he was not

12  aware that she was being terminated for

13  coupon use, and that they should have --

14  well, would have had to fire the whole

15  store.  And he didn't think that was

16  right.

17    Q.    Do you know if he was involved

18  in the investigation?

19    A.    He said that he wasn't aware

20  that she was being terminated.

21    Q.    Do you know if he was involved

22  in the investigation?

23    A.    No, I don't.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 58

1    Q.    Do you know if he knows what

2    the basis for the termination was?

3    A.    Well, he talked about coupons,

4    so.

5    Q.    Did he specifically say what

6    about the coupons?

7    A.    I just told you that, what he

8    stated about the coupons, that they would

9    have to fire the whole store for the

10   misuse of coupons.

11   Q.    Did you talk to anybody else

12   in management besides Mason about abuse

13   terminations?

14   A.    Briefly Stacy Dumas was just

15   talking about how wrong it was, but I

16   didn't get into any deep conversations

17   with her about it.

18   Q.    And what did she say

19   specifically, do you remember?

20   A.    She also disagreed; she felt

21   the same way, that it was wrong.

22   Q.    Do you know if she was

23   involved in the investigation?

Page 59

1          A.      No, I don't.

2          Q.      Do you know if she knows the

3     results of the investigation?

4          A.      All she know, they was

5     terminated -- Beatrice Willis was

6     terminated about coupon abuse; that's all

7     she knows about coupons, I'm assuming.

8          I'm not in Stacy's mind so I

9     wouldn't know what all she knows.

10         Q.      The same thing with Byron?

11         A.      Yes.

12         Q.      He just indicated to you that

13    he felt it was wrong, but you don't know

14    if he participated in the investigation

15    or --

16         A.      He said he wasn't aware of it,

17    so evidently he must didn't participate.

18    He didn't tell me that he didn't

19    participate, but he wasn't aware.

20         Q.      What about Gandy or Reese, did

21    they discuss it with you at all?

22         A.      No.

23         Q.      What about John Lowery, did he

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 60

1    discuss it with you at all?

2        A.    No, he didn't.

3        Q.    Anybody else that you recall

4    that you had a conversation with about

5    either the investigation or the

6    termination?

7        A.    I wouldn't know anything about

8    the investigation, so I wouldn't be able

9    to discuss anything with anybody about the

10   investigation.

11       Q.    Did you discuss the

12   termination with anyone?

13       A.    Yeah.  I mean, it was wrong.

14   I told people that it was wrong, they

15   should not have gotten fired.  Because

16   everybody was using coupons, whether it

17   was a sixty-five-dollar coupon or any

18   other coupon, people was pulling coupons

19   out of the drawer.

20       Matter of fact, after I left in

21   October 2004 I went to the store February

22   2005 to make some purchases, and the girl

23   was willing to take a coupon out of the

Page 61

1    drawer for me then.  And I then told Byron

2    Mason that I would not do that, let her,

3    because I knew Beatrice Willis and Denise

4    Smith were terminated about using coupons.

5    So at that --

6         Q.    Do you know who that girl was?

7         A.    No, I don't know her name.

8         Q.    What department was it in?

9         A.    Well, she was at the

10   children's cash register, in that area,

11   when I made purchases on some clothing.

12        Q.    Do you know what the terms of

13   that coupon were?

14        A.    I don't, because I would not

15   let her use it.

16        Q.    Do you know if you were

17   eligible to receive it?

18        A.    I don't know if I was eligible

19   to receive it.  But I know I didn't bring

20   it in, and I knew that's why Denise Smith

21   and Beatrice Willis were terminated,

22   because they pulled coupons out of the

23   drawer just like any other associate would

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 62

1    do.

2          Q.      Okay.  Who told you that they

3    were terminated because they pulled

4    coupons out of the drawer?

5          A.      Me and Byron and them

6    discussed that.

7          Q.      So you learned it from Byron

8    that that's the reason --

9          A.      Misuse of coupon, that would

10   be the only reason, to pull it out of the

11   drawer.

12         Q.      So your understanding is that

13   Willis and Smith were terminated for using

14   the coupon out of the drawer --

15         A.      Misuse of coupons.

16         Q.      Let me finish my question so

17   we don't talk over each other.

18         So your understanding is that Willis

19   and Smith were terminated for taking a

20   coupon out of the drawer --

21         A.      Misuse of coupons.  And it had

22   to be taken out of the drawer, because if

23   the customer brought them in how would

Page 63

1    they be terminated for it.

2        So what is misuse of coupons now?

3    That's the reuse of coupons, so that means

4    they take them out of the drawer, they put

5    it back in the drawer -- once they scan

6    for the customer, they put it back in the

7    drawer; the next customer come along, they

8    open the drawer, they take it out, and

9    they scan it again, just like any other

10   associate would do in that store.

11        Q.    So that's your understanding

12   of why --

13        A.    Yes

14        Q.    -- they were terminated?

15        A.    Exactly.

16        I even -- When I worked at Sears,

17   associates would pull a coupon out of the

18   drawer for me to use because that was a

19   common practice in the store.

20        Q.    Were you eligible to receive

21   that coupon?

22        A.    If I didn't bring it in,

23   according to the policy, no, I wouldn't

Page 64

1    have been eligible.  But that was a common

2    practice in the Sears' Auburn store.

3        Q.    The policy requires you to

4    give only discounts that the customer is

5    eligible for, right?

6        Is that correct?

7        A.    No.

8        Q.    Customers are not allowed to

9    receive unauthorized discounts; is that

10   right?

11       A.    Well, if you want to talk

12   about unauthorized discounts, whether

13   they're eligible per coupon say or not, if

14   they didn't bring it in, they wasn't

15   eligible also.

16       Q.    Do these coupons have terms on

17   them saying who's eligible to receive

18   them?

19       A.    I don't read the coupons so I

20   don't know.  Sometimes they would come in

21   and state Sears credit card.

22       Q.    So sometimes they would

23   have --

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 65

1     A.    Sears credit card on them.

2     Q.    -- have terms on there that

3 only certain customers are allowed to use

4 them; is that right?

5     A.    Exactly.  For Sears credit

6 card use.

7     Q.    And only those people are

8 entitled to use --

9     A.    Sears credit card coupon.

10    Q.    And according to those terms

11 that's how those coupons --

12    A.    According to the coupon.  But

13 that wasn't the way it was done in the

14 Sears' Auburn store.  We didn't do it that

15 way.

16    But if Kenny Reese had have kept and

17 maintained the Sears corporate policy, it

18 would have been done that way.  But he

19 didn't.  He even made copies of expired

20 coupons and had me and my team, along with

21 himself, to put them at the registers to

22 use, not only for customers to use but for

23 associates to use.

Page 66

1       He also would go to the sign writer

2  and have me and my people, and sometimes

3  he would go to the sign writer, to create

4  yellow signs in the dress department

5  saying twenty dollars on forty-nine

6  ninety-nine dresses and above to drive

7  sales in that department. He also in the

8  appliance areas, when I would go and work

9  that area and put out sales signs, he

10 would remove the sales sign and leave it

11 at regular price, show the regular price,

12 and he would create a sign, save a hundred

13 dollars or whatever savings he would want

14 to do and put it in the center to make the

15 customer think, well, this is a special

16 going on, and it was already on sale any

17 way.

18      See, Kenny Reese was a store manager

19 that I have never seen that was crooked

20 for the company and misled customers.

21 And, yes, I was upset to the fact, and he

22 didn't like me because I was black and I

23 would question him of why he would do

Page 67

1    things like that.  Sears also states a

2    policy, when you're setting

3    advertisements, they would send an auditor

4    in to check and make sure the prices

5    match.  If the prices did not match, then

6    the store would be accounted for.

7        Q.    So you basically disagreed

8    with how Kenny --

9        A.    I disagreed with it.  But

10   everybody was doing it, so, hey, what

11   could I say.

12       And that's one reason Kenny Reese

13   want to get rid of me because I was black

14   and said that I had a attitude.  He wanted

15   to write me up because he knew I was vocal

16   and that I would question his authority.

17   So if he wrote me up about my attitude,

18   then that would have been a way to get me

19   out and he would say attitude and not

20   because I'm black.  But I know the main

21   reason.

22       Q.    And what facts do you have to

23   indicate that that was the reason?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

1    A.    What facts?  Because I was

2  vocal and I was black.  And not only

3  that --

4    Q.    Hang on just a second,

5  Mrs. Bryant.  What facts do you have to

6  support your allegation that he was trying

7  to get rid of you because you're

8  African-American?

9    A.    Because he couldn't get rid of

10  me on the checks, which he tried -- I

11  really believe he tried to get rid of me

12  about those checks; he couldn't get rid of

13  me then, that's why he threw the attitude

14  business up.  He was going to write me up

15  about my attitude.

16    Q.    Okay.  Do you --

17    A.    And do you know why he was

18  going to write me up about my attitude?

19  Because I was a black female that

20  questioned what I thought was wrong.

21    Q.    Did he ever tell you that he

22  was writing you up or anything like that

23  because you were black?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 69

1       A.      Well, he knew he couldn't do

2   that.  By law you cannot do that.

3       Q.      I'm asking you, Mrs. Bryant --

4       A.      No, he did not.  No, he did

5   not.

6       Q.      -- tell you --

7       A.      No.  By law he could not do

8   that.  And the reason for that, because it

9   would have been a lawsuit within itself.

10      Q.      Mrs. Bryant, I'm asking you,

11  did he ever specifically tell you that?

12      A.      No.  But he couldn't tell me I

13  was black, he couldn't use that racist

14  remark.

15      Q.      Did management, anyone else in

16  management, ever tell you that that's why

17  they were trying to -- allegedly trying to

18  get rid of you?

19      A.      Not get rid of me, no.

20      Q.      So no one ever told you that.

21  And that's just what you assume; is that

22  right?

23      A.      No.  I'm not going to say

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 70

1    assume.   Because I heard Terry Gandy tell

2    John Lowery, and right now before my eyes

3    I can take you into that store and give

4    you the identical aisle where they were

5    standing, that we're finally getting rid

6    of the two black females in appliance.

7         Q.    Let's talk about that comment,

8    Mrs. Bryant.  Now, you allege in your

9    affidavit that Terry Gandy said to --

10        A.    We're finally getting rid of

11   the two black troublemakers in appliances.

12        Q.    Now, tell me when that was?

13        A.    When that was, that was

14   September.

15        Q.    And the investigation didn't

16   occur until later; is that right?

17        A.    I don't know because I wasn't

18   aware of the investigation.  They're not

19   supposed to let me know.

20        But pertaining to staff meetings

21   that I have been in, I've heard them --

22        Q.    Mrs. Bryant --

23        A.    -- discuss.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 71

1      Q.     Mrs. Bryant, what I'm asking

2    you is do you know when the investigation

3    occurred.

4      A.     Like I told you before, I

5    wouldn't know when the investigation was.

6      Q.     But you allege that this

7    comment happened in September of 2004; is

8    that correct?

9      A.     Exactly.  Yes.

10     Q.     Now, you were claiming that

11   Terry Gandy said this to John Lowery; is

12   that right?

13     A.     Exactly.

14     Q.     Was there anybody else

15   standing there that overheard this remark?

16     A.     I know I was standing there.

17   But they wasn't aware I was standing there

18   because I was pricing my tickets.

19     Q.     Where was it in the store?

20     A.     It was in the aisle of home

21   fashions.

22     Q.     Now, does it make sense that

23   Terry Gandy would make this remark before

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 72

1    any kind of investigation was going on?

2        A.    I don't know when they was

3    investigating so it could have been --

4        Q.    I'm asking you --

5        A.    -- all of September when they

6    was doing the investigation.

7        Q.    Does it make sense that he

8    would have made this comment before there

9    was any kind of investigation --

10       A.    Yes, it makes sense.  You know

11   why?  Because in a previous staff

12   meeting --

13       Q.    In what previous staff

14   meeting?

15       A.    That the management staff that

16   I attend, Kenny Reese was making

17   statements to the staff that he was aware

18   that Beatrice Willis called the ethic

19   line.

20       Q.    Do you know what that call was

21   about?

22       A.    She was questioning about --

23       Q.    Do you have personal knowledge

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 73

1    what that call was about?

2         A.    What do you mean do I have

3    personal knowledge?

4         Q.    Were you on the phone when she

5    called?

6         A.    No, I was not on the phone.

7    But I was in the staff meeting listening

8    at what Kenny Reese was saying.

9         Q.    So your knowledge is based on

10   what Kenny Reese said in --

11        A.    Kenny Reese saying.  And then

12   not only that, if it wasn't the same day

13   that Terry made that statement, it was a

14   few days later about finally getting rid

15   of two black troublemakers.  So it led me

16   to believe that he was talking about

17   Beatrice Willis and Denise Smith, because

18   he also stated in the staff meeting that

19   Denise Smith was questioning how much work

20   -- time she's supposed to get on the sales

21   floor.

22        And low and behold before then, John

23   Lowery, when I was in appliance

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 74

1    department, said to Carolyn Landers that

2    Jacqueline Dodson was on the outside

3    looking in.  So evidently they wanted her

4    too, but they figured she wasn't doing

5    anything and she wasn't as vocal to

6    question anything --

7         Q.    And what do you base that on?

8         A.    -- that was going on.

9         Q.    Is that your assumption,

10   Mrs. Bryant?

11        A.    Yes, it is my assumption.

12        Q.    Now, you said you don't know

13   who was investigated.  But Ms. Dodson

14   still works there to your knowledge; is

15   that correct?

16        A.    Yes, she does to my knowledge.

17        Q.    And she wasn't terminated; is

18   that right?

19        A.    To my knowledge, she wasn't, I

20   guess.  I don't know whether she's still

21   there or not.

22        Q.    And she was working in

23   appliances at the time you left?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 75

1      A.    Yes, she was.

2      Q.    So anybody else hear this

3  comment, this alleged remark, that Terry

4  Gandy made to John Lowrey?

5      A.    It's for my -- I don't know

6  whether anybody else heard the comment or

7  not.

8      Q.    But I'm asking you, was

9  anybody else standing there with you --

10     A.    You can't make me say someone

11  was standing there or they wasn't standing

12  there.  I was there.  I didn't look around

13  to see if anybody else was standing

14  around.

15     Q.    So you don't know if anybody

16  else was there?

17     A.    I don't know whether anybody

18  was there or not.

19     Q.    But you don't recall anybody

20  else being there?

21     A.    I don't know whether anybody

22  was there or not.  Because I was very

23  stunned and that helped me make my