**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 76

1    decision on leaving; that finalized it,

2    because I was no longer going to put up

3    with that.

4        Q.    Anything else that you

5    allegedly heard from Terry Gandy or Kenny

6    Reese?

7        A.    Allegedly heard like what?

8    What do you mean?

9        Q.    Regarding the terminations of

10   these individuals.

11       A.    No.  No.

12       Q.    What about anything else

13   regarding their race or anything of that

14   sort by Terry Gandy or Kenny Reese?

15       A.    I heard Terry Gandy make that

16   statement, we're finally getting ready of

17   the two black troublemakers in appliances.

18   That's the only thing I have ever heard

19   Terry say.

20       Q.    Did you report it to anybody?

21       A.    Who me?

22       Q.    Did you report it to anybody?

23       A.    Yeah.  I stated that to Stacy

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 77

1    Dumas.  I had made her aware of that.

2         Q.    When did you tell her that?

3         A.    That was before I left Sears.

4         Q.    Did you report it to anybody

5    else?

6         A.    No.  But I should have.

7         I also, before I left Sears, had

8    mentioned to Stacy Dumas, Denise Smith,

9    and Beatrice Willis that I was leaving and

10   that I was going to go and see an attorney

11   and try to start a class action lawsuit on

12   discrimination against Kenny Reese and

13   Terry Gandy because it was in the

14   atmosphere.

15        Q.    We're going to get to that in

16   just a minute.

17        Now, you allege in your affidavit

18   that Byron Mason once told you that he

19   felt Kenny Reese and Carolyn Landers were

20   watching him; is that right?

21        A.    He felt that Kenny Reese had

22   Carolyn Landers watching him when they

23   worked the same shift.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 78

1       Q.    And when did he tell you that?

2       A.    It was before I left.  I know

3    it had to be in September.

4       Q.    2004?

5       A.    Yes.

6       Q.    And was anybody else standing

7    there when he said --

8       A.    No.

9       Q.    He just said this to you?

10      A.    Yes.

11           And because we were black, we needed

12   to watch each other's back.

13      Q.    Did he say anything else to

14   you at that point?

15      A.    No.

16      Q.    Was that the only comment like

17   that that Byron made to you?

18      A.    Yes.  Because I wasn't there

19   long afterwards.

20           Do you actually think I would have

21   wanted to leave my job?  I took over half

22   a cut in pay.  I couldn't hardly eat and

23   stayed sick.  When I would go to my

Page 79

1    doctor, he would ask me if I was still

2    working at Sears, because I would comment

3    how tired I was of that place and the

4    store manager; I could no longer deal with

5    it.

6         Q.    Now, you also state that Kenny

7    Reese was wanting to place certain white

8    employees into a particular department.

9    Is that -- Who are you referring to in

10   that respect?

11        A.    Kenny Reese -- When the hub

12   office and human resource went into a

13   merge, Kenny Reese placed Barbara McDonald

14   into my department, which is a white

15   female, didn't mention nothing about Betty

16   Graham and Rosie Jackson.

17        Q.    Now, do you know what

18   Ms. McDonald's qualifications were?

19        A.    She used to be in in-store

20   marketing.

21        Q.    Do you know what her

22   qualifications were?  Did you see her

23   resume'?

Page 80

1        A.    No, I didn't.  And didn't need

2   to because I didn't hire Barbara McDonald.

3   But if I had the opportunity --

4        Q.    Mrs. Bryant, let me finish

5   please.

6        Do you know what Ms. Graham's and

7   Ms. Jackson's qualifications were?

8        A.    No, I don't.

9        But low and behold on that, Betty

10  Graham is back at Sears now doing the same

11  work, but she just part-time that she was

12  doing when Kenny Reese was there and did

13  not try to place her in another area of

14  the store.

15       Q.    Do you know who made that

16  decision?

17       A.    Made what decision?

18       Q.    To place Barbara McDonald

19  there?

20       A.    Kenny Reese made that

21  decision.

22       Q.    Did he discuss it with you?

23       A.    He discussed it with me.  But

Page 81

1    he's the store manager, so what was I

2    supposed to do, say I didn't want it?

3         Q.    Did he tell you the reasons he

4    was --

5         A.    No, he did not.  No, he did

6    not.

7         Q.    So he never said I'm placing

8    her there because she's white?

9         A.    No, he did not.

10        Q.    Did he ever indicate to you

11   that he felt that Ms. McDonald was not

12   qualified to do that job?

13        A.    No, he did not.

14        Q.    How often did you interact

15   with Kenny Reese?

16        A.    How often?

17        Q.    Yes.

18        A.    I didn't interact much with

19   Kenny Reese at all.

20        Q.    So you weren't around him a

21   lot; is that correct?

22        A.    I was around him.  Yes, I was

23   around him; I worked for him, of course I

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 82

1    was going to be around him.  But, when

2    Barbara McDonald came to my team, he would

3    page Barbara McDonald to make sure things

4    was done, and I would be present in the

5    store, and I was the supervisor.  I was

6    Barbara's supervisor.

7         Q.    What I'm asking you is how

8    much did you see him during the day on a

9    daily basis?  How much time did you spend

10   with him?

11        A.    Didn't spend a whole lot of

12   time.

13        Q.    Just in passing maybe; is that

14   right?

15        A.    In passing.

16        Q.    Okay.

17        A.    He rarely wanted to speak.

18        Q.    Do you know if he spoke to

19   other white associates?

20        A.    Yes.  I know he spoke to

21   Crystal Young.

22        Q.    Do you know if he spoke to any

23   of the other white associates?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 83

1    A.    No.  Because I wasn't tucked

2  behind his trail.  I didn't follow him, I

3  had a job to do.

4    Q.    Do you know if he spoke to

5  certain black associates?

6    A.    I didn't see him speak to any

7  black associates.  Especially when they

8  was in my surroundings.  He would walk

9  past us.

10    Q.    Do you know if he got along

11  with Jackie Dodson?

12    A.    No, I don't.  I don't know

13  whether he got along with Jackie Dodson or

14  not.

15    Q.    Do you know if he got along

16  with Byron Mason?

17    A.    Him and Byron went to lunch

18  together.  But like I said, if Byron had

19  been the timecard lead or just a regular

20  associate, he would not have went to

21  lunch.  And not only that, with Jackie

22  Dodson, she wasn't vocal.

23    Q.    Did you -- Do you know if he

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 84

1    ever talked to Stacy Dumas?

2        A.    Well, at one point, I know

3    that him and Stacy -- Stacy was MCA lead

4    for Byron after I had went to in-store

5    marketing.  I don't think him and Stacy

6    Dumas got along very well.

7        Q.    Do you know if he talked to

8    her at all?

9        A.    No.

10       Q.    Do you know if he associated

11   with her or not?

12       A.    I don't know if he associated

13   with her, unless he did after I left

14   Sears.  But before then, I didn't see her

15   going to lunch with him.  But I wasn't

16   there every day either.

17       Q.    Now, you said that he would

18   page Barbara McDonald?

19       A.    Yes.

20       Q.    Is that right?

21       A.    Exactly.

22       Q.    She worked in your department?

23       A.    In my area.  I was her

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 85

1   supervisor.

2       Q.    And what did she do exactly?

3       A.    He would page her to --

4       Q.    What did Ms. McDonald do?

5       A.    She was a in-store marketing

6   associate.  She worked for me.

7       Q.    What would he page her to do?

8       A.    He would page her and ask her

9   to change a presentation or to check and

10  see if something was done.  And a lot of

11  times I would be in the store when he

12  would even page her over the intercom to

13  come to his office.  And then when she

14  would come out, I would ask her what did

15  he want.

16      Q.    Is that not part of her job to

17  do that?

18      A.    Yeah, it was her job.  But I'm

19  the supervisor, if he wanted something

20  changed, I had more knowledge on the

21  presentation and zone-a-gram book.  He

22  should have gotten with me to see if that

23  was okay to change or if I was in

Page 86

1    agreement with him.  But he didn't want to

2    talk to me.

3          Q.    So you disapproved of him

4    going straight to the sales associate

5    rather than coming --

6          A.    To make a change, because I'm

7    the supervisor.  I'm his supervisor.  She

8    was my associate.

9          Q.    Did he ever tell you that he

10    was doing that because you were black and

11    she was white?

12          A.    No, he didn't.

13          But he wouldn't tell me because I'm

14    black and they white.  Anybody in their

15    right mind wouldn't do a black/white

16    thing, wouldn't say it, wouldn't speak it,

17    black and white.  He know that would have

18    been against the law right then.

19          Q.    Now, what was your reason for

20    resigning from Sears?

21          A.    Because I could no longer take

22    the discriminatory atmosphere that we was

23    in.

Page 87

1       Q.    Have you -- what you consider

2  to be the discriminatory atmosphere what

3  you describe in your affidavit; is that

4  right?

5       A.    No.  Kenny would pass by --

6       Q.    I'm asking you, is it what you

7  have in your affidavit?  Do you talk about

8  it in your affidavit?

9       A.    Yeah.  Some of it I'm talking

10  about in my affidavit.

11       Q.    Some of it?

12       Is there anything else in your

13  affidavit that you refer to this

14  discriminatory atmosphere that you don't

15  mention?

16       A.    Excuse me?

17       Q.    Is there anything that you are

18  referring to --

19       A.    Yeah.  What I mentioned to you

20  early, because I was black and vocal he

21  threatened to write me up about my

22  attitude.  He figured if I was there at

23  Sears and stayed at Sears and if I

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 88

1    questioned anything or disagreed with

2    anything, he was going to fire me because

3    he was going to blame it on my attitude.

4        Q.    Okay.  And you're assuming

5    that that had to do with your race; is

6    that right?

7        A.    Exactly.  Exactly.

8        Q.    But he never told you that; is

9    that right?

10       A.    Well, he wouldn't tell me

11   that.

12       Q.    Right.  But you're assuming

13   that; is that right?

14       A.    He wouldn't tell me that.

15       Q.    Anything else that -- When you

16   would say being around the discrimination

17   atmosphere of Kenny Reese and Terry Gandy

18   in your affidavit, is there anything else

19   that's not included in there that you can

20   think of?

21       A.    That I can think of at this

22   time, there's nothing else at this time.

23       Q.    So we've covered or talked

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 89

1    about either today or it's in your

2    affidavit as to what you think constituted

3    the discriminatory atmosphere; is that

4    right?

5         A.    Yes.

6         Q.    Did you complain about it to

7    anyone?

8         A.    Well, you want to know mostly

9    who all I complained about it to was my

10   husband. And when I left Sears and

11   started my other job, my oldest daughter

12   asked me if I enjoyed the job I was doing

13   now. And I said, yes and she said why;

14   she said, I can tell, Mama. My husband

15   said he didn't have to --

16        Q.    Did you complain to anybody at

17   Sears?

18        A.    No. Other than what I told

19   you I complained.

20        Q.    Other than just your remark --

21        A.    Yes, my remarks, that's all.

22        Q.    Your remark to --

23        A.    My husband is who I --

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 90

1          Q.      -- Reese that you thought it

2     was because you were black; is that right?

3          A.      Exactly.

4          Q.      Okay.

5          My house is so peaceful, my husband

6     and my kids are so much happier because

7     I'm not under that now, and they don't

8     have to listen to me talk about it.

9          It was ridiculous the way Kenny

10    Reese came down there and ran Sears'

11    Auburn store, just ran it down to the

12    ground.

13         Q.      Did you ever hear anyone in

14    management instruct the sales associates

15    to give out discounts even if the customer

16    wasn't eligible for them?

17         A.      No, I didn't hear management.

18    But like I say, Terry Gandy was a loss

19    prevention manager and when --

20         Q.      Did you hear anybody say that,

21    Mrs. Bryant, is all I'm asking you.

22         A.      No.  But you don't have to

23    hear it when you can see it.  When you can

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 91

1    see exactly what's going on, you don't

2    have to hear nobody say that.  Because

3    when Stephanie Darby rung up Terry Gandy's

4    sales on two separate transactions for a

5    thirty-dollar coupon, why not do it on

6    just one transaction?  All of it was over

7    in the same department.  And he did not

8    stop her from taking that coupon out of

9    the drawer to use for him.  That's saying

10   go ahead and use coupons.

11        Q.    And you don't know what the

12   terms of that coupon were?

13        A.    It doesn't matter, Terry

14   didn't bring it in.

15        Q.    I'm asking you do you know

16   what the terms of --

17        A.    I don't know what the term of

18   it was.  But it didn't matter because

19   management used it.  It was a

20   thirty-dollar coupon.

21        Q.    Do you know what kind of

22   coupon it was?

23        A.    A thirty-dollar coupon.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 92

1        Q.    But do you know what it was

2   supposed to be applied to?

3        A.    No, I don't.

4        Q.    Do you know if it had -- if

5   the expiration on it was invalid -- the

6   expiration date was not valid on it?

7        A.    If it's going to be -- if a

8   expiration date is on there, when she

9   scans it, it will pop up and say invalid.

10       Q.    I'm asking you, Mrs. Bryant,

11   do you know if --

12       A.    No, I don't no.

13       Q.    -- when the expiration --

14       A.    No, because I didn't look at

15   it.  I just know she pulled it out of the

16   drawer and she used it on two separate

17   transactions.  So you can tell now they

18   was doing something that was not ethical

19   because he would have rung all of it on

20   one.  Transaction, and he was purchasing

21   those for his family, his parents, his mom

22   and dad, because he told me that they was

23   buying a house in Phenix City, Alabama.

Page 93

1          Okay.  Another thing, if you want to

2     talk about Sears corporate policy, you

3     cannot purchase merchandise unless that

4     person -- and get a discount unless that

5     person was your dependent.  And I'm sure

6     his mom and dad wasn't his dependent.

7          Q.     Do you know if he was giving

8     it to them as a gift?

9          A.     No.  No, I don't.

10         Q.     Now, did you ever work as --

11    You said you worked as a sales associate;

12    is that right?

13         A.     I didn't work -- I was a home

14    improvement sales manager and a soft line

15    sales manager.

16         Q.     Did you ever sell anything?

17         A.     I would help my -- Yeah, I

18    would.  I would go and talk to customers.

19         Q.     I didn't mean that to be

20    offensive, I was just asking if that

21    was --

22         A.     I would talk to the customer.

23    If my sales associates were tied up with

Page 94

1  other customers, I would talk to the

2  customer and see what they want, and then

3  I would turn them over to one of my sales

4  associates.

5      Because they had more knowledge than

6  I did.

7      Q.    Now, do you know -- It's my

8  understanding that there are a variety of

9  registers in each sales area; is that

10 right?

11     A.    Yes, it is.

12     Q.    Do you know when they last

13 upgraded those registers?

14     A.    No, I don't.

15     I can't recall when they last

16 upgraded the registers.

17     Q.    Do you know if the sales

18 associates printed off the journal tapes

19 and handed them into the cash office in

20 October of 2004?

21     A.    Do I know?

22     Q.    Yeah.

23     A.    No.  I can't say that, that I

Page 95

1    know.

2         Q.    You don't have any idea if

3    they're printing off the journal tapes and

4    handing them in; is that right?

5         A.    No.  But policy, they're

6    supposed to do that, but that wasn't going

7    on.

8         Q.    Were you in the hub office at

9    that time?

10        A.    No.

11        Q.    Were you in charge of setting

12   the policies for that?

13        A.    No.  But it should be -- It's

14   corporate policy.

15        Q.    Could they have changed and

16   you not have been aware of it; is that

17   right?

18        A.    It wasn't changed.  It wasn't

19   -- well --

20        Q.    Were you working on the sales

21   floor?

22        A.    Yes.  I was the sales manager

23   of home improvement --

Page 96

1       Q.    In 2004, were you working on

2   the sales floor?

3       A.    Yes, I was.  Because I was

4   in-store marketing, and I was all over the

5   store.

6       Q.    Were you making sales on the

7   floor?

8       A.    No, I wasn't.

9       And another thing, I was a closing

10  manager, and at night they would have to

11  turn detail in, and those associates did

12  not turn -- on the nights that I worked,

13  they did not turn in detail.  The only

14  time they would turn in a detail journal,

15  if they had a problem with a void and

16  their register was going to be short.

17      So, no, on the nights that I worked,

18  they did not turn in journal tape.

19      And then not only that, why turn in

20  a journal tape when you can go into the

21  computer and do a sales extraction to get

22  what you need?

23      Q.    What do you mean a sales

Page 97

1    extraction?

2          A.     Pull up sales.

3          Q.     Do you know if those had the

4    journal tapes attached?

5          A.     Didn't have the journal tape.

6    But it had the store number, which would

7    have been 02595, the register number, and

8    the transaction number, the associate who

9    rung the sale or supposedly had rung the

10   sale, because a lot of times they were

11   ringing other associates sales numbers.

12         Q.     Now, the journal tapes, those

13   actually have the bar code that

14   corresponds to the coupon on them, do you

15   know that?

16         A.     The bar code number.

17         Q.     Correct.

18         A.     Yes, the bar code number.

19         Q.     But that bar code number is

20   not on these other printouts you're

21   referring to; is that right?

22         A.     No, it was not. But they have

23   a way that show how much a coupon was that

Page 98

1    was taken off or reduction -- that would

2    show a reduction, so you know it would

3    have to be a coupon.

4        Q.    It shows the total reduction;

5    is that correct?

6        A.    No.  It will show -- If it's a

7    thirty-dollar coupon, it will show on

8    there thirty dollars minus.

9        Q.    Just to make sure we're

10   talking about the same thing, let me --

11   I'm not going to introduce this as an

12   exhibit, I'm just going to give this as an

13   example.

14       This is entitled an associate

15   summary (indicating).  Is that what you're

16   speaking of?

17       A.    Yes.

18       Q.    And right there is the

19   reduction amount; is that right?

20       A.    Yes, this is a reduction

21   amount.  And it may have been a ten

22   percent.

23       Q.    Do you know if it's a total

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 99

1    reduction amount or if that's --

2         A.    Give me one, I can show you a

3    coupon, whether it was a coupon.  That

4    wasn't a coupon because we don't have a

5    two hundred and twenty-eight dollar

6    coupon.

7         Q.    But it gives the total

8    reduction amount; is that right??

9         A.    Yeah.  But give me another one

10   and I can tell you whether it's a coupon

11   or not.  I'll guarantee you that.

12        And everybody -- Management was

13   aware of whether it was a coupon or not,

14   whether looking at the journal tape or

15   not.

16        Q.    Okay.  But is --

17        A.    That's --

18        Q.    That's the total reduction

19   amount.

20        A.    Exactly.  That's a total

21   reduction amount.  If you're using

22   coupons, that means that person used more

23   than one coupon on that transaction right

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 100

1   there, because there was not a two hundred

2   and twenty-eight dollar coupon.  So if

3   they didn't have --

4        Q.    I guess what I'm getting at

5   is, what that shows is the reduction is

6   done for that particular transaction; is

7   that correct?

8        A.    Yeah.  And it's showing that

9   they're using more markdowns and discounts

10  to get up to two hundred and twenty-eight

11  dollars.

12       Q.    Are you aware of anything else

13  that shows the bar code number besides the

14  journal tape?

15       A.    No.

16            MS. HEMSTREET:  If you want to

17  give me just a minute, Robin.  I don't

18  know if you have any questions for

19  Mrs. Bryant.

20            MR. MCINTYRE:  Yeah.  I have a

21  few.  Or do you want a minute or two?

22            MS. HEMSTREET:  No.  You go

23  ahead, and I'll mull it over while you go.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 101

1              EXAMINATION

2    BY MR. MCINTYRE:

3         Q.    I know you said you went

4    through a training there for management,

5    and we just had a discussion about the

6    lady that he -- Kenny Reese put in your --

7    in your team, and then he would discuss it

8    with her.  What was her name?

9         A.    Barbara McDonald.

10        Q.    Okay.  Now, but in your

11   training for management, did they explain

12   anything about an expected chain of

13   command or how they would expect normally

14   the managers will relate to each other?

15        Was there -- Did you get any

16   training or anything about that?

17        A.    About how management would

18   relate --

19        Q.    Such as what -- You were

20   saying that he should have come to you.

21        A.    Right.

22        Q.    Was there any training that

23   you received, you know, management or any

Page 102

1    explanation of policy, of Sears policy, or

2    anything that would indicate how the

3    general store manager would relate to any

4    given management team?

5        A.    Under previous store managers

6    that I worked under, they would come to

7    the person who was over that department,

8    as far as a change and doing the change.

9    They would -- The store manager and that

10   manager of that department would talk

11   about it and come to an agreement whether

12   it should be done, why it should be done,

13   or why shouldn't it be done.  And that

14   didn't happen with Kenny Reese.

15       The only time he mainly communicated

16   with me, if he wanted us to put up some

17   illegal signs.  And then he would state if

18   district staff come into the store,

19   because most of the time we would know

20   when they would come into the store, that

21   we need to snatch them down.

22       Q.    Snatch down what?

23       A.    The signing.  The illegal

Page 103

1    signing that he would put up in the

2    departments.

3         Q.    So he gave you instructions --

4         A.    To take them down.

5         Q.    -- to take them down.  And

6    what was illegal about them?

7         A.    He would -- Like in the

8    dresses department, he would say, save

9    twenty dollars on dresses forty-nine

10   ninety-nine or up.  Well, that wasn't per

11   company policy.  And I was in charge of

12   Sears advertising and setup, takedowns,

13   markdowns, and markups.

14        And the appliance department, he

15   would remove the sales signing that I

16   would put out per company policy, sales

17   advertising, and he would create a sign or

18   have us to create a sign saying, save;

19   which it was already on sale anyway.  So

20   he misled the customer.  That's the only

21   time he mainly communicated with me, when

22   it was something that he was doing wrong.

23        Q.    When you -- What was the

Page 104

1    procedure if there was going to be a store

2    meeting of whether associates or staff,

3    how was -- how did you typically get

4    notice that the store meeting was going to

5    happen?

6         A.    They would do mostly on Friday

7    mornings.  They would pick up the intercom

8    and say, there will be a storewide meeting

9    in the shoe department.  And the

10   associates that were there would come.

11        Q.    And would this be before the

12   store opened?

13        A.    Before the store opened.

14        Q.    So who -- And that's -- So

15   if -- I know she asked you a question here

16   about that, so you would have -- If you

17   were there, you would have known about if

18   they were going to have either a staff

19   meeting or a staff meeting with the sales

20   associates, you would have gotten --

21        A.    Exactly.  Because, see, not

22   only that -- I mean, Mickey talks about

23   training for the sales associates.  Well,

Page 105

1    in-store marketing also would have had

2    their own separate training also.  And we

3    did not make a practice of communicating

4    well with associates in the store like we

5    should have, the policies or anything.

6         I was there almost, I think,

7    fourteen years before I left, and the

8    handbook that I got when I was hired March

9    13, 1990, that was the only handbook that

10   I received.

11        Q.    Like we went over, was -- do

12   they typically have these meetings on

13   Friday, is that --

14        A.    Mostly Friday morning, because

15   it was going to the weekend.

16        Q.    So that was the typical day

17   you'd have the meetings?

18        A.    Exactly.  Exactly.

19        Q.    And did you typically work on

20   Fridays?

21        A.    Yes, I did.  Because we had a

22   lot of sales, like the super Saturday

23   sale, we would have to start setting up

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 106

1    the ads by five o'clock on Fridays.

2        Q.    So if they had a -- Would you

3    attend the meeting if they had one, if

4    they called over the intercom for the

5    sales associates, did everybody attend

6    those kind of meetings?

7        A.    Everybody didn't attend those

8    kind of meetings.  But I worked all over

9    the store, so sometimes -- You know, if

10   they would have a meeting, if I'm walking,

11   I could stop.  They didn't tell me that I

12   couldn't attend, you know, but I could

13   stop and listen if I had wanted to do

14   that.  And then -- And previous store

15   managers, they used to have meetings like

16   that, but they didn't do that when Kenny

17   was there.

18       Q.    Didn't do what?

19       A.    Have those types of meetings.

20   They didn't.  The other store managers was

21   concerned about making money the right

22   way.  You know, yes, we used coupons,

23   seldomly; but when Kenny Reese came into

Page 107

1    the store, he just really abused the whole

2    system.  He abused the company period,

3    from markdowns to expired coupons to not

4    saying anything about coupons being used

5    over and over and over again.

6         Q.    Okay.  So how many -- Did he

7    have many meetings or who called these

8    meetings on Friday, who --

9         A.    Well, sometimes I would get on

10   the intercom and say there would be a

11   storewide meeting in the shoe department;

12   sometimes Byron would get on the intercom

13   and say it.

14        Q.    And who would have given you

15   instructions to do that or who was

16   actually going to conduct the meeting?

17        A.    Well, if -- Well, mostly -- I

18   tell you who actually -- Kenny Reese

19   talked about sales, he did, and the big

20   events; Byron Mason would talk about

21   credit applications.  Or if Kenny Reese

22   wasn't there, Byron would go on and talk

23   about sales, big events, and protection

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 108

1    agreement; you know, where you stood in

2    the area.

3         Nobody was ever concerned about

4    coupons at all.  Coupons did not even come

5    up in that discussion.  And you would not

6    want just a particular department to know

7    about not to use coupons, you would want

8    the whole store, because the whole store

9    was doing that.

10        But it wasn't a problem in our eyes

11   as management.  It wasn't a problem.  As

12   long as we was getting sales, it didn't

13   matter.  We didn't question them.  Loss

14   prevention, Terry Gandy, he had access to

15   anything he want to have access to, so why

16   did he let it go on as long as it did?

17        Q.    Was he there on Friday

18   mornings?

19        A.    Sometimes he would be.

20        Q.    So he knew about these

21   meetings or would hear this --

22        A.    Yeah.  He knew about the

23   meetings.

Page 109

1          Q.     Did he attend them or do you

2     know?

3          A.     Yeah.  He was standing out and

4     attend some when he was there and I was

5     there.

6          Q.     So you definitely attended

7     some of these meetings?

8          A.     Yes, I did.

9          Q.     And the ones you attended,

10    there was no discussion --

11         A.     No discussion on coupons.

12         Q.     -- on coupon use?

13         A.     No handbook, nothing.

14    Strictly protection agreement, credit

15    applications, where you stand in your

16    department, and what's going to be the big

17    event from the weekend.

18         Q.     And I know you mentioned or it

19    was mentioned here about on this -- when

20    this investigation was occurring, did

21    anybody mention any sales associates or

22    anybody, that you heard, mention about the

23    investigation to you?

Page 110

1       A.    No.  Because I wouldn't know.

2       You know, when you're in an

3  investigation, and you're investigating

4  somebody, actually -- Terry and Kenny

5  Reese would be the two, because Kenny is

6  the store manager.  No one else really

7  should even know about the investigation,

8  even management; that should be

9  confidentiality.

10      Q.    Did somebody mention to you,

11  one of the sales associates in appliances,

12  mention -- or they had knowledge about the

13  -- of an investigation that occurred or

14  was happening or right after it was over,

15  any of the white associates?

16      A.    Well, the only thing was I had

17  heard that -- but, you know, nobody -- I

18  had heard, but not from that associate,

19  but Carolyn Landers had stated and this

20  came, you know, from someone that was

21  inside of the store after that, that she

22  was being -- that John told her she was

23  being investigated on.  But I can't -- You

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 111

1    know, I don't have no proof of that.

2         Q.    She seemed to have some

3    knowledge about --

4         A.    That she was being

5    investigated.

6         Q.    You said John, she had gotten

7    that information --

8         A.    From John -- From John Lowery.

9         Q.    Lowery.  And this was Carolyn

10   Landers?

11        A.    Yes.  But I wasn't there.

12   This is -- I'm just a third party.

13        But, you know, my thing was, why

14   would she know that she's being

15   investigated?  She's not supposed to know.

16        Q.    That information shouldn't

17   have ever really gotten out is what you're

18   saying?

19        A.    It shouldn't have gotten out.

20   She may have just told somebody.

21        Q.    Who was Lisa -- You mentioned

22   a Lisa Lipp?

23        A.    Leatha Lipp.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 112

1        Q.      Excuse me, Leatha Lipp.  Who

2   was that?

3        A.      Now, she retired from the

4   company, but she was the loss prevention

5   manager when she retired from the company.

6        Q.      And when did she retire?

7        A.      It could have been -- I'm

8   thinking maybe in 2003 she retired.  I

9   don't know the exact month.  I know Roy

10  Treadwell was the store manager when she

11  retired.

12       Q.      When she was there, how were

13  coupons being used?

14       A.      People -- The associates would

15  use coupons out of the drawer, we would

16  still pull coupons out the drawer, but it

17  was nothing in -- like Kenny Reese had us

18  doing.  And it wasn't very often, you

19  know, that it was done.  Because I'm

20  assuming she checked her reports.

21       Q.      All right.

22       A.      You know, a customer might

23  come in and say, I forgot my coupon, you

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 113

1    know, and we would let them use a coupon

2    because we would have extra coming in from

3    the advertisement that we would get in the

4    store.

5        Q.    But there were extra coupons

6    at that time?

7        A.    Right.  Exactly.  It was extra

8    coupons.

9        Q.    And so she was -- Did Terry

10   Gandy take her place?

11       A.    Yes.

12       And Terry Gandy actually worked for

13   Leatha, he did.  And when she left, he

14   just stepped right on in.

15       Q.    He then was moved up?

16       A.    Yeah.

17       Q.    Okay.

18       To your knowledge, did they ever

19   have while you were there -- I know it was

20   mentioned, something about an annual

21   meeting, was there any -- Kenny Reese --

22       A.    Now, this was before Kenny

23   came, the company used to have maybe once

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 114

1    a year, a storewide meeting for the entire

2    store on like a early Sunday morning; they

3    would go over different training.  But

4    coupons never came up in that training

5    also.  But they would just go to the new

6    structure that Sears is going to do or if

7    it was something new that Sears -- a new

8    event that Sears was coming out with, we

9    discuss that; we would discuss about

10   associates being to work on time.

11       Q.    So would you get prior

12   notification of this kind of meeting?

13       A.    Yes.  They would post a note

14   and say it's mandatory.

15       Q.    Did you ever see such a note

16   posted while Kenny Reese was the store

17   manager?

18       A.    No.  No.

19       Q.    I know you've been asked about

20   your declaration, is this everything that

21   you know.  This doesn't -- does not relate

22   everything that happened while you were at

23   the store for fourteen years, does it?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 115

1      A.    No.  No.

2           MR. MCINTYRE:  I guess that's

3   all at this moment.  If you've got your

4   stuff composed.

5           MS. HEMSTREET:  I do.

6           EXAMINATION CONTINUED

7   BY MS. HEMSTREET:

8      Q.    Do you know who made the

9   decision to terminate Ms. Smith and

10  Ms. Willis?

11     A.    No, I don't.  I didn't even

12  get into who made the decision.

13         All I know that Kenny Reese --

14     Q.    You don't know who made the

15  decision --

16     A.    Terminated them, yeah.  I

17  don't know who made the decision, but

18  evidently Kenny Reese, by him being the

19  store manager, he had to talk to them and

20  let them go as far as my concern.  I mean,

21  I don't know.

22     Q.    You don't know for sure?

23     A.    Huh-uh (negative response).

Page 116

1      Q.      Is that no?  Just to verbalize

2   for her.

3      A.      To what?

4      Q.      Is that a no?

5      A.      I don't know -- I do know that

6   you're supposed to call the social service

7   center.

8      Q.      But what I'm asking you, do

9   you know who made the decision to

10  terminate --

11     A.      I don't know who made -- If it

12  was associate service center or Kenny

13  Reese.  But I do know being in that store,

14  when you're terminated, the store manager

15  normally does it unless you're a salary

16  manager.

17     Q.      Now, your understanding, the

18  reason that they were terminated is

19  because they used coupons out of the

20  drawer, that's your understanding; is that

21  right?

22     A.      My understanding what was

23  told, they reused coupons.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 117

1          Q.      Who told you that?

2          A.      When I was talking to Byron

3    Mason when he called, he said misuse of

4    coupons, reuse coupons.

5          Q.      Okay.

6          A.      When he called me off Denise's

7    cell phone.

8          Q.      Now, you said that the only

9    handbook you received was the one that you

10   first got when you became employed; is

11   that right?

12         A.      Right.

13         Q.      But y'all had online training

14   after that; is that correct?

15         A.      We had online training.  But

16   let me tell you with the online training,

17   that wasn't done --

18         Q.      Did you have online training?

19         A.      Yes, I had some online

20   training.

21         Q.      Was it your responsibility to

22   do the online training?

23         A.      It was supposed to have been

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 118

1    my responsibility.  But sometimes the

2    human resource manager would get the

3    associate number or either the manager in

4    that department would get the associate

5    identification number and do the training

6    for them.

7        Q.    So you can log onto the

8    computer and do the training on your own

9    time; is that correct?

10       A.    On your own time?

11       Q.    Like it's made available to

12   you and you can go into the computer and

13   do the online training; is that right?

14       A.    You can go into the computer

15   and do the online training.  But you

16   didn't come in on your own time.  You

17   would have to be -- You're supposed to be

18   scheduled time.

19       Q.    I see.  You sign up for it?

20       A.    No.  The manager is supposed

21   to schedule the time for you to go ahead

22   and do your training.  But that didn't

23   always work.  Sometimes they would go in

Page 119

1    the computer and do the training for the

2    associate.

3          Q.    Did you ever -- In these

4    meetings, I know you said -- you claim

5    that the meetings that you attended there

6    weren't any discussions about coupons.

7          A.    Right.

8          Q.    Were there ever any

9    discussions about unauthorized discounts?

10         A.    No.  No.  No.

11         Q.    Not in the meetings that you

12   attended?

13         A.    No.

14         Q.    Now, coupons you said under

15   Leatha Lipp, there were coupons used out

16   of the drawer; is that right?

17         A.    I said it may have been some

18   coupons that was used out of the drawer,

19   but it couldn't have been often.

20         Q.    What about under Lewis

21   Collins, did y'all use coupons out of the

22   drawer then?

23         A.    One thing about Lewis Collins,

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 120

1    he did not --

2         Q.    Did you use coupons?

3         A.    No, I didn't.  No, I did not.

4         Q.    Do you know if other

5    associates did?

6         A.    No.  No.

7         Q.    You don't know if they did?

8         A.    I don't know whether they did

9    or not.  I know I didn't.

10        Q.    What about under Newton, do

11   you know --

12        A.    Greg Newton?

13        Q.    Yeah, Greg Newton.

14        A.    Yes, we did use coupons out of

15   the drawer.

16        Q.    What about Roy Treadwell, did

17   you use coupons out of the drawer then?

18        A.    I don't think I've used any

19   coupons out of the drawer when Roy was

20   there, no.

21        Q.    Did you ever see anyone in the

22   appliance department use a

23   sixty-five-dollar coupon?

Page 121

1       A.     No.

2       Q.     Now, you said that Kenny Reese

3   would have you make copies of --

4       A.     Expired coupons.

5       Q.     -- expired coupons?

6       A.     Yes.

7       Q.     Do you know if anyone ever

8   used these expired coupons?

9       A.     Yeah, they used them.  I even

10   used them.

11       Q.     Now, when you scan it in

12   though, they come up they won't go

13   through, that's my understanding, right,

14   because they're expired; is that right?

15       A.     They're not supposed to go

16   through.  Sometimes they will go through.

17       And then if it didn't take, all you

18   have to do is manually input the number

19   and it definitely will take then.

20       Q.     So you would just input the

21   number --

22       A.     You could manually input the

23   number.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 122

1       Q.    Do you know what the

2  circumstances were as to what -- Did he

3  tell you why he was having you copy these

4  coupons?

5       A.    Because he wanted to drive

6  sales.

7       Q.    Is that what he told you?

8       A.    Yes.  He wanted to drive

9  sales.

10      Q.    Do you know if he had

11 permission from corporate to do this?

12      A.    No, he didn't have permission

13 because --

14      Q.    Do you know if he did?

15      A.    No, he didn't.

16      And the reason I know he didn't have

17 permission, because that was one of the

18 things also he would say if the district

19 staff come into the store, remove them.

20 So he was well aware that we wasn't

21 supposed to do it anyway.

22      Q.    Now, do you know if he put

23 these coupons to help correct errors in

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 123

1    the cash system?

2        A.    No.  No.  No.

3        Q.    You don't know if he did or

4    not?

5        A.    That wasn't what he used it

6    for.  Because I was one of them that he

7    had putting out the coupons.

8        He was strictly using it to try to

9    drive sales.

10        Q.    But it wouldn't go through, is

11    that right, when it would ring up if it

12    was expired; is that right?

13        A.    No.  If you scan the bar, if

14    it comes up saying expired, you can

15    manually input it, and it will go through.

16    And if it didn't go through then, you know

17    who they would call?  A manager on duty.

18    And we would put our approval code, which

19    was our social security number.

20        Q.    And the manager had the

21    authority to then approve --

22        A.    He gave us the authority to do

23    it.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 124

1    Q.    He gave you -- He would have

2    the ability to approve that transaction;

3    is that right?

4    A.    He gave us the -- He empowered

5    us to do it.

6    Q.    Do you know if Kenny Reese or

7    any other managers put any

8    sixty-five-dollar service coupons by the

9    register?

10    A.    I didn't do it.  I didn't put

11    any by the register.

12    Q.    Do you know if anybody did?

13    A.    I don't know whether he did or

14    not.  It wouldn't surprise me if he did.

15    Q.    Do you know if he did?

16    A.    No.  But it wouldn't surprise

17    me either.  He did everything else that

18    was wrong in the book.

19    MS. HEMSTREET:  I think that's

20    about all I've got, Robin.

21    MR. MCINTYRE:  I've got one.

22    EXAMINATION CONTINUED

23    BY MR. MCINTYRE:

Page 125

1      Q.    You mentioned sometimes the

2  manager did the training.  What did you

3  mean by that?

4      A.    Well, when we went -- Well,

5  the system -- Like she said, you can go in

6  the computer and do training.  We're

7  actually supposed to, on the schedule,

8  schedule time for our associates to go

9  back there and do training, and then

10 schedule other people in for floor

11 coverage.  Well, that didn't happen.  Just

12 like any other thing, it didn't happen.

13      So we would sometimes, because the

14 company would send email saying, well,

15 whatever department was at a hundred --

16 whether you was at a hundred percent of

17 your training or not.  Okay, before that

18 time would come, we would get the

19 information that we need to go in the

20 computer and do our associate's training,

21 we would do that.  Management did training

22 for associates in the system, which it was

23 wrong, but we did it.

Page 126

1        Q.    You mean you-all just clicked

2    through whatever they were supposed to go

3    over -- the manager just went in there and

4    it appeared that it was the associate

5    doing it --

6        A.    Exactly.

7        Q.    -- but the manager really just

8    clicked through it, and it updated that

9    sales associate's training --

10        A.    Right.

11        Q.    -- program.  And really in

12    reality, the sales associate never even

13    was there?

14        A.    Right.  Right.

15        Q.    And this was purely because

16    they had some schedule that they would

17    look at, well, have all the sales

18    associates in that area gotten their

19    training then by a certain date?

20        A.    Yeah.  They would email --

21    They would email the stores and say, well,

22    you're at a hundred percent of your

23    training on whatever training it was or

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 127

1    you're at fifty percent.  Well, you know,

2    by going out to -- You know, from the

3    company, we didn't want to look bad, so we

4    did whatever we could do to look good.

5    Just like coupons, we did that to drive

6    sales because we didn't want to be at the

7    bottom line, we wanted to be up there.

8         Q.    Okay.

9              EXAMINATION CONTINUED

10   BY MS. HEMSTREET:

11        Q.    Did you ever do that?

12        A.    Yeah.  I sure did.

13        Q.    Did you ever see Terry Gandy

14   or Kenny Reese do that?

15        A.    No.  Because on that side, I

16   don't even think anybody actually did

17   training.  I know my people didn't do

18   training.  And when Kenny Reese was there,

19   I didn't go back and do all of my people's

20   training because he didn't enforce that.

21        Q.    So you don't know --

22        A.    But Nina Fitzwater did it.

23   Nina Fitzwater did it, I know she did it.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 128

1      Q.    Do you know if John Lowrey

2   filled out the training for his people?

3      A.    No.  No.  But you know what,

4   they're commission sales people, and I

5   guarantee you they didn't leave the floor

6   to do some training.  I guarantee that.

7   Because they was on a commission versus

8   draw, they had to sell to make money.

9      Q.    Straight commission; is that

10  correct?

11     A.    Yeah.  They had to sell to

12  make money.

13     Q.    The more sales you make the

14  more money --

15     A.    The more money you make.

16     Q.    So it's your benefit to close

17  sales and get more sales; is that right?

18     A.    Exactly.

19          MS. HEMSTREET:  That's all I've

20  got.

21          MR. MCINTYRE:  Okay.

22  (The deposition of Shannon Bryant was

23    concluded at 3:20 p.m. on September 6,

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 129

1    2006.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1               C E R T I F I C A T E

2   STATE OF ALABAMA      )

3   COUNTY OF JEFFERSON )

4

5               I hereby certify that the

6   above and foregoing proceeding was taken

7   down by me by stenographic means, and that

8   the content herein was produced in

9   transcript form by computer aid under my

10  supervision, and that the foregoing

11  represents, to the best of my ability, a

12  true and correct transcript of the

13  proceedings occurring on said date at said

14  time.

15              I further certify that I am

16  neither of counsel nor of kin to the

17  parties to the action; nor am I in anywise

18  interested in the result of said case.

19

20

21  _____

22  Court Reporter and Commissioner

23