# EXHIBIT 4

## DECLARATION OF KENNY REESE

1.   My name is Kenny Reese. I am a white male and am over the age of nineteen (19) years. I have personal knowledge of the facts set forth below pertaining to the case pending in the United States District Court for the Middle District of Alabama, Eastern Division, styled Beatrice Willis v. Sears, Roebuck and Co., CV-05-1019-W. I give this Declaration voluntarily, without coercion and under the penalty of perjury.

2.   From February 2004, until April 2005, I worked for Sears as the Store General Manager ("SGM") at its store in Auburn, Alabama. As the SGM, my duties included overseeing the daily operations of the Auburn store.

3.   At all times relevant to Willis' lawsuit against Sears, Terry Gandy was the Loss Prevention Manager, John Lawrie was the Hardlines Manager (which included the appliance, electronics, lawn and garden, fitness, vacuums, and hardware departments), and Byron Mason was the Softlines Manager (which included the apparel, home fashions, luggage, and the shoe departments). Gandy and Lawrie are white and Mason is African-American.

4.   At all times when I was the SGM, Sears had a policy strictly prohibiting employees from giving unauthorized discounts to its customers. This included applying coupons to sales transactions when customers <u>were</u> <u>not</u> <u>eligible</u> to receive the discount as provided by the terms of the coupon. Sears considered this conduct to be <u>completely unethical</u> and grounds for <u>immediate termination</u>. This policy was clearly stated in Sears' Code of Conduct in Sears' Associate Handbook. The Code of Conduct was distributed to all Sears' sales associates and reviewed with them annually.

5. Not only were the sales associates trained on this policy through the Associate Handbook, but myself and the assistant managers, including Byron Mason and John Lawrie, advised them of Sears' policies during our regular associate meetings. I specifically recall discussing when to use coupons and Sears' unauthorized discount policy in some of these meetings.

6. During my employment at Sears, we trained the sales associates to discard a coupon after they received it from a customer and applied it to a sale or to put it in the detail drawer to be turned into the cash office at the end of the day. Associates were specifically told not to reuse coupons presented to them by customers.

7. When I worked at the Auburn store, Sears had a $65.00 service coupon that its service technicians distributed to Sears' customers who had received a service call at their home but had declined to have their appliance repaired because they wanted to purchase a replacement. Sears offered this $65.00 coupon to these customers as an incentive for them to purchase a replacement item at Sears rather than one of its competitors. These coupons were distributed by Sears' service technicians and <u>not</u> Sears' sales associates. The service coupons were different than most other Sears coupons because only those customers who had <u>received</u> a <u>service call</u> and had declined a repair <u>were eligible</u> to receive this $65.00 discount. <u>No other</u> customers were permitted to receive this discount. This condition was clearly stated on the coupon.

8. This service coupon also specifically instructed sales associates to collect and destroy the coupon and not to reuse it.

9. I did tell sales associates to call a manager if they were having trouble closing a sale to see if the manager could work something out with that customer to help

close the sale. I never told Beatrice Willis or any other sales associate that they were allowed to give a customer an <u>unauthorized</u> <u>discount</u> using Sears' service coupon or any other coupon when the customer was not entitled to it. I never heard anyone in management instruct Willis or any other sales associate to give a customer an unauthorized discount using Sears' service coupon, or any other coupon, when the customer was not entitled to it.

10. On or about November 1, 2004, Terry Gandy, who was the store's Loss Prevention Manager, informed me that Sears' delivery company had notified him that Beatrice Willis was attempting to give a customer <u>unauthorized</u> free delivery. This was a violation of Sears' unauthorized discount policy. Gandy told me that while he was investigating this allegation, he discovered that Willis had approximately 15 or 16 transactions involving Sears' service coupon within the last month. This was extremely high for one associate. A store the size of the Auburn store usually had only a total of 4 to 8 service coupon markdowns per month for the <u>entire</u> store. Gandy further stated that he contacted the service department and confirmed that almost <u>none</u> of Willis' customers had received a service call.

11. Gandy and Nina Fitzwater, who the Human Resources Lead at the time, questioned Willis about these transactions. I understand that during this meeting Willis admitted that she had misused the coupon and further failed to explain why she had given the service coupon discount to so many customers who were not entitled to it. Consequently, Gandy and I made the decision to terminate Willis' employment. We consulted with one of Sears' corporate human resources consultants during this process and she approved the decision.

12. On or about November 1, 2004, Gandy and I met with Willis and informed her that she was being terminated for giving Sears' service coupon to customers who were not eligible for it in violation of Sears' unauthorized discount policy. My decision to terminate Willis was based <u>exclusively</u> on the investigation and her failure to reasonably explain her misconduct. I did not consider Willis' race at all in making my decision. Neither the HR consultant nor Gandy ever said or did anything to lead me to believe that they considered Willis' race in making the decision to terminate her.

13. Gandy and I subsequently decided that we needed to investigate the remaining appliance associates to determine if any other associates were also misusing the service coupon.

14. I recall that the other appliance associates who were working in the appliance department at this time included Denise Smith (African-American), Jackie Dodson (African-American), Carolyn Landers (white), and Merle Miller (white).

15. Gandy investigated these remaining sales associates in the same manner as he did with Willis.

16. Gandy's investigation revealed that Denise Smith had used the service coupon 9 times during this same time period (the month of October 2004). Gandy told me that he had contacted the service department and had confirmed that 7 out of 9 of Smith's customers <u>had</u> <u>not</u> received a service call. Based on this, we contacted Sears' corporate Human Resources consultants at Sears' corporate office. The HR consultant advised us to interview and obtain a statement from Smith regarding her misuse of the service coupons.

17. On or about November 8, 2004, Gandy and Nina Fitzwater (white), who was the HR Lead at the time, questioned Smith about these unauthorized discounts. I understood that during this meeting, Smith admitted that she was reusing the service coupon and giving it to customers who <u>were not eligible</u> to receive it and failed to explain her violation of Sears' well-published and well-known unauthorized discount policy.

18. Based on the investigation and Smith's interview, Gandy and I concluded that Smith should be terminated. The corporate HR consultant approved our recommendation. Race was likewise not a factor in this decision. Smith was terminated solely because she gave the service coupon to numerous customers who were not eligible to receive it. Gandy notified Smith of her termination on about November 14, 2004.

19. This same investigation revealed that associate <u>Dodson</u> had completed <u>four</u> sales transactions using the $65.00 service coupon, that associate <u>Landers</u> had completed <u>one</u> transaction using the $65.00 service coupon, and that <u>Miller</u> had completed <u>none</u>.

20. Gandy informed me that Sears' service department verified that <u>Landers'</u> one customer was entitled to the discount and that <u>three out of four</u> of <u>Dodson's</u> customers were entitled to the discount.

21. I understood that Gandy and Fitzwater subsequently asked Dodson about this fourth transaction. I further understood from my review of Dodson's statement from this meeting that Dodson explained that this particular customer had obtained a service coupon from her daughter, who had received the service call, and that this customer had purchased the appliance as a gift for her daughter.

22. I believed Dodson's explanation and therefore concluded that Dodson did not misuse the service coupon and that she should not be terminated. Dodson is an African-American.

23. Additionally, Gandy pulled all of the sales associates' transactions in the electronics department. I recall that <u>both</u> black and white associates were working in this department at the time. Gandy informed me that based on his review of these transactions that <u>none</u> of the electronics associates had used the service coupon.

24. Prior to November 2004, I was not aware that any sales associates in the appliance department were using the service coupon or any other coupon to give customers unauthorized discounts.

25. I have no reason to believe that prior to the November 2004 investigation, that Gandy, Mason, Lawrie or any member of management was aware that anyone in the appliance department was misusing Sears' service coupon or other coupon to give customers unauthorized discounts.

26. Prior to November 2004, I was not aware that there were any service coupons being kept in or by the registers in the appliance department that were not being "collected and destroyed" or turned into the cash office at the end of the day.

27. I did not treat African-American employees less favorably than I treated white employees.

28. When I first started working at the Auburn store, Denise Smith was working part-time selling vacuums and microwaves. In late March or early April 2004, a full-time sales position in the appliance department became available. The appliance department was considered to be the top sales associate position because these associates

had the opportunity to make more money as compared to other departments. Sales associates in the appliance department were paid on a straight commission basis. Smith told me that she wanted to be considered for this position and that she wanted to work full-time. I subsequently promoted Smith to this full-time sales position. Smith is black.

29. I also promoted several other African-Americans when I worked at the Auburn store, including Stacy Dumas from Softlines Lead to Automotive Store Manager and Tammy Calhoun from Merchandising Associate to Merchandising Lead.

30. When I worked at the Auburn store, I had lunch with Byron Mason (Softlines Manager) almost every day. Mason was one of the employees that I got along with the best. Mason is African-American.

31. I did not always speak to all employees when I saw them. This included both white associates and African-American associates.

32. When I was the SGM, I would ask both black and white sales associates to perform certain work-related tasks that would take them away from the sales floor. I never singled any employees out to do certain tasks based on their race. In fact, usually if I needed help from an associate, I would call the relevant department and whoever answered the phone is the one I would ask to help me.

33. When I was the SGM, I frequently asked about how all the sales associates in the store were doing on their sales. I did not only ask about the white associates. In fact, I held monthly meetings with each sales associate who worked on commissions to go over their sales.

34. When I was SGM, I frequently helped both white and black associates close sales. I remember that on one occasion Willis was helping a customer who wanted an appliance that Sears did not have in stock. Willis walked away from this customer to go help someone else because Sears did not have the item the customer wanted. The customer was about to leave to go to a competitor, and therefore, I told him that we could give him another model until his arrived. The customer agreed. I then gave this sale to Willis to ring up under her sales number. Willis did so and received the commission for the sale.

35. I never observed Lawrie or Gandy treat African-American employees less favorably that white employees in any respect.

36. When I was the SGM, the Hardlines and Softlines Managers were responsible for making the schedules for the sales associates in their departments. They were required to use Sears' scheduling software. I never observed that Lawrie or Mason ever treated the African-American associates less favorably than the white associates with respect to scheduling.

37. I did not make the decision to terminate either Gerdine Barnes (African American) or Jimmie Tyson (African-American). To my knowledge Byron Mason (African American) made these termination decisions.

38. When I was employed with Sears, it took policy violations concerning integrity issues very seriously. I have never retained a Sears employee whom I have known to have violated Sears' unauthorized discount policy.

39. I am not aware of any Sears manager who has retained an employee who has given a customer an unauthorized discount.

40. While I was the SGM, Terry Gandy and myself were involved in the terminations of several white sales associates for unauthorized discounts and other integrity issues. I recall that we participated in the decision to terminate Michael Cunningham, who is white, for offering delivery for less that the actual cost, and Chris Pritchett and Brent Haney, both of whom are white, for re-ringing customers' tickets to make their sales appear better than they actually were.

41. I have never made any derogatory remarks about African-Americans or ever heard anyone in management ever make any such remarks while I was the SGM.

42. I never told Willis that she was being terminated because of her race or heard anyone in management ever make any such remarks.

43. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

10-16-06
DATE

*Kenny Reese* (signature)
KENNY REESE

1508992

9