LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CASE NUMBER: 3:05-CV1018-M

DENISE L. SMITH,
    Plaintiff,
vs.
SEARS,
    Defendant.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of Denise L. Smith may be taken before Anita Thebo, Commissioner, at the offices of Burr & Forman, at 201 Monroe Street, Montgomery, Alabama 36104, on the 28th day of April, 2006.

DEPOSITION OF DENISE L. SMITH
(48094)

Page 2

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that in accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Anita Thebo, am hereby delivering to Mieke A. Hemstreet the original transcript of the oral testimony taken on the 28th day

Page 3

of April, 2006, along with the exhibits.
    Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.
* * * * * * * * * *

Page 4

I N D E X
EXAMINATION
                       Page
By Ms. Hemstreet ...................... 7
DEFENDANT'S EXHIBITS
                       Page
Exhibit 1 ............................. 18
Exhibit 2 ............................. 50
Exhibit 3 ............................. 51
Exhibit 4 ............................. 52
Exhibit 5 ............................. 116
Exhibit 6 ............................. 120
Exhibit 7 ............................. 142
Exhibit 8 ............................. 187
Exhibit 9 ............................. 188
Exhibit 10 ............................ 190
Exhibit 11 ............................ 245
Exhibit 12 ............................ 253
Exhibit 13 ............................ 260
Exhibit 14 ............................ 261
Exhibit 15 ............................ 270
Exhibit 16 ............................ 275
Exhibit 17 ............................ 276

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 133

1  Q. Do you know if that customer
2  had a service call?
3  A. I can't say. I don't know.
4  Q. And your associate number is
5  associated with that transaction, correct?
6  A. That's correct.
7  Q. Now, Ms. Smith, how did you
8  know to use that two ninety-nine one?
9  A. They were in the register.
10 And actually, to be --
11 Q. Did you look at the terms of
12 the coupon to know to use the two
13 ninety-nine one rather than three
14 ninety-nine?
15 A. No.
16 Q. You just happened to pick up
17 the right one?
18 A. No. You just pick up a coupon
19 and you scan it and you use it. We
20 didn't --
21 Q. You just keep scanning coupons
22 to see which ones go through?
23 A. Uh-huh (positive response).

Page 134

1  We do.
2  And that was something --
3  Q. Even though the customer
4  wasn't eligible and didn't have a service
5  call, you would do that?
6  A. Yes, we did.
7  Q. And, again, according to the
8  handbook, that's an unauthorized discount,
9  correct?
10 A. According to the handbook.
11 Q. Now, on -- This might be the
12 same -- I might just have duplicates in
13 here, I'll have to look and figure that
14 out. I think it is, yeah. So never mind
15 about that one.
16 Yeah, that's a duplicate in there.
17 A. That's a duplicate right
18 there.
19 Q. Yeah. I think I just printed
20 the page twice.
21 A. Yeah. All these are
22 duplicates.
23 Q. Now, flip to page eighty-five

Page 135

1  for me.
2  A. (Witness complies.)
3  Q. Where the sales check number
4  is 0612, you see that one?
5  A. Uh-huh (positive response).
6  Q. And the total discount
7  reduction amount is one forty; is that
8  right?
9  A. Uh-huh (positive response).
10 Q. And on page eighty-six, the
11 journal tape associated with that
12 transaction indicated at the bottom, 0612.
13 And it shows that you made that
14 transaction; is that right? You completed
15 that transaction?
16 A. It's under my number.
17 Q. Sales associate 190, okay.
18 That also shows a sixty-five-dollar
19 discount, correct --
20 A. Yes.
21 Q. -- using coupon with the bar
22 code that's on -- the same as the one on
23 the service coupon?

Page 136

1  A. That's correct.
2  Q. Do you know if that customer
3  had a service call?
4  A. I don't know.
5  Q. Now, do you recall that on
6  November 8, 2004, Terry and Nina Fitzwater
7  talked to you about your abuse of the
8  service coupon?
9  A. Not abuse, no. They talked to
10 me about the coupon.
11 Q. And was this the first you had
12 heard of this?
13 A. Yes.
14 Q. So you had no idea this was
15 going on?
16 A. As far as what, the
17 interrogations?
18 Q. Yes.
19 A. I had heard it earlier that
20 day when I came in at one o'clock.
21 Q. So this was the first you
22 learned that --
23 Let me back up. This was the first

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 137

1 you learned that there was an
2 investigation going on for coupon abuse?
3   A.   It was within that -- If it
4 wasn't that day, it was within that week.
5   Q.   Do you recall when you first
6 heard it?
7   A.   It was one day when I worked
8 nights, I came in at one.
9   Q.   Do you know who you heard it
10 from?
11   A.   Yes. I heard it -- Well, no.
12 What I heard was that there was an
13 investigation going on.
14   Q.   Who told you that?
15   A.   Beatrice Willis and Jackie
16 Dodson, but they were not at liberty to
17 discuss it, and that I would find out
18 soon.
19   Q.   Now, did they say anything
20 else to you about it?
21   A.   Not about -- They didn't give
22 me any specifics about what the
23 interrogation was.

Page 138

1   Q.   What the investigation was
2 about, they didn't tell you?
3   A.   No.
4   Q.   So you had no idea it really
5 had to do with coupon abuse?
6   A.   Not until I got back in the
7 back.
8   Q.   Did they allude to you at all
9 what it was about?
10   A.   No.
11   Q.   Now, when you went to talk to
12 Terry and Nina, what did they say to you?
13   A.   Nina didn't say anything.
14   Q.   Okay. What did Terry say?
15   A.   Word for word, I can't
16 remember. But he basically pulled the
17 receipts out and asked me was I aware of
18 those receipts.
19   Q.   And what receipts are you
20 talking about, the ones we just
21 reviewed --
22   A.   Uh-huh (positive response).
23   Q.   -- in Defendant's Exhibit 6?

Page 139

1   A.   Right.
2   Q.   And what did you tell him?
3   A.   He asked me -- The first one
4 was about Clint Teal's receipt, he asked
5 me did I ring that up. And I told him I
6 did not remember ringing that up, I didn't
7 remember that sale.
8       A few of them at that particular
9 time I did remember, but that's all he
10 asked me.
11   Q.   Did he ask you if they had had
12 a service call?
13   A.   No, he didn't.
14   Q.   Did he ask you if you were
15 using coupons that the customer had
16 brought in or were reusing the coupons?
17   A.   He asked me why was I using
18 coupons and under what circumstances.
19 And, you know, I just went on to explain
20 to him that we use coupons to, you know,
21 keep a customer from walking, make a
22 customer for life, make a customer happy.
23 And he asked me what was I to do with

Page 140

1 coupons. And I told him only thing I knew
2 was to put them in the drawer, that's what
3 I had been doing from the time that I had
4 been there. He asked did I know that I
5 was supposed to tear them up and turn them
6 in at night. And I told him, no, I
7 didn't; I had never been told that and had
8 never did that before.
9       Well, the first part of the
10 conversation was I told him I was going to
11 record the conversation. He said, well,
12 we'll end it. And I cut the recorder off,
13 so that's the first --
14   Q.   You didn't record anything?
15   A.   No, I didn't. That was the
16 first thing.
17   Q.   So then he asked you under
18 what circumstances you were using the
19 coupon, and you told him basically you
20 were using it to close sales?
21   A.   Right.
22   Q.   And you told him that you
23 didn't throw coupons away, you just kept

35 (Pages 137 to 140)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 141

1  them in the drawer?
2      A.  Yes.
3      Q.  And you would reuse them?
4      A.  Yes.
5      Q.  Did he ask you to explain any
6  of those transactions?
7      A.  The only one he really asked
8  to explain was the Clint Teal one.
9      Q.  Did you know if that
10 transaction actually went through?
11     A.  I don't know.
12     Q.  You don't know if it was
13 cancelled or not?
14     A.  I don't.
15     Q.  Did he ask you to explain why
16 you were misusing the coupons and giving
17 it to customers who weren't eligible for
18 it?
19     A.  He didn't.
20     Q.  Did he ask you to write a
21 statement?
22     A.  He did.
23         (Whereupon, Defendant's

Page 142

1              Exhibit No. 7 was
2              marked for
3              identification.)
4      Q.  Is this the statement that you
5  wrote?
6      A.  It is.
7      Q.  In here you say you've never
8  been told by past or present managers not
9  to use the coupons, not to turn in at
10 night or destroy.
11     A.  That's correct.
12         From my understanding, that was
13 discussed by a manager before I got there,
14 Chandler, and I didn't know him. He was
15 the one they said made that rule -- make
16 everybody aware of that rule. But after
17 him, nobody made that rule aware, and he
18 was before I got there. That's what I
19 had -- Once I got terminated and found
20 out, that's what I was told. I don't
21 know.
22     Q.  Told that they had to put
23 coupons in the drawer?

Page 143

1      A.  That's when he -- No. At the
2  time that he was the manager, he was
3  telling associates this is what you need
4  to do, and he was enforcing this rule.
5  But that was before I got to Sears.
6      Q.  Did y'all ever have meetings
7  about giving proper discounts to customers
8  or basically when you should use coupons
9  or anything like that?
10     A.  No.
11     Q.  So if other sales associates
12 -- Do you not recall that meeting or you
13 just say that there wasn't one?
14     A.  There wasn't one. Not for
15 coupons, no.
16     Q.  What about giving unauthorized
17 discounts, was there a meeting for that?
18 Did y'all ever talk about that?
19     A.  Yes.
20         And the one -- The person that I
21 remember having that type meeting probably
22 was Louis Collins. And his thing, he
23 would give you the answer to the test

Page 144

1  before the test.
2      Q.  So in that meeting, you were
3  instructed not to give unauthorized
4  discounts or give discounts to people who
5  weren't eligible for them, correct?
6      A.  I can't remember exactly what
7  the conversation or the gist of the
8  meeting was. But if somebody was doing
9  something wrong at that particular time,
10 he would have a meeting, and he would
11 discuss whatever was going on. And it
12 could be taking unauthorized markdowns as
13 far as just marking stuff down just to be
14 marking them down.
15     Q.  Well, you said there was a
16 meeting about unauthorized discounts; you
17 said that there was one and Louis Collins
18 had that.
19     A.  Right.
20     Q.  So unauthorized discounts are
21 basically giving discounts to people who
22 are not eligible, correct?
23     A.  He wasn't talking about

36 (Pages 141 to 144)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 161

1  documents that Ms. Smith has produced in
2  response to our request for production.
3       A.   It's almost to the back.  I
4  guess about halfway in between the
5  receipts.  My number is 190, so it would
6  be --
7       Q.   Where is your number located
8  on this?
9       A.   On here, it's going to be
10 right here (indicating).
11      Q.   In the middle of the page.
12      A.   Uh-huh (positive response).
13      What are you looking at now?  I can
14 tell you if you're close to it or not.
15      It's going to look different than
16 that type sheet (indicating).
17      That's it.  And that television he
18 bought for one of his friends that they
19 jump out of the airplane together.  And I
20 sold that.
21      Q.   You sold that to him?
22      A.   I did.
23      Q.   And you say a reduction total

Page 162

1  of one ninety?
2       A.   Uh-huh (positive response).
3       Q.   And that's the associate
4  discount, correct?
5       A.   No.  Associate discount is
6  eighty-one dollars.
7       Q.   Right.  Right.
8       A.   And the reductions is the ten
9  percent plus coupons.
10      Q.   Do you recall which coupons
11 you used?
12      A.   No.  They were just in the
13 drawer.
14      Q.   Do you know if they were being
15 used consistent with their terms?
16      A.   I can't say they were.
17 Because I used those just like I did every
18 other coupon.
19      Q.   I guess what I'm saying, the
20 terms that were written on the coupon --
21      A.   I don't know what was on the
22 coupon.
23      Q.   Now, after you finished your

Page 163

1  meeting with Nina and Terry, how did that
2  end?  You wrote this statement?
3       Let me back up.  Let me back up.
4       Did you tell me everything that
5  basically transpired during that meeting?
6       A.   I didn't.
7       Q.   Finish telling me about that
8  meeting.
9       A.   The last thing that I said --
10 I asked him, I said, well, Terry, you know
11 we're still having problems with the
12 system, with the delivery.  I said, and we
13 still -- we've been using coupons to
14 straighten those out.  I said, how do you
15 want us to handle that.  He said, those
16 instances, go head and still use the
17 coupons.
18      Q.   Okay.  And that was what we
19 talked about before?
20      A.   Right.
21      Q.   Because it was overcharging,
22 so y'all were using coupons to fix that,
23 correct?

Page 164

1       A.   Right.
2       Q.   And they had told you that
3  that was okay, correct?
4       A.   At that time he said that.
5       Now, from what I understand -- They
6  called me at home and terminated me at
7  home.  And from what I heard, they said
8  that I said to call me at home.  That was
9  not true.
10      What I said was, don't let me work
11 all day and then terminate me.  And I told
12 him, if he was going to terminate me, to
13 terminate me then.
14      Q.   Do you know if Sears had
15 reached a decision at that point?
16      A.   Well, they probably did, had
17 already knew.
18      Q.   Do you know if --
19      A.   I don't know.
20      And the only reason --
21      Q.   Did you tell me all the
22 conversations you had with anyone before
23 you met with Gandy and Nina about the

41 (Pages 161 to 164)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 165

1  coupon abuse?
2    A.  No, I didn't.
3    Q.  Okay.
4    A.  When they told me that they
5  couldn't discuss the conversation, I told
6  them they had a right to discuss it, that
7  they're -- I can't remember what amendment
8  I used --
9    Q.  Who had a right to discuss it?
10   A.  That was with them. You
11 couldn't discuss anybody else.
12   Q.  I'm confused because you keep
13 referring to them.
14   A.  Beatrice and Jackie. I can't
15 remember which one it was, but it was one
16 of the two.
17   Q.  Had -- This is when they came
18 out and said, I can't discuss it?
19   A.  No. I came on the floor.
20 They had already had their discussion
21 earlier that morning or whatever, because
22 I came to work like at one or two o'clock
23 that evening. And they told me that I was

Page 166

1  going to be -- I had a meeting or I was
2  going to be made aware of something, but
3  they couldn't discuss it. And I asked
4  what you mean you can't discuss it; they
5  told us we couldn't discuss it. I said,
6  well, you can discuss anything that has to
7  do with you; you can't discuss anything
8  that has to do with anybody else. They
9  said, well, if -- whatever they discuss,
10 if you discuss it, they're going to
11 terminate you.
12    I'm like, they can't do that. So I
13 said, well, I'll tell you what, I'm going
14 to get me a tape recorder, because
15 whatever they say, I want to have it on a
16 recorder. John Lawrie was standing there
17 when I said that, because it wasn't
18 anything I was trying to hide from
19 anybody, because if I was trying to hide
20 it, I definitely wouldn't say it in front
21 of a manager. I went and I bought me a
22 tape recorder at Sears.
23   Q.  Is that the extent of the

Page 167

1  conversation --
2    A.  That's the extent of that
3  conversation.
4    Q.  -- with Louis and/or Dodson
5  prior to?
6    A.  Right.
7    Q.  Did you have any conversations
8  about the coupon abuse investigation with
9  anybody else before you talked to Terry
10 and --
11   A.  No.
12   Q.  -- Nina?
13   A.  No.
14   Q.  Now, after you talked to Terry
15 and Nina, did you continue to work?
16   A.  That night, because I was
17 closing that night.
18   Q.  And that -- You had a
19 conversation with them on the 8th; is that
20 right?
21   A.  That's correct.
22   Q.  And you were terminated on
23 the --

Page 168

1    A.  -- 13th at home.
2    Q.  And Terry called you, correct?
3    A.  Yes.
4    Q.  Did you have any conversations
5  with anybody in management between that
6  meeting with Terry and Nina and when Terry
7  called you at home to terminate you?
8    A.  Not about me, no.
9     Now, Byron Mason and I discussed it
10 after Beatrice was terminated.
11   Q.  What was that conversation?
12   A.  It wasn't right. Any of you
13 terminate her, you've got to terminate
14 everybody, because everybody was doing the
15 same thing.
16   Q.  That's what Byron said?
17   A.  Yes. That's what we all were
18 saying.
19   Q.  Do you know if he helped with
20 the investigation?
21   A.  Honestly, I don't think he
22 did.
23   Q.  Do you know?

42 (Pages 165 to 168)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 169

1   A.   I don't know. But I honestly
2   don't think he did.
3   Q.   Do you know if he knew what
4   the investigation showed?
5   A.   Probably after it was done he
6   did.
7   Q.   Did he have any input on the
8   decision, do you know?
9   A.   No. I don't think so.
10  Q.   Do you know?
11  A.   According to what came back
12  from his conversation, he couldn't have.
13  Q.   Do you know if he knew the
14  details of the investigation?
15  A.   After it was over with.
16  Q.   But not while it was going on?
17  A.   No.
18  Q.   And not before the decision
19  was made?
20  A.   No.
21  Q.   Anybody else in management
22  that you discussed this with --
23  A.   No.

Page 170

1   Q.   -- before your termination?
2   A.   No.
3   Q.   Now, you said Terry called you
4   at home. What did he say to you?
5   A.   He was just calling to let me
6   know my services was no longer needed.
7   Q.   And you understood that to be
8   for the coupon -- use of the service
9   coupon?
10  A.   Yes.
11  That's what I assumed it was.
12  Q.   So you basically continued to
13  work from 11/8/2004 to 11 -- through
14  11/13/2004, is that right, those five
15  days?
16  A.   That's correct.
17  Q.   Now, when you continued to
18  work, didn't you go and pull off
19  information from Sears's computer and
20  remove customer reports --
21  A.   I did.
22  Q.   -- on associate summaries and
23  things like that?

Page 171

1   A.   I did.
2   Q.   Were those for this particular
3   reason?
4   A.   Yes.
5   Q.   So they had nothing to do with
6   Sears's business, correct?
7   A.   Right.
8   Q.   And we discussed earlier that
9   that's a violation of Sears's policy,
10  correct?
11  A.   That's correct.
12  Q.   Who gave you access to
13  manager's information such as Terry Gandy
14  and these other customer reports?
15  A.   Associate access. Associates
16  have access to that.
17  You put your password in and you log
18  on and you get it.
19  Q.   What about -- You have access
20  to other associate sales?
21  A.   Yes.
22  Q.   So the associate summaries
23  that we went over in Exhibit, I believe it

Page 172

1   was, 6, you have access to those?
2   A.   Yes.
3   Q.   Did you copy them at that
4   point in order to pursue a lawsuit?
5   A.   No. To protect myself in case
6   I was terminated.
7   Actuality it was -- Yeah, I say
8   that, to protect myself.
9   Q.   Any other conversations at any
10  time with management about the service
11  coupon investigation and/or your
12  termination?
13  A.   Not that I recall.
14  Q.   Did you ever talk to Gandy
15  about it?
16  A.   Not after that.
17  Q.   You ever talk to Kenny Reese
18  about it?
19  A.   No.
20  Q.   You ever talk to John Lawrie
21  about it?
22  A.   No.
23  Q.   Just Byron Mason?

43 (Pages 169 to 172)

Page 193

1  Stephanie Darby, do you know if Sears did
2  that?
3      A.   I don't know.
4      Q.   So then you don't know what
5  those documents showed, do you?
6      A.   Some of them I do.
7      Q.   Do you know what the documents
8  show between the dates of -- I guess for
9  the month of October 2004?
10     A.   Not offhand. If I look back
11 through, I might. I don't know right
12 offhand.
13     Q.   And what do you recall that
14 these documents show?
15     A.   They used the same coupons,
16 the sixty-five-dollar coupon, I guess
17 specifically.
18     Q.   Now, do you know if those
19 customers had a service call?
20     A.   Well, according to --
21     Q.   Do you know if those customers
22 had a service call is my question,
23 Ms. Smith?

Page 194

1      A.   Not per -- No. But in a
2  sense, yes.
3      Q.   So, no, you don't know if they
4  had a service call?
5      A.   No.
6      Q.   Do you know if Terry contacted
7  customer service to find out if those
8  customers that Darby sold appliances to
9  and used that coupon, do you know what
10 customer service told him if they had had
11 a service call or not?
12     A.   No.
13     Q.   Do you know --
14     A.   Can I go back and -- I pretty
15 much know that they didn't have a service
16 call because the coupons that they used
17 for the sixty-five dollars is the same
18 coupons that's in the register. There was
19 no new coupons added to the register.
20     Q.   Well, do you know if Darby
21 turned her coupons in?
22     A.   Nobody turned them in.
23     Q.   How do you know? Were you

Page 195

1  there every day that she worked?
2      A.   No, I wasn't. But that wasn't
3  a practice. I've been there to close with
4  her.
5      Q.   Were you there every day that
6  Darby worked?
7      A.   I have worked with her and we
8  closed together a lot.
9      Q.   Ms. Smith, that's not my
10 question.
11     A.   Not every night I closed with
12 her.
13     Q.   Okay. Were you there every
14 day that she worked?
15     A.   No, I wasn't.
16     Q.   So do you know if she turned
17 in her coupons at any time?
18     A.   She did not turn them in.
19 Because --
20     Q.   And you weren't with her every
21 day when you worked, correct?
22     A.   Not every day.
23     Q.   So, therefore, you would not

Page 196

1  know if she turned her coupons in if you
2  weren't there, correct?
3      A.   I know the practice of
4  everybody, that they didn't turn them in.
5  We only turned in the money and a slip
6  that showed the money, that's what we
7  turned in. Then we turned in the sheets
8  when we had to do credit copies; those are
9  the only things we turned in.
10     Q.   But, Ms. Smith, what I'm
11 asking you, you said you didn't work with
12 Darby every day, correct?
13     A.   That's correct.
14     Q.   So, therefore, you don't know
15 what she did every single minute of the
16 day with regards to coupons, do you?
17     A.   That's correct.
18     Q.   And you don't know what
19 service told Terry Gandy about whether or
20 not those customers had a service call, do
21 you?
22     A.   No.
23     Q.   Now, you said -- mentioned

49 (Pages 193 to 196)

Page 197

1  Carolyn Landers also. Do you know if she
2  was investigated?
3      A.  No.
4      Q.  Do you know if she used the
5  coupon -- the service coupon other than
6  the time she was supposed to?
7      A.  If she -- Because of the
8  sixty-five there, she could not have used
9  them. She could not have used one that a
10 customer brought in. She had to use the
11 ones that was in the register, because
12 that's all that was there.
13     Q.  Do you know if she misused the
14 service coupon?
15     A.  I did not work with her every
16 night, so, no. But if she used them, she
17 used the ones that was in the register.
18     Q.  How do you know if she used
19 the ones in the register?
20     A.  Because no one turned them in.
21 There were no new coupons in the register.
22     Q.  Again, I asked --
23     A.  They were all the same

Page 198

1  coupons.
2      Q.  Again I ask you, Ms. Smith,
3  did you work with Carolyn Landers every
4  single day?
5      A.  No.
6      Q.  So then a customer may have
7  brought a coupon in, and she may have
8  turned it in, and you may not have known
9  about it, correct, since you weren't
10 working with her?
11     A.  No, that didn't happen.
12     Q.  That didn't happen?
13     A.  No, it didn't happen.
14     Q.  So you weren't there, but you
15 know that --
16     A.  I know that it did not happen.
17     Q.  Even though you weren't there?
18     A.  Right.
19     Q.  Do you know what customer
20 service told Terry Gandy or -- I'm sorry.
21 Do you know what the service
22 department told Terry Gandy if he called
23 to check and see if the customer that she

Page 199

1  gave that coupon to actually had a service
2  call?
3      A.  No.
4      Q.  So you don't know if they told
5  him that that customer did have a service
6  call, do you, and was issued a coupon, do
7  you?
8      A.  No. But the only thing I was
9  told, that Terry said there was only one
10 service at that time during that month,
11 and they did not provide that receipt
12 because I know that it was one of my
13 customers that came in that did have a
14 service, but it's not there, that month.
15     And so if my customer is the one
16 that did it, all the others was used in
17 the register.
18     Q.  I'm not following you.
19     A.  From what I understand what
20 Terry said, is that there was only one
21 customer that had service that month that
22 received a coupon. I know I had a
23 customer that came in that had a service

Page 200

1  call.
2      Q.  Okay. Was he referring to
3  your transactions?
4      A.  If it's one month, he said one
5  month out of all the ones that was used,
6  that was everybody included.
7      Q.  Do you know if he had
8  completed his investigation at that point?
9      A.  Yes. This is the time he was
10 doing his interrogations then.
11     Q.  Do you know if he had reviewed
12 -- do you know if he had reviewed Landers'
13 transactions and the other transactions at
14 this point?
15     A.  He said he had out of all the
16 whole month. Because he told me how many
17 I supposed to have used, he told
18 Ms. Willis how many she supposed to have
19 used, there were some left over, so
20 apparently he had to have investigated
21 everybody. But I had that one.
22     Q.  My question: Did he tell you
23 he had investigated everybody?

50 (Pages 197 to 200)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 201

1   A.   I can't say that word for word
2   what he said about, you know, had he
3   completed his investigation.
4       Q.   Do you know when he
5   investigated each of you?
6       A.   No.
7       But he said for the month of
8   October.
9       Q.   But you don't know what
10  service told Gandy about each of y'all's
11  transactions, do you, as to whether or not
12  the customers had --
13      A.   Said for the month of October
14  only one --
15      Q.   That's not my question,
16  Ms. Smith.  You're not listening to my
17  question.
18      Okay.  I'm asking you, do you know
19  what the service department told Gandy
20  when he called about each of your
21  transactions where all of you used the
22  sixty-five-dollar coupon, do you know what
23  customer service told Gandy about each of

Page 202

1   those transactions.
2       A.   He said that there was only
3   one coupon that was issued for the month
4   of October.
5       Q.   And when did he tell you that?
6       A.   He told Beatrice Willis that.
7   And then I stated it during my
8   interrogation, and he did say yes.
9       Q.   Okay.  So this was after
10  Willis's interrogation or investigation he
11  said that?
12      A.   Right.  Then I stated that.
13      Q.   So at that point you don't
14  know if he had investigated your
15  transactions or anybody else's, do you?
16      A.   But he did agree to that when
17  I said that.
18      Q.   He agreed to what?
19      A.   That there was only one that
20  was issued that month.
21      Q.   Only one out of the ones that
22  he investigated, correct?
23      A.   He said for the whole month.

Page 203

1   He didn't say for everybody he
2   investigated.  He said for the whole month
3   there was only one issued.
4       Q.   So you don't know if he
5   actually had investigated everybody else
6   at that point, do you?
7       A.   Well, I would assume that he
8   did because he said out of the whole
9   month --
10      Q.   That's your assumption.  But
11  you don't know if he did it, correct?
12      A.   Not to say yes, I was there
13  when he did it, no, I can't say that.
14      Q.   Do you know if -- Clint Teal,
15  do you know when he worked in appliances?
16      A.   No.
17      Q.   Do you know if he was working
18  in appliances at the time this
19  investigation was going on?
20      A.   Yes.  He worked -- He wasn't a
21  sales person I don't believe.  He was
22  working with the remodel team.
23      Q.   So he wasn't in sales at that

Page 204

1   point?
2       A.   Right.
3       Q.   Anybody else that you claim
4   that was not terminated for misusing the
5   service coupon besides Darby, Landers, and
6   Teal?
7       A.   No.
8       Q.   Do you know if Gandy pulled
9   Clint Teal's transactions?
10      A.   I don't know.  I know he
11  pulled the one that was supposedly run
12  under my number.
13      Q.   But you don't know if he
14  pulled the associate summaries and the
15  journal tapes for Clint's transactions?
16      A.   I don't.
17      But the transaction with the
18  sixty-five-dollar transaction was used
19  under Clint Teal's sale.
20      Q.   The sixty-five-dollar
21  transaction was, I'm sorry, what?
22      A.   Under his sale.  The sale that
23  he bought something.

51 (Pages 201 to 204)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO